## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TNC KAZCHROME JSC<br><br>                    Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>                    Defendant. | Court No. 25-00129 |

## <u>COMPLAINT</u>

Plaintiff TNC Kazchrome JSC ("Kazchrome"), by and through its counsel, files this Complaint to challenge the U.S. International Trade Commission's ("Commission") final affirmative injury determination with respect to imports of ferrosilicon from Brazil, Kazakhstan, and Malaysia ("Final Injury Determination"). The Final Injury Determination fails to account for the overwhelming *overselling* by ferrosilicon imports from Brazil, Kazakhstan, and Malaysia ("subject imports"). In so doing, the Commission erroneously identifies volume, price, and impact trends that relate to higher-priced subject imports. Further, the Commission relies on flawed import volume and market share calculations—offered by the U.S. ferrosilicon producers at the eleventh hour—that fundamentally contradict other record evidence and depart from the calculations presented to and used by the Commission throughout the relevant investigations. The Commission disregarded its original calculations by erasing them from a post-hearing staff report (after presenting different data sets in a pre-hearing staff report and through questions at the hearing) and failing to discuss them in any detail in the views accompanying its Final Injury Determination. The Commission also failed to explain why it rejected an alternative method of calculating apparent U.S. consumption proposed by the respondents (including Plaintiff) in the

1

relevant investigations. The Commission's failure to address material evidence and arguments related to the calculation of apparent U.S. consumption renders its Final Injury Determination unsupported by substantial evidence and contrary to law.

Even when it used the (flawed and unwarranted) revised import volume and market share calculations, the Commission ignored extensive record evidence demonstrating that subject imports did not injure the U.S. ferrosilicon industry. Specifically, the Commission failed to consider robust evidence that the volume of subject imports was not significant; that subject imports did not have adverse effects on the U.S. ferrosilicon industry's prices; and that subject imports did not adversely impact the U.S. industry's performance during the relevant period. Even accepting the Commission's last-minute shift in the calculation of import volumes and market shares, its Final Injury Determination was unlawful and unsupported by substantial evidence on the record.

Plaintiff alleges and states as follows:

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1.    Plaintiff seeks judicial review of the final affirmative material injury determination issued by the Commission in the antidumping and countervailing duty ("AD/CVD") investigations of *Ferrosilicon from Brazil, Kazakhstan, and Malaysia* (Inv Nos. 701–TA–712–714 and 731–TA–1679–1681 (Final)). Specifically, Plaintiff contests certain factual findings and legal conclusions that resulted in the Commission's final determination that subject imports caused material injury to the U.S. ferrosilicon industry between January 1, 2021 and June 30, 2024 (the period of investigation, or "POI"). The Commission issued this Final Injury Determination on May 12, 2025 and published it in the *Federal Register* on May 16, 2025. *See Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, 90 Fed. Reg. 21,078 (Int'l Trade Comm'n, May 16, 2025). The

Commission's Final Injury Determination and the accompanying public version of the Commission's views are contained in *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 (May 2025) ("USITC Pub. 5630"). The confidential version of the Commission's views were released to parties on the administrative protective order ("APO") on May 13, 2025. *See* EDIS Doc. ID 851151, *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Views of the Commission, Inv. Nos. 701-TA-712-714 and 731-TA-1679-1681 (Final) (May 13, 2025).

2.     On May 20, 2025, the U.S. Department of Commerce ("Commerce") published the AD/CVD orders ("Orders") that followed the Commission's Final Injury Determination. *See Ferrosilicon From Kazakhstan: Amended Final Countervailing Duty Determination; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Countervailing Duty Orders*, 90 Fed. Reg. 21,446 (Dep't of Commerce, May 20, 2025); *see also Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't of Commerce, May 20, 2025).

## JURISDICTION

3.     This action is brought pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i). This Court has jurisdiction over this action to review the Commission's Final Injury Determination pursuant to 28 U.S.C. § 1581(c), which grants the Court exclusive jurisdiction over civil actions under 19 U.S.C. § 1516a.

## STANDING

4.     Plaintiff is a Kazakhstani producer and exporter of ferrosilicon, the merchandise subject to the Commission's Final Injury Determination and the subsequent Orders issued by Commerce. Plaintiff participated in the Commission's investigation that resulted in the contested

Final Injury Determination by submitting factual information and argument on the record. Plaintiff was therefore an interested party within the meaning of 19 U.S.C. § 1677(9)(A) and has standing to bring this action under 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF ACTION

5.     Commerce published the Orders in the *Federal Register* on May 20, 2025. Plaintiff filed the Summons on June 20, 2025, within 30 days of the publication of the Orders.[1] Plaintiff files this Complaint within 30 days of the filing of the Summons. Accordingly, Plaintiff has filed the Summons and Complaint within the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Rule 3(a)(3) of the Rules of the Court of International Trade.

## PROCEDURAL HISTORY AND BACKGROUND

6.     On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively "Petitioners") filed a petition for AD and CVD measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia. *See Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation: Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of CC Metals and Alloys LLC and Ferroglobe USA, Inc*., Case Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-813, C-557-829, and C-821-839, USITC Inv. Nos. 701-TA-____-_____, 731-TA-____-____ (Mar. 28, 2024).

7.     On April 3, 2024, the Commission published the institution and scheduling notice for its preliminary phase injury investigations. *See Ferrosilicon From Brazil, Kazakhstan,*

---

[1]     June 20, 2025 is the last day of the 30-day period following publication of the CVD Order because June 19, 2025 is a federal holiday. *See* Rule 6(a)(1)(C) of the Rules of the Court of International Trade ("When the period is stated in days or a longer unit of time . . . include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

*Malaysia, and Russia; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 89 Fed. Reg. 23,042 (Int'l Trade Comm'n, Apr. 3, 2024). The Commission held a Staff Conference in these investigations on April 18, 2024 and accepted post-conference briefs from interested parties until April 23, 2024.

8.     On May 13, 2024, the Commission issued its preliminary determination that there is a reasonable indication that imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia had caused material injury to the U.S. ferrosilicon industry. *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia; Determinations*, 89 Fed. Reg. 43,435 (Int'l Trade Comm'n, May 17, 2024). The preliminary determination and public version of the Commission's views were set forth in *Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Inv Nos. 701-TA-712–715 and 731-TA-1679–1682 (Preliminary), USITC Pub. 5506 (May 2024) ("USITC Pub. 5506").

9.     Commerce issued its preliminary AD and CVD determinations for ferrosilicon from Russia under the default timelines provided for by the Tariff Act of 1930 (the "Act") and 19 C.F.R. § 351.205(b)(1). In other words, Commerce did not postpone these determinations pursuant to 19 C.F.R. § 351.205(b)(2). Consequently, on June 28, 2024, Commerce published its preliminary affirmative AD and CVD determinations for ferrosilicon from Russia. *See Ferrosilicon From the Russian Federation: Preliminary Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 53,949 (Dep't of Commerce, Jun. 28, 2024); *see also Ferrosilicon From the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 53,953 (Dep't of Commerce, Jun. 28, 2024).

10.     However, Commerce did postpone its preliminary AD and CVD determinations concerning ferrosilicon from Brazil, Kazakhstan, and Malaysia. As a result, Commerce published

its preliminary CVD determinations for Brazil, Kazakhstan, and Malaysia on September 10, 2024.[2]

Commerce published its preliminary AD determinations concerning ferrosilicon from Brazil,

Kazakhstan, and Malaysia on November 6, 2024.[3]

      11.     The divergent timelines for Commerce's preliminary determinations resulted in the

Commission's final phase injury investigations becoming staggered.  After Commerce issued its

preliminary AD and CVD determinations with respect to ferrosilicon from Russia, the Commission

published an initial scheduling notice for its final phase injury investigations.  *See Ferrosilicon*

*From Brazil, Kazakhstan, Malaysia, and Russia; Scheduling of the Final Phase of Countervailing*

*Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 56,407 (Int'l Trade Comm'n, Jul. 9,

2024).  On August 6, 2024, the Commission issued a revised schedule to conform the final phase

deadlines with Commerce's extended schedule for the issuance of a final CVD determination for

Russia.  *See Ferrosilicon From Brazil, Kazakhstan, Malaysia, and Russia; Revised Schedule for*

*the Subject Investigations*, 89 Fed. Reg. 65,671 (Int'l Trade Comm'n, Aug. 12, 2024) ("Revised

Commission Scheduling Notice").[4]

---

[2]     *See Ferrosilicon from Malaysia: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 73,364 (Dep't of Commerce, Sept. 10, 2024); *see also Ferrosilicon from the Republic of Kazakhstan: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 73,369 (Dep't of Commerce, Sept. 10, 2024); *Ferrosilicon from Brazil: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination in Part, and Alignment of Final Determination With Final Antidumping Duty Determination*, 89 Fed. Reg. 73,371 (Dep't of Commerce, Sept. 10, 2024).

[3]     *See Ferrosilicon from Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88,004 (Dep't of Commerce, Nov. 6, 2024); *see also Ferrosilicon from Kazakhstan: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88,007 (Dep't of Commerce, Nov. 6, 2024); *Ferrosilicon from Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 88,010 (Dep't of Commerce, Nov. 6, 2024).

[4]     Commerce published its final AD and CVD determinations for Russia on September 18, 2024.  *See Ferrosilicon from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 76,454 (Dep't of Commerce, Sept. 18, 2024); *see*

12.    Pursuant to this revised schedule, the Commission released the confidential Prehearing Staff Report in its final phase investigations on August 28, 2024. *See* Investigation Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final): Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia—Prehearing Report (Aug. 28, 2024) ("Prehearing Staff Report"). In this report, the Commission calculated apparent U.S. consumption using Petitioners' U.S. shipments data (submitted in response to the Commission's U.S. Producer Questionnaire) and official U.S. import statistics for imports of in-scope ferrosilicon.[5] *See* Prehearing Staff Report, at Table C-1. This data showed that apparent U.S. consumption increased between 2021 and 2022, but then declined between 2022 and 2023 and between interim 2023 and interim 2024. *See* Prehearing Staff Report, at Table C-1. The data further showed that subject imports lost U.S. market share in every year from 2021 to 2023 and between the interim periods. *See* Prehearing Staff Report, at Table C-1. By definition, then, this data showed that subject imports did not gain U.S. market share at the expense of the U.S. industry at any point during the POI.

13.    The Prehearing Staff Report further showed that the absolute volume of subject imports increased between 2021 and 2022, but declined between 2022 and 2023 and between the interim periods. *See* Prehearing Staff Report, at Table C-1. The volume of subject imports therefore followed trends in total apparent U.S. consumption. The import data also showed that the volume of non-subject imports increased by 25.9 percent over the full years of the POI (with a particularly significant increase of 81.9 percent between 2021 and 2022), and by 27.4 percent between the interim periods. *See* Prehearing Staff Report, at Table C-1.

---

also *Ferrosilicon From the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 76,450 (Dep't of Commerce, Sept. 18, 2024).

[5]    Specifically, the Commission used data from Commerce's Census Bureau for imports for consumption of ferrosilicon classified under U.S. Harmonized Tariff Schedule ("HTSUS") subheadings 7202.21.1000, 7202.21.5000, 7202.21.7500, 7202.21.9000, 7202.29.0010, and 7202.29.0050.

14.     Meanwhile, over the full years of the POI, the U.S. ferrosilicon producers enjoyed improvements across various metrics.  Between 2021 and 2023, the U.S. producers increased their practical capacity, production quantity, capacity utilization, U.S. shipments quantity, value, and unit values, and net sales quantity, value, and unit values.  *See* Prehearing Staff Report, at Table C-1.  The U.S. producers also improved most of their employment metrics.  *See* Prehearing Staff Report, at Table C-1.  The U.S. producers even managed to increase their U.S. shipments and gain market share between 2022 and 2023, when apparent U.S. consumption declined.  *See* Prehearing Staff Report, at Table C-1.

15.     The Prehearing Staff Report also presented an initial underselling analysis based on pricing product data collected by the Commission.  This analysis demonstrated that subject imports had oversold the domestic like product in the majority of instances over the POI.  *See* Prehearing Staff Report, at V-30-V-32.  Moreover, a <u>large majority</u> of subject import volumes for which the Commission collected pricing data had oversold the domestic like product.  *See* Prehearing Staff Report, at V-30-V-32.

16.     The Commission accepted pre-hearing briefs from interested parties until September 5, 2024.  *See* Revised Commission Scheduling Notice.  At no point in their pre-hearing brief did the Petitioners raise any concerns with the import volume or apparent U.S. consumption calculations presented in the Prehearing Staff Report.  Indeed, the Petitioners wholly avoided a discussion of any changes between the market share of the U.S. industry and subject imports, suggesting that the Petitioners accepted the Prehearing Staff Report's conclusions that no market share shift had occurred.

17.     Plaintiff also submitted a joint pre-hearing brief with certain Brazilian and Malaysian ferrosilicon producers (collectively, the "Joint Respondents").  In this brief, the Joint

Respondents highlighted the import volume and apparent U.S. consumption data from the Prehearing Staff Report, which showed that no market share shift from the U.S. industry to subject imports had occurred.  *See Ferrosilicon from Brazil, Malaysia, and Russia*, Joint Respondents' Prehearing Brief, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Sept. 5, 2024), at 7, 20 ("Joint Respondents' Prehearing Brief").  The Joint Respondents also noted the significant increase in non-subject imports at certain points during the POI and stressed that these imports disrupted any causal link between subject imports and the U.S. industry's performance.  *See* Joint Respondents' Prehearing Brief, at 21-24.

18.    With respect to price effects, the Joint Respondents highlighted data from the Prehearing Staff Report showing that subject imports had predominantly oversold the domestic like product.  *See id.* at 27.  The Joint Respondents also emphasized the disconnect between instances of underselling on the record and trends in the volume of subject imports.  Specifically, the Joint Respondents explained that, in the first year of the POI when subject imports had the highest import penetration, only a *de minimis* percent of this volume was identified as undersold.  *See id.* at 28 (internal citations omitted).  On such a record, a claim of price effects from subject imports cannot be sustained.  The Joint Respondents further refuted allegations of price depression by subject imports, referencing record evidence that the U.S. producers' prices were generally higher at the end of the POI from where they started in 2021.  *See id.* at 29.  With respect to price suppression, the Joint Respondents explained why the increase in the U.S. industry's cost of goods sold ("COGS") to net sales ratio over the POI was driven by particularly identified issues with one of the domestic producers that were completely unrelated to subject imports.  *See id.* at 30-31.  The Joint Respondents also described the significant non-price factors that influenced U.S. purchasers' sourcing decisions during the POI.  *See id.* at 34-35.

19.    Finally, the Joint Respondents explained why subject imports had not adversely impacted the U.S. industry.  In pertinent part, the U.S. producers experienced broad improvements during the full years of the POI, and declines in the industry's profitability during this period were driven by issues demonstrably unrelated to subject imports.  *See id.* at 40-52.  The Joint Respondents also explained why factors other than subject imports—namely, declines in demand and other specific domestic industry business decisions—accounted for any declines in the U.S. industry's performance during the interim period.  *See id.* at 52-56.

20.    The Commission held its hearing in these investigations on September 12, 2024. *See* Revised Commission Scheduling Notice.  For the first time at this hearing and when faced with a record that did not bear out any of their allegations, Petitioners raised concerns with the apparent U.S. consumption data from the Prehearing Staff Report and vaguely proposed that the Commission might use "the shipment data to calculate U.S. ferrosilicon consumption."  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia: Revised and Corrected Hearing Transcript*, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final) (Sept. 12, 2024), at 33:3-18 (Bay) ("Tr.").  However, Petitioners did not affirmatively articulate a specific methodology that the Commission should use to calculate apparent U.S. consumption—even when asked.

21.    The Commission accepted post-hearing briefs from interested parties until September 19, 2024.  *See* Revised Commission Scheduling Notice.  For the first time in their post-hearing brief, Petitioners presented two new methodologies for calculating apparent U.S. consumption.  The first method used U.S. producers' questionnaire data for U.S. shipments, official U.S. import statistics for Brazilian, Kazakhstani, Malaysian, and non-subject imports, and U.S. importers' U.S. shipments data for Russian imports.  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Petitioners' Post-Hearing Brief, Inv. Nos. 701-TA-712-715

and 731-TA-1679-1682 (Final) (Sept. 19, 2024), at 6-7, Exhibit 2 ("Petitioners' Post-Hearing Brief").  According to the Petitioners, this methodology ostensibly accounted for shifts in inventories of subject imports—namely a drawdown in inventories of Russian imports in the latter part of the POI.  *See* Petitioners' Post-Hearing Brief, at 6.  Under their second methodology, the Petitioners calculated all import volumes by adjusting the official U.S. import statistics for changes in U.S. importers' inventories and re-exports.  *See id.* at 8-9, Exhibit 3.  Again, Petitioners had not presented either of these calculations at any prior point in these investigations.

22.    In their post-hearing brief, the Joint Respondents explained why an apparent U.S. consumption calculation using shipment data for Russian imports is improper.  In particular, the Joint Respondents presented considerable evidence that inventories of subject imports from Russia did not have a material impact on the U.S. ferrosilicon market in 2023 and 2024, including specific details about the Russian imports and sworn declarations confirming that "customers have increasingly refused to purchase product imported from Russia, regardless of whether the product is already in the United States."  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Joint Respondents' Post-Hearing Brief, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final) (Sept. 19, 2024), at 4-5, Exhibit 1 APP-5-APP-10 ("Joint Respondents' Post-Hearing Brief").

23.    For the sake of comprehensiveness, the Joint Respondents also offered an alternative calculation of apparent U.S. consumption.  Specifically, the Joint Respondents proposed that the Commission calculate apparent U.S. consumption using U.S. importers' U.S. shipments data for all import sources, adjusted to account for the incomplete levels of questionnaire coverage.  *See* Joint Respondents' Post-Hearing Brief, at 6-7, Exhibit 1 APP-17-APP-20.  The Joint Respondents explained that, using this method, "both demand and subject import market share declined over the POI."  *Id.* at 6, Exhibit 1 APP-18.  This was consistent with

trends seen in the Commission's original market share analysis from the Prehearing Staff Report. Specifically, under the Joint Respondents' method, subject imports had considerably lower market share in interim 2024 than they had in 2021, while non-subject imports and domestically-produced ferrosilicon held higher market share in interim 2024 than they had in 2021.  *See id.* at 6-7, Exhibit 1 APP-19.

24.    In their post-hearing brief, the Joint Respondents provided further evidence that subject imports did not have adverse price effects on the U.S. industry over the POI.  Notably, the Joint Respondents explained that the most significant declines in the U.S. producers' prices occurred in periods where subject imports were overselling.  *See id.* at Exhibit 1 APP-30-APP-43. In addition, the Joint Respondents highlighted extensive witness testimony indicating that underselling in 2023 resulted not from price undercutting by subject imports, but from market dynamics that gave the U.S. producers negotiating power to keep prices relatively high.  *See id.* at Exhibit 1 APP-34-APP-37.  The fact that the U.S. producers gained market share between 2022 and 2023 further supported this view of the record.  *See id.* at Exhibit 1 APP-36.  The Joint Respondents also noted evidence that the pricing data for the contract-oriented products (*e.g.*, Pricing Products 1 and 3) included significant volumes sold under long-term contracts, and therefore did not meaningfully reflect head-to-head competition between the domestic like product and subject imports.  *See id.* at Exhibit 1 APP-38.  Finally, the Joint Respondents presented evidence that low-priced *non*-subject imports—and in particular, non-subject imports of 75 percent silicon content grade ferrosilicon—were responsible for pricing pressure in the U.S. market in the latter portions of the POI.  *See id.* at Exhibit 1 APP-51-APP-55 and Exhibit 3 p. 3.  For example, the average unit values ("AUVs") of shipments of 75 percent silicon content grade ferrosilicon

from non-subject sources were lower than the AUVs for domestic *and* subject import shipments of this product in interim 2024. *See id.* at Exhibit 1 APP-51-APP-55 and Exhibit 14.

25.    On October 2, 2024, the Commission released its confidential Final Staff Report to parties on the APO. In the Final Staff Report, the Commission only calculated apparent U.S. consumption using the first of Petitioners' new methodologies. Specifically, the Commission calculated apparent U.S. consumption by compiling U.S. producers' questionnaire data for U.S. shipments, official U.S. import statistics for Brazilian, Kazakhstani, Malaysian, and non-subject imports, and U.S. importers' U.S. shipments data for Russian imports. *See* Investigation Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final): Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia—Staff Report (Oct. 2, 2024) ("Final Staff Report"), at Table C-1. The Final Staff Report did not present Petitioners' second methodology or the methodology proposed by the Joint Respondents. The Final Staff Report also entirely erased the apparent U.S. consumption calculations that appeared in the Prehearing Staff Report.

26.    The Final Staff Report continued to show that subject imports' U.S. market share was lower in interim 2024 than in 2021. *See* Final Staff Report, at Table C-1. In addition, non-subject imports still held greater U.S. market share in interim 2024 than they held in 2021. *See id.* at Table C-1.

27.    The Final Staff Report continued to measure non-subject imports using official U.S. import statistics. To that end (and consistent with the Prehearing Staff Report), the Final Staff Report reiterated that non-subject imports increased by 25.9 percent between 2021 and 2023 and by 27.4 percent between interim 2023 and interim 2024. *See id.* at Table C-1. Of note, ferrosilicon imports from China surged by 12,843 percent between 2021 and 2022, from 189 short tons ("ST") to 24,462 ST. *See id.* at IV-8. Further, under the Commission's original apparent U.S.

consumption calculation <u>and</u> its revised calculation, non-subject imports gained U.S. market share between 2021 and 2023 and between the interim periods. *See* Prehearing Staff Report, at Table C-1; *see also* Final Staff Report, at Table C-1.

28.    Consistent with the Prehearing Staff Report, the Final Staff Report also contained robust evidence that subject imports had not had adverse price effects on the U.S. producers' prices. In particular, the final pricing data showed that subject imports oversold the domestic like product in nearly 60 percent of comparisons (88 of 148 instances) and an even higher percent of volumes accounted for by the Commission's pricing analysis. *See* Final Staff Report, at V-33–V-35. Moreover, the Final Staff Report continued to show that: (1) the U.S. producers' prices were generally higher at the end of the POI than at the beginning; and (2) the most significant declines in the U.S. producers' prices occurred in periods of subject import overselling. *See id.* at V-15–V-32.

29.    Finally, the Final Staff Report continued to show that the U.S. producers experienced broad performance improvements between 2021 and 2023, and that declines in the industry's financial metrics during this period were driven by trends not related to subject imports. *See id.* at V1-5–VI-10 and Table C-1.

30.    After releasing its Final Staff Report, the Commission accepted final comments from interested parties until October 9, 2024. *See* Revised Commission Scheduling Notice. In their final comments, the Joint Respondents reiterated that an apparent U.S. consumption calculation using shipments data for Russia was unwarranted, because Russian inventories did not have a material impact on the U.S. ferrosilicon market in 2023 and 2024. *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Joint Respondents' Final Comments, Inv. Nos. 701-

TA-712-715 and 731-TA-1679-1682 (Final) (Oct. 9, 2024), at 2-3 ("Joint Respondents' Final Comments").

31.    The Joint Respondents also explained why this revised calculation was unreliable. Specifically, the revised calculation showed an increase in apparent U.S. consumption between the interim periods, but considerable evidence elsewhere on the record indicated that U.S. ferrosilicon demand declined during this period.  *See* Joint Respondents' Final Comments, at 3-6.  That other evidence included sworn testimony from petitioners and respondents alike, responses to the Commission's questionnaires, data from the Final Staff Report related to downstream iron and steel demand, and the U.S. producers' recent financial results.  *See id.*; *see also* Joint Respondents' Prehearing Brief, at 42.

32.    Joint Respondents also recalled the extensive record evidence—presented throughout their post-hearing brief and the Final Staff Report—that subject imports were not responsible for declines in the U.S. producers' prices or performance indicators in the latter part of the POI.  *See* Joint Respondents' Final Comments, at 6-13.

33.    The Commission issued its final affirmative injury determination concerning ferrosilicon from Russia on November 5, 2024.  *See Ferrosilicon from Russia*, 89 Fed. Reg. 88,814 (Int'l Trade Comm'n, Nov. 8, 2024).  This final determination and the public version of the Commission's views were set forth in *Ferrosilicon from Russia*, Inv Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final), USITC Pub. 5556 (November 2024) ("USITC Pub. 5556").  The Commission also released the confidential version of its views to parties on the APO on November 5, 2024.  *See* EDIS Doc. ID 836462, *Ferrosilicon from Russia*, Inv. Nos. 701-TA-715 and 731-TA-1682 (Final) (Nov. 5, 2024) ("Commission Russia Views").

34.    In its views, the Commission found that the volume of subject imports was significant, based on the revised import volume and apparent U.S. consumption figures. The Commission failed to explain why it had ignored the Joint Respondents' proposal to calculate apparent U.S. consumption using coverage-adjusted questionnaire data for all import sources. *See* Commission Russia Views, at 39-40 fn. 189. Nor did it meaningfully engage with the Joint Respondents' evidence and arguments that inventories of subject imports from Russia did not materially impact the U.S. ferrosilicon industry in 2023 and 2024.

35.    The Commission did explain why it rejected the Joint Respondents' argument that other record evidence demonstrated the unreliability of the revised apparent U.S. consumption calculation. However, the Commission's explanation was inadequate and nonsensical. The Commission stated:

> An argument raised by Joint Respondents in their final comments is that the Commission's calculation is unreliable because it shows that apparent U.S. consumption was higher in interim 2024 than in interim 2023, which they allege is contradicted by testimony and other record evidence suggesting that demand was lower in interim 2024 than in interim 2023 . . . We find this argument unconvincing . . .the record evidence is mixed as to whether demand increased, decreased, or stayed the same over the course of the POI. Further, Joint Respondents' argument appears to assume that demand and apparent U.S. consumption are the same, which is not the case. Demand refers to consumers' willingness to purchase a product at various price levels, while consumption reflects what was actually purchased and sold in the market. Therefore, even if demand was lower in interim 2024, that would not foreclose the possibility of higher apparent domestic consumption relative to interim 2023.

*Id.* at 40, fn. 189.

36.    Calculations of apparent U.S. consumption based on shipment data might **_understate_** total demand if purchasers were satisfying their needs from their own previously-built inventories. However, calculations of apparent U.S. consumption based on shipment data could not **_overstate_** demand. To that end, any record evidence that demand was lower in interim 2024

than in interim 2023 directly calls apparent U.S. consumption figures that suggest otherwise into question. While the Joint Respondents presented extensive evidence that demand declined in interim 2024, the Commission almost entirely ignored that evidence in its views.

37.    Further, the Commission found that underselling by subject imports was significant. *See id.* at 45. However, in making this finding, the Commission ignored the fact that, overall, subject imports predominantly oversold the domestic like product (both in terms of instances and volume). The Commission considered pricing trends year to year but failed to consider the pricing trends as a whole.

38.    In addition, the Commission found that subject imports had suppressed U.S. producers' prices to a significant degree. *See id.* at 48. This finding seemed to hinge on the (flawed) assumption that apparent U.S. consumption increased in interim 2024, yet the U.S. producers did not raise their prices during that time. *See id.* at 48.

39.    Finally, the Commission found that subject imports had a significant adverse impact on the domestic ferrosilicon industry. The Commission found that subject imports caused declines in the domestic industry's performance in the latter part of the POI, despite the extensive evidence, provided by the Joint Respondents, which demonstrated alternative causes for the industry's condition. *See id.* at 53-59.

*    *    *

40.    Commerce published its final affirmative AD and CVD determinations for Brazil, Kazakhstan, and Malaysia on March 28, 2025.[6] After Commerce issued these determinations, the

---

[6]    *See Ferrosilicon From Brazil: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 14,112 (Dep't of Commerce, Mar. 28, 2025); *see also Ferrosilicon From Kazakhstan: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,077 (Dep't of Commerce, Mar. 28, 2025); *Ferrosilicon From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,105 (Dep't of Commerce, Mar. 28, 2025); *Ferrosilicon From Brazil: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 Fed. Reg. 14,114 (Dep't of Commerce, Mar.

Commission issued a supplementary scheduling notice for its final injury determination concerning ferrosilicon from Brazil, Kazakhstan, and Malaysia. *See Ferrosilicon From Brazil, Kazakhstan, and Malaysia; Supplemental Schedule for the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 90 Fed. Reg. 14,869 (Int'l Trade Comm'n, Apr. 4, 2025) ("Commission Supplemental Scheduling Notice"). Pursuant to that notice, the Commission accepted additional final comments from interested parties addressing Commerce's final AD and CVD margins until April 11, 2025. *See* Commission Supplemental Scheduling Notice.

41.    The Commission then issued the contested Final Injury Determination on May 12, 2025. For this determination, the Commission adopted its findings and analysis regarding material injury from its November 2024 determination concerning Russian imports. *See* USITC Pub. 5630, at 7. To that end, the material injury findings presented in USITC Pub. 5556 and the Commission's Russia Views are incorporated by reference into the Final Injury Determination.

## STATEMENT OF CLAIMS

42.    The Commission's Final Injury Determination is unsupported by substantial evidence on the record and otherwise not in accordance with the law, as averred in Counts I through VII.

43.    The Commission's Final Injury Determination relied on calculations of subject import volumes and apparent U.S. consumption that fundamentally diverged from the calculations presented in the Prehearing Staff Report. The Commission performed these new calculations in response to Petitioners' eleventh-hour proposal that subject imports from Russia be measured based on U.S. importers' U.S. shipments data. Petitioners wholly failed to raise this issue before

---

28, 2025); *Ferrosilicon From the Republic of Kazakhstan: Final Affirmative Countervailing Duty Determination*, 90 Fed. Reg. 14,108 (Dep't of Commerce, Mar. 28, 2025); *Ferrosilicon From Malaysia: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 90 Fed. Reg. 14,075 (Dep't of Commerce, Mar. 28, 2025).

the Commission's September 12, 2024 hearing.  Further, the Petitioners did not propose specific, alternative calculation methodologies until they filed their post-hearing brief.  In any event, the Joint Respondents provided ample evidence and argument in their post-hearing brief and final comments demonstrating that a revised methodology for calculating subject import volumes and apparent U.S. consumption would be unwarranted.  Further, the Joint Respondents: (1) explained why calculations that only used U.S. importers' U.S. shipments data for Russia would be unreliable; and (2) offered an alternative method that would use coverage-adjusted questionnaire data to measure import volumes from all sources.  Inexplicably, the Commission accepted Petitioners' last-minute methodological change, erased and ignored its original apparent U.S. consumption calculations, and failed to meaningfully address Joint Respondents' arguments and proposals related to the calculation of apparent U.S. consumption. The Commission's spotty reasoning behind this fundamental methodological shift renders its Final Injury Determination unsupported by substantial evidence on the record and unlawful.

44.     Even accepting the Commission's revised calculations for subject import volumes and apparent U.S. consumption, the Commission's Final Injury Determination still fails to account for robust evidence demonstrating that subject imports did not injure the domestic industry over the POI.  Indeed, even with the aforementioned revisions, extensive evidence supporting a negative injury determination remained undisturbed.  In particular, it remained true that: (1) the domestic producers gained U.S. market share between 2021 and 2023; (2) subject imports had lower market share at the end of the POI than at the beginning; (3) subject imports predominantly oversold the domestic like product; (4) the domestic producers' prices were generally higher at the end of the POI than at the beginning; (5) significant non-price factors influenced purchasers' sourcing decisions for ferrosilicon; (6) the U.S. industry improved across various operational metrics

between 2021 and 2023; and (7) declines in the domestic industry's financial performance were driven by the U.S. producers' internal issues and strategic decisions, not subject imports. For those reasons, the Commission's Final Injury Determination is unsupported by substantial evidence on the record and not in accordance with law.

## CLAIMS

### COUNT I

45.      Paragraphs 1-44 are incorporated by reference.

46.      The Commission's determination that "the volume of cumulated subject imports is significant, in absolute terms and relative to both consumption and production in the United States" and the related findings on which this conclusion rests, are unsupported by substantial evidence on the record and otherwise not in accordance with law.

47.      Among other errors, the Commission:

  a.  Incorrectly quantified subject imports and apparent U.S. consumption;

  b.  Failed to account for the fact that imports filled crucial gaps in supply that domestic producers could not, or would not, supply;

  c.  Failed to account for record evidence when assessing inventory volumes, particularly regarding subject imports from Russia.

48.      Further, the Commission failed to account for evidence and argument related to the proper calculation of subject import volumes and apparent U.S. consumption. Instead, the Commission adopted an unreliable, unwarranted, and last-minute method for calculating these figures. The Commission inexplicably disregarded its original calculation methods and ignored proposals for alternative calculation methods, thereby depriving Plaintiff of the opportunity to fully assess and rebut the conclusions that ultimately formed the basis of the Commission's findings.

**COUNT II**

49. Paragraphs 1-44 are incorporated by reference.

50. The Commission's determination that subject imports undersold the domestic like product to a significant degree was unlawful and unsupported by substantial evidence on the record.

51. Among other errors, the Commission failed to account for the overwhelming prevalence of overselling; failed to explain how its finding on lost sales is not undermined by the prevalence of overselling in the pricing data; failed to explain why it gave more weight to anecdotal and unverified information than to the Commission's own pricing data; failed to address the lack of correlation between volume and price trends; and failed to account for evidence that U.S. prices were rising late in the POI.

**COUNT III**

52. Paragraphs 1-44 are incorporated by reference.

53. The Commission's determination that subject imports suppressed prices for the domestic like product was unlawful and unsupported by substantial evidence on the record.

**COUNT IV**

54. Paragraphs 1-44 are incorporated by reference.

55. The Commission's determination that subject imports had significant price effects was unlawful and unsupported by substantial evidence on the record.

**COUNT V**

56. Paragraphs 1-44 are incorporated by reference.

57.    The Commission's determination that subject imports had a significant adverse impact on the domestic industry was unlawful and unsupported by substantial evidence on the record.

## COUNT VI

58.    Paragraphs 1-44 are incorporated by reference.

59.    The Commission's determination that the domestic industry experienced material injury by reason of the subject imports was unlawful and unsupported by substantial evidence on the record.

60.    Specifically, the Commission failed to account for the reporting by domestic producers regarding business decisions that affected supply and profitability.

## COUNT VII

61.    Paragraphs 1-44 are incorporated by reference.

62.    The Fifth Amendment requires that no person be deprived of their property without due process of law.  *Matthews v. Eldridge*, 424 U.S. 319, 332-22 (1976); *see also Young v. Dep't of Housing and Urban Development*, 706 F.3d 1373, 1376 (Fed. Cir. 2013).

63.    Procedural due process requires that certain substantive rights, such as a property interest, cannot be deprived unless constitutionally adequate procedures are followed.  *See 2910 Georgia Avenue LLC v. District of Columbia*, 234 F. Supp.3d 281 (D.D.C. 2017).  The Federal Circuit has explained that notice and an opportunity to be heard are essential requirements of due process.  *See Young*, 706 F.3d at 1376.

64.    The Commission must adhere "to the procedures which Congress has set out in the statutes and {the Commission} has implemented in regulations."  *PPG Indus., Inc. v. United States*, 708 F. Supp. 1327, 1332 (Ct. Int'l Trade 1989), *aff'd*, 978 F.2d 1232 (Fed. Cir. 1992).

65.     The Commission denied Plaintiff a meaningful opportunity to participate and rebut figures that became the core of the Commission's findings on material injury—namely, an eleventh-hour revision of apparent U.S. consumption figures using U.S. shipment volumes rather than official U.S. import statistics for Russian imports, as had been used throughout the investigations since the preliminary phase.  The shifting methodology at the eleventh hour of these investigations overemphasized data on inventory of subject imports from Russia, and did so only in a post-hearing staff report.  This methodology was against contrary record evidence and presented so late in the proceedings that Plaintiff was deprived of an opportunity to address the new presentation of the data on which significant findings ultimately rested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(A)     Enter judgment in favor of Plaintiff;

(B)     Declare the Commission's Final Injury Determination unsupported by substantial evidence on the record and otherwise not in accordance with law;

(C)     Declare that the recalculation of apparent U.S. consumption using questionnaire data for Russian imports violated Plaintiff's procedural due process rights;

(D)     Remand this matter to the Commission to issue a revised final determination in conformity with this Court's decision; and

(E)     Grant Plaintiff such additional relief as the Court may deem just and appropriate.

Dated: July 18, 2025                          Respectfully submitted,

                                              */s/ Christine M. Streatfeild*
                                              Christine M. Streatfeild
                                              Justin R. Becker
                                              Lauren Shapiro
                                              Baker & McKenzie LLP
                                              815 Connecticut Avenue, N.W.
                                              Washington, DC 20006-4078
                                              Tel.: (202) 835-6111
                                              christine.streatfeild@bakermckenzie.com

                                              *Counsel to Plaintiff TNC Kazchrome JSC*