UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE LISA W. WANG, JUDGE

TNC KAZCHROME JSC

               Plaintiff,

v.

UNITED STATES,

               Defendant.

and

CC METALS AND ALLOYS, LLC AND
FERROGLOBE USA, INC.

          Defendant-Intervenors.

Court No. 25-cv-00129

**NON-CONFIDENTIAL
VERSION**

**Business Proprietary
Information Contained in
Brackets ("[|]") and Removed
From Pages 5, 9, 10, 15, 24-26,
28, 31, and 34-42**

**PLAINTIFF TNC KAZCHROME JSC'S RULE 56.2 MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Christine M. Streatfeild
Lauren Shapiro

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

February 19, 2026

*Counsel to Plaintiff TNC Kazchrome JSC*

# TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ................................................................................. 1

   A. Administrative Determination to Be Reviewed ................................................. 1

   B. Issues Presented and Summary of Argument ................................................... 2

II.   STATEMENT OF FACTS ................................................................................. 6

III.  STANDARD OF REVIEW ............................................................................. 18

IV.   ARGUMENT ................................................................................................. 20

   A. The Commission's Volume Analysis Was Unsupported By Substantial Evidence and
Otherwise Unlawful ....................................................................................... 20

     i.  The Commission Acted Unlawfully When It Adopted Petitioners' Last-Minute
Recalculation of Apparent U.S. Consumption, While Inexplicably Erasing Its Past
Calculations and Failing to Meaningfully Address Alternative Methods ...................... 21

     ii. The Commission's Determination That Subject Imports Volumes Were "Significant"
Relative to U.S. Consumption Was Unlawful ................................................... 27

   B. The Commission's Price Effects Analysis Was Unsupported By Substantial Evidence .. 29

     i.  The Commission's Underselling Analysis Was Unsupported By Substantial Evidence
and Inconsistent with Prior Determinations .................................................... 30

     ii. The Commission Failed to Provide a Reasoned Explanation For Rejecting Joint
Respondents' Arguments Regarding the 2023 Pricing Trends .......................... 32

     iii. The Commission's Determination That Subject Imports Suppressed Prices for U.S.-
Produced Ferrosilicon Was Unsupported By Substantial Evidence ................................ 36

   C. The Commission's Impact Analysis Was Unsupported By Substantial Evidence ........... 37

     i.  The Commission Failed to Address Compelling Arguments That Factors Other Than
Subject Imports Explain the U.S. Industry's Performance in 2023 .................................. 38

     ii. The Commission's Impact Analysis for the Interim Period Relied on Inappropriate
Calculations and Was Therefore Unlawful ....................................................... 40

V.    CONCLUSION ............................................................................................... 42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
    167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ........................................................19

*Atlantic Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)..............................................................................18

*Chemours Company FC, LLC v. United States*,
    443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ........................................................19

*Chr. Bjelland Seafoods A/S v. United States*,
    19 C.I.T. 35 (Ct. Int'l Trade 1995) ........................................................................20

*DAK Americas LLC v. United States*,
    456 F.Supp. 3d 1340 (Ct. Int'l Trade 2020) ..........................................................20

*Hynix Semiconductor, Inc. v. United States*,
    431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ........................................................20

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)..............................................................................18

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992)................................................................................19

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ...............................................................................................19

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................18

19 U.S.C. § 1673d(b)(B) ...................................................................................................20

19 U.S.C. § 1677(7)(C)(i) .............................................................................................3, 20

19 U.S.C. § 1677(7)(C)(ii) ...........................................................................................4, 29

19 U.S.C. § 1677(7)(C)(iii)(V) ..........................................................................................19

**Regulations**

19 C.F.R. § 351.205(b)(1)....................................................................................................6

19 C.F.R. § 351.205(b)(2)........................................................................................................7

**Administrative Determinations**

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, 90 Fed. Reg. 21,078 (Int'l
    Trade Comm'n, May 16, 2025)............................................................................1

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia; Determinations*, 89
    Fed. Reg. 43,435 (Int'l Trade Comm'n, May 17, 2024)........................................6

*Ferrosilicon from Russia*, 89 Fed. Reg. 88,814 (Int'l Trade Comm'n, Nov. 8,
    2024) ....................................................................................................................16

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-712–714
    and 731-TA-1679–1681 (Final), USITC Pub. 5620 (May 2025) ...................1, 7, 18

## I.   RULE 56.2 STATEMENT

### A.  Administrative Determination to Be Reviewed

Plaintiff seeks judicial review of the final affirmative material injury determination issued

by the Commission in the antidumping and countervailing duty ("AD/CVD") investigations of

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia* (Inv Nos. 701–TA–712–714 and 731–TA–

1679–1681 (Final)).  Specifically, Plaintiff challenges the Commission's injury determination

where the record demonstrated neither lost market share nor price suppression or depression, and

where the Petitioners presented data and evidence ***three*** separate times that confirmed the lack of

material injury across these key factors.  Then, following the Commission's final phase hearing,

Petitioners advanced a new theory to rework shipment data to suit their goals.  Even that data

fails to sustain a material injury finding with respect to the U.S. ferrosilicon industry between

January 1, 2021 and June 30, 2024 (the period of investigation, or "POI").  The Commission

issued this Final Injury Determination on May 12, 2025 and published it in the *Federal Register*

on May 16, 2025.  *See Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, 90 Fed. Reg. 21,078

(Int'l Trade Comm'n, May 16, 2025), P.R. 180.

The Commission's Final Injury Determination and the accompanying public version of

the Commission's Views are contained in *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*,

Inv. Nos. 701-TA-712–714 and 731-TA-1679–1681 (Final), USITC Pub. 5620 (May 2025)

("USITC Pub. 5620"), P.R. 178.  The confidential version of the Commission's Views were

released to parties on the administrative protective order ("APO") on May 13, 2025.  *See* EDIS

Doc. ID 851151, *Ferrosilicon from Brazil, Kazakhstan, and Malaysia, Views of the Commission*,

Inv. Nos. 701-TA-712-714 and 731-TA-1679-1681 (Final) (May 13, 2025), C.R. 214.

### B.  Issues Presented and Summary of Argument

**i.  Did the Commission act unlawfully when it relied on Petitioners' eleventh-hour and factually unsupported method for calculating apparent U.S. consumption, while erasing its original calculations from the Final Staff Report and failing to address other proposed calculation methods?**

Yes.  Through its dependence on data from the Final Staff Report, the Commission's Final Injury Determination relied on an apparent U.S. consumption calculation that used U.S. importers' U.S. shipment data to measure Russian subject imports and official U.S. import statistics to measure all other sources of imports.  This method—which was only offered by Petitioners for the first time in their post-hearing brief—fundamentally departed from the method presented in the Prehearing Staff Report and diverged from Commission practice.  When it adopted Petitioners' eleventh-hour method in the Final Staff Report, the Commission inexplicably erased its original apparent U.S. consumption calculations.  Not only did Petitioners fail to follow the thrust of the statute and regulations with their self-serving pivot on the data, but then the Commission also outright ignored or failed to rationally address robust evidence that called the reliability of Petitioners' new method into question.  Further, the Commission inexplicably rejected or ignored other alternative calculation methods offered by interested parties, which provided a more accurate estimate of apparent U.S. consumption—and in no event could lawfully be ignored, particularly given the timing of Petitioners' new-found theory of the case.  For these reasons, the Commission's adoption of the apparent U.S. consumption calculation advanced by Petitioners and presented in the Final Staff Report was unlawful and unsupported by substantial evidence.

### ii. Was the Commission's determination that the volume of subject imports was legally "significant" supported by substantial evidence?

No.  The Commission's determination that the volume of subject imports was "significant" within the meaning of 19 U.S.C. § 1677(7)(C)(i) relied on faulty conclusions, such as the conclusion that subject imports had meaningfully increased their U.S. market share between the interim periods.  These conclusions, however, were grounded in the unreliable and unlawful apparent U.S. consumption calculations presented in the Final Staff Report.  As a result, the Commission's determination that the volume of subject imports was legally "significant" was also unlawful and unsupported by substantial evidence.

Even accepting the apparent U.S. consumption calculations in the Final Staff Report (which Plaintiff does not), the Commission's affirmative injury determination based on these calculations remains unlawful.  The Commission inexplicably departed from past practice when it made an affirmative material injury determination, even though: (1) the domestic industry consistently **gained** U.S. market share over the full years of the POI; (2) cumulated subject imports consistently **declined** over the full years of the POI; (3) cumulated subject imports consistently **lost** U.S. market share over the full years of the POI; and (4) subject imports ended interim 2024 with **lower** U.S. market share than they had in 2021.  These plain facts simply cannot support a material injury finding, particularly without explanation or reconciliation with prior cases.

### iii. Was the Commission's determination that subject imports undersold the domestic like product to a significant degree—despite a record of predominant overselling—supported by substantial evidence?

No.  The record showed: (1) predominant overselling over the POI (both in terms of instances and volumes oversold); and (2) average and maximum overselling margins that were far larger than the average and maximum underselling margins.  A finding of significant

3

underselling cannot be sustained on these facts.  Indeed, the Commission's finding of significant underselling in this case inexplicably departs from prior determinations in which the Commission found no significant underselling on similar facts.  The Commission's failure to explain why these past determinations were distinguishable renders its underselling analysis unlawful and unsupported by substantial evidence.

In addition, when analyzing pricing trends, the Commission failed to provide coherent or logical reasons for rejecting Joint Respondents' arguments that the "underselling" shown in 2023 was not actually reflective of adverse price effects.  Specifically, the Commission provided virtually no explanation for rejecting the argument that domestic ferrosilicon prices were higher than subject import prices in 2023 due to the outsized bargaining power that the U.S. producers had had during negotiations with customers (in late-2022) over the terms for their 2023 contracts.  The Commission's flawed reasons for rejecting Joint Respondents' arguments contaminated its finding of significant underselling, rendering that finding unsupported by substantial evidence and not in accordance with law.

### iv.  Was the Commission's price suppression determination supported by substantial evidence?

No.  The Commission found that subject import prices suppressed U.S. producers' prices in interim 2024—that is, they prevented domestic price increases, which otherwise would have occurred, to a significant degree.  *See* 19 U.S.C. § 1677(7)(C)(ii).  The Commission found that the U.S. producers' U.S. prices did not increase between the interim periods despite an increase in apparent U.S. consumption.  However, this entire finding was based on a faulty premise— namely, that apparent U.S. consumption increased between the interim periods.  But it did not. Using proper calculations from the Prehearing Staff Report, apparent U.S. consumption declined substantially between the interim periods, fully explaining any declines in U.S. producers' prices

in interim 2024.  In other words, the entire price suppression determination rests on manipulated data.  Because the Commission's price suppression finding relied entirely on an unsubstantiated apparent U.S. consumption calculation for interim 2024, it too was unlawful and unsupported by substantial evidence.

### v. Was the Commission's determination that subject imports had significant price effects supported by substantial evidence?

No.  The Commission found that subject imports had significant effects on prices of the domestic like product based on its findings that subject imports undersold the domestic like product to a significant degree and suppressed domestic producers' prices to a significant degree. As explained in Section IV.B below, both of these findings were legally and factually flawed. Therefore, the Commission's overarching determination of significant price effects was also unsupported by substantial evidence and unlawful.

### vi. Was the Commission's determination that subject imports had a significant adverse impact on the U.S. ferrosilicon industry supported by substantial evidence?

No.  The Commission failed to meaningfully address evidence and argument regarding the alternative factors that were responsible for the domestic industry's performance over the POI.  With respect to the full years of the POI, the Commission entirely ignored certain evidence and argument regarding **[                                             ]**, which had nothing to do with subject imports and **[                                                          ]**.  With respect to interim 2024, the Commission's impact- and causation-related findings depended on the unlawful apparent U.S. consumption calculations presented in the Final Staff Report. Reliance on these calculations infected the Commission's analysis of market share trends, demand, and trends in the domestic industry's operational metrics.  As a result, the Commission's

impact and causation analysis for interim 2024 was unlawful and unsupported by substantial evidence.

## II.    STATEMENT OF FACTS

On March 28, 2024, CC Metals and Alloys, LLC ("CC Metals") and Ferroglobe USA, Inc. ("Ferroglobe") (collectively "Petitioners") filed a petition for AD and CVD measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia.  *See Ferrosilicon from Brazil, Malaysia, the Republic of Kazakhstan, and the Russian Federation: Petitions for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, on Behalf of CC Metals and Alloys LLC and Ferroglobe USA, Inc.*, Case Nos. A-351-860, A-834-812, A-557-828, A-821-838, C-351-861, C-834-813, C-557-829, and C-821-839, USITC Inv. Nos. 701-TA-____-____, 731-TA-____-____ (Mar. 28, 2024), C.R. 1, P.R. 1.

On April 3, 2024, the Commission published the institution and scheduling notice for its preliminary phase injury investigations.  *See Ferrosilicon From Brazil, Kazakhstan, Malaysia, and Russia; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 89 Fed. Reg. 23,042 (Int'l Trade Comm'n, Apr. 3, 2024), P.R. 9.  The Commission held a Staff Conference in these investigations on April 18, 2024 and accepted post-conference briefs from interested parties until April 23, 2024.

On May 13, 2024, the Commission issued its preliminary determination that there was a reasonable indication that imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia had caused material injury to the U.S. ferrosilicon industry.  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia; Determinations*, 89 Fed. Reg. 43,435 (Int'l Trade Comm'n, May 17, 2024), P.R. 75.

Commerce issued its preliminary AD and CVD determinations for ferrosilicon from Russia under the default timelines provided for by the Tariff Act of 1930 and 19 C.F.R. § 351.205(b)(1). That is, Commerce did not postpone these determinations pursuant to 19 C.F.R. § 351.205(b)(2). Consequently, on June 28, 2024, Commerce published its preliminary affirmative AD and CVD determinations for ferrosilicon from Russia. *See* USITC Pub. 5620, at 1.1, P.R. 178.

However, Commerce did postpone its preliminary AD and CVD determinations concerning ferrosilicon from Brazil, Kazakhstan, and Malaysia. As a result, Commerce published its preliminary CVD and AD determinations for these countries on September 10, 2024 and November 6, 2024, respectively. *See* USITC Pub. 5620, at 1.1-1.2, P.R. 178.

The divergent timelines for Commerce's preliminary determinations resulted in the Commission's final phase injury investigations becoming staggered. After Commerce issued its preliminary determinations for ferrosilicon from Russia, the Commission published an initial scheduling notice for its final phase injury investigations. *See Ferrosilicon From Brazil, Kazakhstan, Malaysia, and Russia; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 56,407 (Int'l Trade Comm'n, Jul. 9, 2024), P.R. 93. On August 6, 2024, the Commission issued a revised schedule to conform its final phase deadlines with Commerce's extended schedule for the final CVD determination for Russia. *See Ferrosilicon From Brazil, Kazakhstan, Malaysia, and Russia; Revised Schedule for the Subject Investigations*, 89 Fed. Reg. 65,671 (Int'l Trade Comm'n, Aug. 12, 2024) ("Revised Commission Scheduling Notice"), P.R. 101.[1]

---

[1]    Commerce published its final AD and CVD determinations for Russia on September 18, 2024. *See* USITC Pub. 5620, at 1.2, P.R. 178.

Pursuant to this revised schedule, the Commission released its confidential Prehearing Staff Report on August 28, 2024. *See* Investigation Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final): Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia—Prehearing Report (Aug. 28, 2024) ("Prehearing Staff Report"), C.R. 173, P.R. 110. In this report, the Commission calculated apparent U.S. consumption using Petitioners' U.S. shipments data (submitted in response to the Commission's U.S. Producer Questionnaire) and official U.S. import statistics for in-scope ferrosilicon.[2] *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. This data showed that apparent U.S. consumption increased between 2021 and 2022 but declined between 2022 and 2023 and between interim 2023 and interim 2024. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. The data further showed that subject imports lost U.S. market share in every year from 2021 to 2023 and between the interim periods. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. By definition, then, subject imports did not gain U.S. market share at the expense of the U.S. industry at any point during the POI.

The Prehearing Staff Report further showed that the absolute volume of subject imports increased between 2021 and 2022 but declined between 2022 and 2023 and between the interim periods. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. The volume of subject imports therefore followed trends in total apparent U.S. consumption. The import data also showed that the volume of non-subject imports increased by 25.9 percent over the full years of the POI (with a particularly significant increase of 81.9 percent between 2021 and 2022), and by 27.4 percent between the interim periods. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.

---

[2]    The Commission used data from Commerce's Census Bureau for imports for consumption of ferrosilicon classified under U.S. Harmonized Tariff Schedule ("HTSUS") subheadings 7202.21.1000, 7202.21.5000, 7202.21.7500, 7202.21.9000, 7202.29.0010, and 7202.29.0050.

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

Meanwhile, over the full years of the POI, the U.S. producers realized clear and demonstrable improvements across various metrics. Between 2021 and 2023, the U.S. producers increased their practical capacity, production quantity, capacity utilization, U.S. shipments quantity, value, and unit values, and net sales quantity, value, and unit values. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. The U.S. producers also improved most of their employment metrics. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. The U.S. producers even managed to increase their U.S. shipments and gain market share between 2022 and 2023, when apparent U.S. consumption declined. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.

The Prehearing Staff Report also presented an underselling analysis based on pricing product data collected by the Commission. This analysis demonstrated that subject imports oversold the domestic like product in the majority of instances over the POI. *See* Prehearing Staff Report, at V-30-V-32, C.R. 173, P.R. 110. Moreover, a large majority of subject import volumes for which the Commission collected pricing data ([     ] percent) had oversold the domestic like product. *See* Prehearing Staff Report, at V-30-V-32, C.R. 173, P.R. 110.

The Commission accepted pre-hearing briefs from interested parties until September 5, 2024. *See* Revised Commission Scheduling Notice, P.R. 101. At no point in their pre-hearing brief did Petitioners question the import volume or apparent U.S. consumption calculations presented in the Prehearing Staff Report. Indeed, Petitioners wholly avoided a discussion of any changes between the market share of the U.S. industry and subject imports, suggesting that they accepted the Prehearing Staff Report's conclusions that no market share shift had occurred.

Plaintiff also submitted a joint pre-hearing brief with certain Brazilian and Malaysian ferrosilicon producers (collectively, "Joint Respondents"). In this brief, Joint Respondents

9

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

highlighted the import volume and apparent U.S. consumption data from the Prehearing Staff

Report, which showed that no market share shift from the U.S. industry to subject imports had

occurred. *See Ferrosilicon from Brazil, Malaysia, and Russia*, Joint Respondents' Prehearing

Brief, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Sept. 5, 2024), at 7, 20 ("Joint

Respondents' Prehearing Brief"), C.R. 175, P.R. 117.  Joint Respondents also noted the

significant increase in non-subject imports at certain points during the POI and stressed that these

imports disrupted any causal link between subject imports and the U.S. industry's performance.

*See* Joint Respondents' Prehearing Brief, at 21-24, C.R. 175, P.R. 117.

With respect to price effects, Joint Respondents highlighted data from the Prehearing

Staff Report showing predominant overselling by subject imports.  *See* Joint Respondents'

Prehearing Brief, at 27, C.R. 175, P.R. 117.  Joint Respondents also emphasized the disconnect

between instances of underselling on the record and trends in the volume of subject imports.

Specifically, Joint Respondents explained that, in the first year of the POI when subject imports

had the highest import penetration, only a *de minimis* percent of this volume was identified as

undersold.  *See* Joint Respondents' Prehearing Brief, at 28 (internal citations omitted), C.R. 175,

P.R. 117.  This timing point is of crucial importance, as indeed, on such a record, a claim of price

effects from subject imports cannot be sustained.  The record also could not support allegations

of price depression by subject imports, as the U.S. producers' prices were generally higher at the

end of the POI from where they started in 2021.  *See* Joint Respondents' Prehearing Brief, at 29,

C.R. 175, P.R. 117.  With respect to price suppression, Joint Respondents explained why the

increase in the U.S. industry's cost of goods sold ("COGS")-to-net sales ratio over the POI was

driven by particularly identified issues with [                                    ] that were

completely unrelated to subject imports.  *See* Joint Respondents' Prehearing Brief, at 30-31, C.R.

175, P.R. 117.  Joint Respondents also described the significant non-price factors that influenced

U.S. purchasers' sourcing decisions during the POI.  *See* Joint Respondents' Prehearing Brief, at

34-35, C.R. 175, P.R. 117.

Finally, Joint Respondents explained why subject imports had not adversely impacted the

U.S. industry.  In pertinent part, the U.S. producers experienced broad improvements during the

full years of the POI, and declines in the industry's profitability during this period were driven by

issues demonstrably unrelated to subject imports.  *See* Joint Respondents' Prehearing Brief, at

40-52, C.R. 175, P.R. 117.  Joint Respondents also explained why factors other than subject

imports—namely, declines in demand and specific domestic industry business decisions—

accounted for any declines in the U.S. industry's performance during the interim period.  *See*

Joint Respondents' Prehearing Brief, at 52-56, C.R. 175, P.R. 117.

The Commission held its hearing in these investigations on September 12, 2024.  *See*

Revised Commission Scheduling Notice, P.R. 101.  For the first time at this hearing and only in

response to a question after Petitioners' complete affirmative testimony, Petitioners raised

concerns with the apparent U.S. consumption data from the Prehearing Staff Report and vaguely

proposed that the Commission might use "the shipment data to calculate U.S. ferrosilicon

consumption."  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia: Revised and*

*Corrected Hearing Transcript*, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final) (Sept.

12, 2024), at 33:3-18 (Bay) ("Tr."), P.R. 129.  However, Petitioners had no calculations

available, presented no data, and did not affirmatively articulate a specific methodology that the

Commission should use to calculate apparent U.S. consumption—even when asked.

The Commission accepted post-hearing briefs from interested parties until September 19,

2024.  *See* Revised Commission Scheduling Notice, P.R. 101.  For the first time in their post-

hearing brief—and with only one final (and limited) comment opportunity left for Respondents, Petitioners presented two new methodologies for calculating apparent U.S. consumption. The first method used U.S. producers' questionnaire data for U.S. shipments, official U.S. import statistics for Brazilian, Kazakhstani, Malaysian, and non-subject imports, and U.S. importers' U.S. shipments data for Russian imports. *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Petitioners' Post-Hearing Brief, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final) (Sept. 19, 2024), at 6-7, Exhibit 2 ("Petitioners' Post-Hearing Brief"), C.R. 184, P.R. 126. According to Petitioners, this methodology ostensibly accounted for shifts in inventories of subject imports—namely a drawdown in inventories of Russian imports in the latter part of the POI. *See* Petitioners' Post-Hearing Brief, at 6, C.R. 184, P.R. 126. Under their second methodology, Petitioners calculated all import volumes by adjusting the official U.S. import statistics for changes in U.S. importers' inventories and re-exports. *See* Petitioners' Post-Hearing Brief, at 8-9, Exhibit 3, C.R. 184, P.R. 126. Again, Petitioners had not presented either of these calculations at any prior point in these investigations.

Joint Respondents addressed Petitioners' vague hearing testimony by explaining why an apparent U.S. consumption calculation using shipment data for Russian imports was improper. In particular, Joint Respondents presented considerable evidence that inventories of subject imports from Russia did not have a material impact on the U.S. ferrosilicon market in 2023 and 2024, including specific details about the Russian imports and sworn declarations confirming that "customers have increasingly refused to purchase product imported from Russia, regardless of whether the product is already in the United States." *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Joint Respondents' Post-Hearing Brief, Inv. Nos. 701-TA-

712-715 and 731-TA-1679-1682 (Final) (Sept. 19, 2024), at 4-5, Exhibit 1 APP-5-APP-10

("Joint Respondents' Post-Hearing Brief"), C.R.182, P.R. 128.

Joint Respondents also offered an alternative calculation of apparent U.S. consumption.

Joint Respondents proposed that the Commission calculate apparent U.S. consumption using

U.S. importers' U.S. shipments data for all import sources, adjusted to account for the incomplete

levels of questionnaire coverage.  *See* Joint Respondents' Post-Hearing Brief, at 6-7, Exhibit 1

APP-17-APP-20, C.R. 182, P.R. 128.  Joint Respondents explained that, using this method, "both

demand and subject import market share declined over the POI."  Joint Respondents' Post-

Hearing Brief, at 6, Exhibit 1 APP-18, C.R. 182, P.R. 128.  This was consistent with trends seen

in the Commission's original market share analysis from the Prehearing Staff Report.  Subject

imports thus had considerably lower market share in interim 2024 than they had in 2021, while

non-subject imports and domestically-produced ferrosilicon held higher market share in interim

2024 than they had in 2021.  *See* Joint Respondents' Post-Hearing Brief, at 6-7, Exhibit 1 APP-

19, C.R. 182, P.R. 128.

In their post-hearing brief, Joint Respondents further demonstrated why subject imports

did not have adverse price effects on the U.S. industry over the POI.  Notably, Joint Respondents

explained that the most significant declines in the U.S. producers' prices occurred in periods

where subject imports were overselling.  *See* Joint Respondents' Post-Hearing Brief, at Exhibit 1

APP-30-APP-43, C.R. 182, P.R. 128.  In addition, Joint Respondents highlighted extensive

witness testimony indicating that underselling in 2023 resulted not from price undercutting by

subject imports, but from market dynamics that gave the U.S. producers negotiating power to

keep prices relatively high.  *See* Joint Respondents' Post-Hearing Brief, at Exhibit 1 APP-34-

APP-37, C.R. 182, P.R. 128.  The fact that the U.S. producers gained market share between 2022

and 2023 further supported this view of the record.  *See* Joint Respondents' Post-Hearing Brief, at Exhibit 1 APP-36, C.R. 182, P.R. 128.

On October 2, 2024, the Commission released its confidential Final Staff Report.  In the Final Staff Report, the Commission only calculated apparent U.S. consumption using the first of Petitioners' new methodologies.  Specifically, the Commission calculated apparent U.S. consumption by compiling U.S. producers' questionnaire data for U.S. shipments, official U.S. import statistics for Brazilian, Kazakhstani, Malaysian, and non-subject imports, and U.S. importers' U.S. shipments data for Russian imports.  *See* Investigation Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final): Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia—Staff Report (Oct. 2, 2024) ("Final Staff Report"), at Table C-1, C.R. 206, P.R. 145.  The Final Staff Report did not present Petitioners' second methodology or the methodology proposed by Joint Respondents.  The Final Staff Report also entirely erased the apparent U.S. consumption calculations that appeared in the Prehearing Staff Report.  This fundamentally skewed the market share data, which was now wholly masked by the new calculations.

Even so, the Final Staff Report still showed that: (1) the U.S. producers consistently gained U.S. market share over the full years of the POI; (2) subject imports consistently lost U.S. market share over the full years of the POI; (3) subject imports consistently declined, in absolute terms, over the full years of the POI; and (4) subject imports' U.S. market share was lower in interim 2024 than in 2021.  *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.  In addition, non-subject imports still held considerably greater U.S. market share in interim 2024 than they held in 2021.  *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.

The Final Staff Report continued to measure non-subject imports using official U.S. import statistics.  Therefore, consistent with the Prehearing Staff Report, the Final Staff Report

14

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

reiterated that non-subject imports increased by 25.9 percent between 2021 and 2023 and by 27.4 percent between the interim periods.  *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145. Of note, ferrosilicon imports from China surged by 12,843 percent between 2021 and 2022.  *See* Final Staff Report, at IV-8, C.R. 206, P.R. 145.  Further, under the Commission's original apparent U.S. consumption calculation and its revised calculation, non-subject imports gained U.S. market share between 2021 and 2023 and between the interim periods.  *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110; *see also* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.

The Final Staff Report also contained robust evidence that subject imports had not had adverse price effects on the U.S. producers' prices.  In particular, the final pricing data showed that subject imports oversold the domestic like product in nearly 60 percent of comparisons (88 of 148 instances) and over **[     ]** percent of volumes accounted for by the Commission's pricing analysis.  *See* Final Staff Report, at V-33-V-35, C.R. 206, P.R. 145.  Moreover, the Final Staff Report continued to show that: (1) the U.S. producers' prices were generally higher at the end of the POI than at the beginning; and (2) the most significant declines in the U.S. producers' prices occurred in periods of subject import overselling.  *See* Final Staff Report, at V-15-V-32, C.R. 206, P.R. 145.

Finally, the Final Staff Report continued to show that the U.S. producers experienced broad performance improvements between 2021 and 2023, and that declines in the industry's financial metrics during this period were driven by trends unrelated to subject imports.  *See* Final Staff Report, at V1-5-VI-10 and Table C-1, C.R. 206, P.R. 145.

After releasing its Final Staff Report, the Commission accepted final comments from interested parties until October 9, 2024.  *See* Revised Commission Scheduling Notice, P.R. 101.

In their final comments, Joint Respondents reiterated that an apparent U.S. consumption calculation using shipments data for Russia was unwarranted, because Russian inventories did not have a material impact on the U.S. ferrosilicon market in 2023 and 2024.  *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia*, Joint Respondents' Final Comments, Inv. Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final) (Oct. 9, 2024), at 2-3 ("Joint Respondents' Final Comments"), C.R. 209, P.R. 148.  Joint Respondents also explained why this revised calculation was unreliable.  Specifically, the revised calculation showed an increase in apparent U.S. consumption between the interim periods, but considerable evidence elsewhere on the record indicated that U.S. ferrosilicon demand declined or remained flat during this period.  *See* Joint Respondents' Final Comments, at 3-6, C.R. 209, P.R. 148.  That evidence included sworn testimony from petitioners and respondents alike, responses to the Commission's questionnaires, data from the Final Staff Report related to downstream iron and steel demand, and the U.S. producers' recent financial results.  *See* Joint Respondents' Final Comments, at 3-6, C.R. 209, P.R. 148; *see also* Joint Respondents' Prehearing Brief, at 42, C.R. 175, P.R. 117.

Joint Respondents also recalled the extensive record evidence—presented throughout their post-hearing brief and the Final Staff Report—that subject imports were not responsible for declines in the U.S. producers' prices or performance indicators in the latter part of the POI.  *See* Joint Respondents' Final Comments, at 6-13, C.R. 209, P.R. 148.

The Commission issued its final affirmative injury determination concerning ferrosilicon from Russia on November 5, 2024.  *See Ferrosilicon from Russia*, 89 Fed. Reg. 88,814 (Int'l Trade Comm'n, Nov. 8, 2024), P.R. 156.  This determination and the public version of the Commission's Views were set forth in *Ferrosilicon from Russia*, Inv Nos. 701-TA-712-715 and 731-TA-1679-1682 (Final), USITC Pub. 5556 (November 2024) ("USITC Pub. 5556"), P.R.

16

155.  The Commission also released the confidential version of its Views to parties on the APO on November 5, 2024.  *See* EDIS Doc. ID 836462, *Ferrosilicon from Russia*, Inv. Nos. 701-TA-715 and 731-TA-1682 (Final) (Nov. 5, 2024) ("Commission Russia Views"), C.R. 210.

In its Views, the Commission found that the volume of subject imports was significant, based on the revised apparent U.S. consumption figures.  The Commission failed to explain why it had ignored Joint Respondents' proposal to calculate apparent U.S. consumption using coverage-adjusted questionnaire data for all import sources.  *See* Commission Russia Views, at 39-40 fn. 189, C.R. 210.  Nor did it address Joint Respondents' evidence and arguments that inventories of subject imports from Russia did not materially impact the U.S. ferrosilicon industry in 2023 and 2024.

Further, the Commission found that underselling by subject imports was significant.  *See* Commission Russia Views, at 45, C.R. 210.  In making this finding, the Commission ignored that: (1) overall, subject imports predominantly oversold the domestic like product (both in terms of instances and volume); and (2) the average and maximum overselling margins were far larger than the average and maximum underselling margins.  In addition, the Commission found that subject imports had suppressed U.S. producers' prices to a significant degree.  *See* Commission Russia Views, at 48, C.R. 210.  This finding seemed to hinge on the (flawed) assumption that apparent U.S. consumption increased in interim 2024, yet the U.S. producers did not raise their prices during that time.  *See* Commission Russia Views, at 48, C.R. 210.

Finally, the Commission found that subject imports had a significant adverse impact on the domestic industry.  The Commission found that subject imports caused declines in the domestic industry's performance in the latter part of the POI, despite the extensive evidence,

provided by Joint Respondents, demonstrating alternative causes for the industry's condition.
*See* Commission Russia Views, at 53-59, C.R. 210.

*       *       *

Commerce published its final affirmative AD and CVD determinations for Brazil,
Kazakhstan, and Malaysia on March 28, 2025. *See* USITC Pub. 5620, at 1.2, P.R. 178. After
Commerce issued these determinations, the Commission issued a supplementary schedule for its
final injury determination concerning ferrosilicon from Brazil, Kazakhstan, and Malaysia. *See
Ferrosilicon From Brazil, Kazakhstan, and Malaysia; Supplemental Schedule for the Final
Phase of Countervailing Duty and Antidumping Duty Investigations*, 90 Fed. Reg. 14,869 (Int'l
Trade Comm'n, Apr. 4, 2025) ("Commission Supplemental Scheduling Notice"), P.R. 163.
Pursuant to that notice, the Commission accepted additional final comments from interested
parties addressing Commerce's final AD and CVD margins until April 11, 2025. *See*
Commission Supplemental Scheduling Notice, P.R. 163.

The Commission then issued its Final Injury Determination on May 12, 2025. For this
determination, the Commission adopted its findings and analysis regarding material injury from
its November 2024 determination concerning Russian imports. *See* USITC Pub. 5620, at 7, P.R.
178. Thus, the material injury findings presented in USITC Pub. 5556 and the Commission's
Russia Views are incorporated by reference into the Final Injury Determination.

## III.    STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or conclusion found . . . to be
unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19
U.S.C. § 1516a(b)(1)(B)(i). To satisfy the "substantial evidence" standard, the Commission must
take into account "the entire record, including whatever fairly detracts from the substantiality of

the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).  This Court may not sustain the Commission's determination "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

To satisfy the "substantial evidence" standard, the Commission must provide a reasoned explanation for its determination.  To do so, it must "make the necessary findings and have an adequate evidentiary basis for its findings," which requires "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)).  The Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

To be "in accordance with law," the Commission's determination must comply with the Tariff Act of 1930, as amended.  To fulfill these obligations, the Commission, at a minimum, "shall consider" each injury factor mandated by the statute (*i.e.*, the statutory volume, price effects, and impact factors) and explain why the record supports its findings. *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992) (the "core factors directed by the statute" comprise the "mandated 'minimum' analysis.").  A determination is not in accordance with law if, in considering the impact of subject imports on the domestic industry, the Commission fails to "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected

industry." 19 U.S.C. § 1677(7)I(iii)(V).  If it finds "present" injury, the Commission must

"reference a time period which is as nearly contemporaneous to vote day as possible and for

which reliable record evidence is available." *Chr. Bjelland Seafoods A/S v. United States*, 19

C.I.T. 35, 43 n.22 (Ct. Int'l Trade 1995).

Where the Commission "departs from applicable findings of a general nature from prior

determinations," it is obligated to "explain whether: (1) good reasons prompt that departure; or

(2) the prior determinations are inapposite such that it is not in fact a departure at all." *DAK*

*Americas LLC v. United States*, 456 F.Supp. 3d 1340, 1354-57 (Ct. Int'l Trade 2020) (explaining

that the *sui generis* nature of Commission investigations does not conflict with this obligation).

Finally, in determining whether injury is "by reason of" subject imports within the

meaning of 19 U.S.C. § 1673d(b)(B), the Commission must "analyze compelling arguments that

purport to demonstrate the comparatively marginal role of subject imports in causing that

injury." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade

2006).

## IV.    ARGUMENT

### A.  The Commission's Volume Analysis Was Unsupported By Substantial Evidence and Otherwise Unlawful

In assessing injury, the Commission must "consider whether the volume of imports of the

merchandise, or any increase in that volume, either in absolute terms or relative to production or

consumption in the United States, is significant." 19 U.S.C. § 1677(7)(I)(i).  Here, the

Commission erred in its analysis of subject import volumes.  Specifically, the Commission rested

its volume-related findings upon an apparent U.S. consumption calculation that was offered by

Petitioners at the eleventh hour, and which the Joint Respondents demonstrated was unreliable

and unwarranted.  The Commission relied exclusively on this revised, faulty calculation method

to assess the volume of subject imports relative to U.S. consumption, ignoring its prior

calculation methods and alternative methods proposed by the parties.  In the following section,

Plaintiff explains why this decision by the Commission was unsupported by substantial evidence

and unlawful.

> ### i. The Commission Acted Unlawfully When It Adopted Petitioners' Last-Minute Recalculation of Apparent U.S. Consumption, While Inexplicably Erasing Its Past Calculations and Failing to Meaningfully Address Alternative Methods

In its Prehearing Staff Report, the Commission calculated apparent U.S. consumption

using Petitioners' U.S. shipments data and official U.S. import statistics for all ferrosilicon

imports.  *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.  This original

calculation showed that apparent U.S. consumption increased between 2021 and 2022 but

declined between 2022 and 2023 and between interim 2023 and interim 2024.  *See* Prehearing

Staff Report, at Table C-1, C.R. 173, P.R. 110.  This calculation further showed that subject

imports lost U.S. market share in every year from 2021 to 2023 and between the interim periods.

*See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.

Petitioners did not challenge these calculations until late in the proceedings.  Nor did they

offer any clear alternative calculation methods until they submitted their post-hearing brief—

despite being asked about alternative calculations at the hearing.  *See* Petitioners' Post-Hearing

Brief, at 6-7, Exhibit 2, C.R. 184, P.R. 126.  When, at the eleventh-hour, Petitioners ultimately

proposed alternatives for calculating apparent U.S. consumption, they offered two new methods.

The first method added Petitioners' U.S. shipment data, official U.S. import statistics for all

sources except Russia, and U.S. importers' U.S. shipments of Russian imports to calculate

apparent U.S. consumption.  *See* Petitioners' Post-Hearing Brief, at 6-7, Exhibit 2, C.R. 184, P.R.

126.  The second method calculated all import volumes for purposes of the apparent U.S.

consumption calculation by adjusting the official U.S. import statistics for changes in U.S. importers' inventories and re-exports.  *See* Petitioners' Post-Hearing Brief, at 8-9, Exhibit 3, C.R. 184, P.R. 126.

The Final Staff Report only presented Petitioners' first method for calculating apparent U.S. consumption.  The original calculations from the Prehearing Staff Report were inexplicably erased, and Petitioners' second proposed method was inexplicably ignored.  An alternative proposed by the Joint Respondents to calculate apparent U.S. consumption using coverage-adjusted data for U.S. importers' U.S. shipments for all import sources was also inexplicably ignored.

As a result, in the Russia Views, the Commission's quantitative market share analysis relied exclusively on Petitioners' first method.  The Commission sought to justify this choice by asserting that the official U.S. import statistics were the most reliable data source for all non-Russian imports, but that "U.S. shipments of subject imports from Russia reported in U.S. importers' questionnaire responses were the most reliable data . . . for purposes of calculating apparent U.S. consumption" for those imports.  Commission Russia Views, at 39-40 fn. 189, C.R. 210.  The Commission believed these sources to be the most reliable for each set of imports because the U.S. importer questionnaire data: (1) did not account for virtually all imports reflected in the official statistics from Brazil, Kazakhstan, Malaysia, and non-subject countries, but: (2) did account for virtually all imports reflected in the official statistics from Russia. Commission Russia Views, at 5-6, 39-40 fn. 189, C.R. 210.

The flaws in this reasoning are immediately apparent.  The Commission based its conclusion that U.S. importer questionnaire data were not reliable for non-Russian imports on that data's less-than-complete coverage of official U.S. import statistics.  It is true that the U.S.

importer questionnaire data offered incomplete coverage for non-Russian imports, and that the reliance on that raw data would not have provided an accurate view of the U.S. ferrosilicon market. Indeed, Joint Respondents recognized this themselves. *See* Joint Respondents' Post-Hearing Brief, at 3-4, C.R. 182, P.R. 128. But if the Commission was concerned with incomplete data coverage, why could it not use a method that adjusted <u>all</u> of the U.S. importer questionnaire data for coverage gaps, instead of cherry-picking the record and using different data sources for different import volumes? This uniform and less convoluted approach is the exact method that Joint Respondents proposed in their Post-Hearing Brief. *See* Joint Respondents' Post-Hearing Brief, at 6-7 and Exhibit 1, C.R. 182, P.R. 128. In its Russia Views, the Commission never explained why Petitioners' method was more appropriate than Joint Respondents' method. In fact, the Commission only mentions Joint Respondents' proposed method when discussing the ways in which Joint Respondents commented on Petitioners' proposal for a revised apparent U.S. consumption calculation. *See* Commission Russia Views, at 39-40 fn. 189, C.R. 210. Otherwise, the Commission ignored Joint Respondents' alternative method, even though it addressed the precise issues that the Commission identified with the U.S. importer questionnaire data.

The Commission's errors do not end at its unjustified disregard for Joint Respondents' alternative apparent U.S. consumption calculation. The Commission's selection of Petitioners' first method was also unlawful in light of the ample evidence that this method did not accurately reflect market conditions. Not only was this evidence robust, the Commission also wholly failed to address it in its Russia Views. As noted above, Petitioners' first method used U.S. importers' U.S. shipment data for Russian imports; as a result, this calculation included U.S. importers' shipments of Russian ferrosilicon from inventory in each segment of the POI, but excluded

volumes held in inventory in each segment.  *See* Commission Russia Views, at 39-40 fn. 189,

C.R. 210.  While Petitioners argued that an assessment of subject imports' market share over the

POI required consideration of a supposed build-up and subsequent destocking of Russian

product, Joint Respondents demonstrated that shipments of Russian product from inventory did

not, in actuality, materially impact the U.S. ferrosilicon market in the latter segments of the POI.

Joint Respondents' Post-Hearing Brief, at 4, C.R. 182, P.R. 128.  For example, the Joint

Respondents submitted an affidavit from [

], who explained that [

].  Joint

Respondents' Post-Hearing Brief, at 5 and Exhibit 2, C.R. 182, P.R. 128.  Joint Respondents also

provided evidence—including an affidavit from a representative of a major ferrosilicon trader—

showing that U.S. customers were "increasingly refus{ing} to purchase product imported from

Russia," even if that product was already in the United States and sitting in importers'

inventories.  Joint Respondents' Post-Hearing Brief, at 5 and Exhibit 3, C.R. 182, P.R. 128.

Indeed, data presented in the Final Staff Report supported this view of the market.  U.S.

importers' U.S. shipments of Russian imports were more than [                    ] times larger than

their ending inventories of Russian imports in 2021 (*i.e.*, before the Russian invasion of

Ukraine), and were [                    ] to such inventories in 2022.  *See* Final Staff Report,

at Table C-1, C.R. 206, P.R. 145.  However, by 2023 and interim 2024, U.S. importers' U.S.

shipments of Russian imports were mere fractions of their ending inventories.  *See* Final Staff

Report, at Table C-1, C.R. 206, P.R. 145.  And even though U.S. importers held [          ] STCS

of Russian product in inventory at the end of 2023, they had only shipped [          ] STCS of

that volume by the end of the first half of 2024.  *See* Final Staff Report, at Table C-1, C.R. 206,

P.R. 145.  These figures illustrate how U.S. customers were unwilling to purchase Russian-origin

volumes, even if they were already sitting in inventory in the United States.  In sum, substantial

qualitative and quantitative evidence on the record demonstrated that Russian inventories of

subject merchandise did not have a material impact on the U.S. ferrosilicon market in 2023 and

2024.  The Commission ignored this evidence in its Russia Views.

Joint Respondents also demonstrated that Petitioners' new method resulted in an

unreliable estimate of apparent U.S. consumption.  Petitioners' revised calculation showed a

[      ] percent increase in apparent U.S. consumption between the interim periods, "which

would result in annualized apparent consumption [                                    ] the

unprecedented levels of consumption in 2022."  Joint Respondents' Final Comments, at 3, C.R.

209, P.R. 148.  However, considerable evidence elsewhere on the record indicated that U.S.

ferrosilicon demand declined or remained flat in interim 2024, and certainly was not at a level

that would indicate [                                    ].  *See* Joint Respondents' Final

Comments, at 3-6, C.R. 209, P.R. 148.  As noted in Section II above, that evidence included

sworn testimony from petitioners and respondents alike, responses to the Commission's

questionnaires, data from the Final Staff Report related to downstream iron and steel demand,

and the U.S. producers' recent financial results.  *See* Joint Respondents' Final Comments, at 3-6,

C.R. 209, P.R. 148; *see also* Joint Respondents' Prehearing Brief, at 42, C.R. 175, P.R. 117.

Several pieces of this evidence are particularly noteworthy.  <u>First</u>, Ferroglobe itself

recognized "demand weakness in the U.S." for silicon-based alloy products in interim 2024.

Joint Respondents' Prehearing Brief, at 42 and Exhibit 8 (quoting *Ferroglobe Reports Strong

Second Quarter 2024 Financial Results*, Ferroglobe.com (Aug. 5, 2024)), C.R. 175, P.R. 117;

*see also* Joint Respondents' Final Comments, at 5-6, C.R. 209, P.R. 148.  <u>Second</u>, the large

majority of U.S. importers and purchasers that responded to the Commission's questionnaires

reported that overall U.S. demand for ferrosilicon had either not changed or fluctuated down

during the POI.  *See* Joint Respondents' Final Comments, at 4, C.R. 209, P.R. 148.  In other

words, based on the reporting of most U.S. market participants, demand in 2024 was not tracking

to be **[          ]** demand in 2022, as the Final Staff Report incorrectly suggests.  <u>Third</u>, the

Commission <u>and</u> Petitioners both recognized that U.S. ferrosilicon demand is tied to U.S. iron

and steel production, which was notably lower in interim 2024 than interim 2023.  *See* Joint

Respondents' Final Comments, at 4-5, C.R. 209, P.R. 148.  <u>Finally</u>, representatives of both

Petitioners testified before the Commission that demand was down in 2024.  *See* Tr. at 28:6-7

(Mr. Hammer, Ferroglobe) and 28:18-21 (Mr. Sossonko, CC Metals), P.R. 129.

     The Commission's rationale for disregarding this evidence and accepting Petitioners'

revised calculation was nonsensical.  The Commission stated:

> An argument raised by Joint Respondents in their final comments is that the
> Commission's calculation is unreliable because it shows that apparent U.S.
> consumption was higher in interim 2024 than in interim 2023, which they allege is
> contradicted by testimony and other record evidence suggesting that demand was
> lower in interim 2024 than in interim 2023 . . . We find this argument unconvincing
> . . .the record evidence is mixed as to whether demand increased, decreased, or
> stayed the same over the course of the POI.  Further, Joint Respondents' argument
> appears to assume that demand and apparent U.S. consumption are the same, which
> is not the case.  Demand refers to consumers' willingness to purchase a product at
> various price levels, while consumption reflects what was actually purchased and
> sold in the market.  Therefore, even if demand was lower in interim 2024, that
> would not foreclose the possibility of higher apparent domestic consumption
> relative to interim 2023.

Commission Russia Views, at 40, fn. 189, C.R. 210.

     Calculations of apparent U.S. consumption based on shipment data might ***<u>understate</u>***

total demand if purchasers were satisfying their needs from their own previously-built

inventories.  Thus, in this case, shipments of Russian imports in interim 2024 could theoretically

be ***lower*** than customers' actual desire for that product in interim 2024, if customers already had some Russian volumes in their inventories and drew down those inventories to satisfy a portion of their needs. However, data for shipments of Russian imports in interim 2024 could not ***overstate*** purchasers' demand for Russian imports in that period. Therefore, an overall calculation of apparent U.S. consumption in interim 2024 that was reliant on shipment data for Russian imports (or any other sources of ferrosilicon) could not overstate total U.S. demand for ferrosilicon in interim 2024. To that end, record evidence that demand was lower in interim 2024 than in interim 2023 directly calls the Commission's apparent U.S. consumption calculation showing otherwise into question. While Joint Respondents presented extensive evidence that demand declined (or at most, remained flat) in interim 2024, the Commission almost entirely ignored that evidence in its Views.

In sum, the Commission adopted a flawed, eleventh-hour methodology to calculate apparent U.S. consumption that the Joint Respondents demonstrated was both unwarranted and unreliable. The Commission outright ignored considerable evidence that undermined this calculation, and in the instances where it addressed certain evidence, the Commission failed to provide coherent reasons for rejecting it. The Commission also inexplicably rejected alternative methods that could have provided a more accurate estimate of apparent U.S. consumption. For these reasons, the Commission's decision to calculate apparent U.S. consumption in the manner in which it did was unsupported by substantial evidence and unlawful.

### ii.  The Commission's Determination That Subject Imports Volumes Were "Significant" Relative to U.S. Consumption Was Unlawful

When conducting its market share analysis, the Commission calculated imports from all sources except Russia using official U.S. import statistics. *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145; *see also* Commission Russia Views, at 39, C.R. 210. However, the

Case 1:25-cv-00129-LWW    Document 36-1    Filed 02/19/26    Page 32 of 48

Court No. 25-00129

**BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED**

NON-CONFIDENTIAL VERSION

Commission calculated Russian imports using U.S. importers' U.S. shipments data.  *See* Final

Staff Report, at Table C-1, C.R. 206, P.R. 145; *see also* Commission Russia Views, at 39, C.R.

210.  Using this method, the Commission found that subject imports consistently lost market

share between 2021 and 2023 but increased their market share by **[      ]** percentage points

between the interim periods.  *See* Commission Russia Views, at 39, C.R. 210.  Had the

Commission used official U.S. import statistics to measure Russian imports as well, it would

have seen declines across the full POI, with a **[      ]** percentage point decline in subject import

market share, by volume, between the interim periods.  *See* Prehearing Staff Report, at Table C-

1, C.R. 173, P.R. 110.

As explained above, reliance on U.S. importers' U.S. shipments data for Russian imports

rendered the Commission's market share analysis improper and unreliable.  As a result, the

Commission's finding that subject imports had meaningfully increased their U.S. market share

between the interim periods was based entirely on a faulty methodology.  Therefore, the

Commission's finding that subject import volumes were significant relative to U.S. consumption

was not supported by substantial evidence.

Even assuming that the Final Staff Report's market share analysis was lawful (which, as

explained above, it was not), the Commission's findings still, inexplicably, departed from past

practice.  Often, where the domestic industry has gained U.S. market share and cumulated

subject imports have lost U.S. market share over the full years of a POI, the Commission has not

found present material injury.  *See, e.g.*, *Glass Wine Bottles from China*, Inv. No. 701-TA-703

(Final), USITC Pub. 5550 (Oct. 2024), at 1, IV-32 ("China Glass Wine Bottles Determination");

*see also Fabricated Structural Steel from Canada, China, and Mexico*, Inv. Nos. 701-TA-616-

617 and 731-TA-1432-1434 (Final), USITC Pub. 5031 (Mar, 2020), at 1, IV-27.  In fact, this is

28

even true in certain cases where the domestic industry lost U.S. market share and subject imports gained U.S. market share between subsequent interim periods.  *See, e.g.*, Glass Wine Bottles China Determination, at 1, IV-32.

Here, the Commission's revised market share analysis shows these trends.  in fact, using the Commission's revised analysis, subject imports *consistently* declined and lost market share while the U.S. producers *consistently* gained market share across the full years of the POI.  *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.  Moreover, using the Commission's revised market share analysis, subject imports ended interim 2024 with lower U.S. market share than they had in 2021.  *See* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.  Even accepting the market share trends in the Final Staff Report as accurate (which, again, Plaintiff does not), the Commission's conclusions that these trends supported a material injury finding do not align with multiple past determinations.  The Commission never explained why the volume-related facts in this case were distinguishable from these prior cases.  Therefore, the Commission's volume-related findings in this case were unsupported by substantial evidence and unlawful.  *See DAK Americas LLC*, 456 F.Supp. 3d at 1354-57.

## B.  The Commission's Price Effects Analysis Was Unsupported By Substantial Evidence

In evaluating the price effects of subject imports, 19 U.S.C. § 1677(7)I(ii) directs the Commission to determine whether—

> (II)    there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II)    the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

Here, the Commission erred in finding adverse price effects based on flawed conclusions that: (1) subject imports undersold U.S.-produced ferrosilicon to a significant degree; and (2) subject imports suppressed prices for U.S.-produced ferrosilicon to a significant degree.  The Commission found significant underselling even though the record showed predominant overselling (both in terms of instances and volumes), as well as average and maximum overselling margins that were far larger than the average and maximum underselling margins.  This finding is inconsistent with prior determinations in which the Commission found no significant underselling on comparable facts.  The Commission did not adequately justify a departure from these past determinations, nor did it clearly explain why its past determinations were distinguishable.  The Commission also provided nonsensical reasons for rejecting Joint Respondents' arguments related to the 2023 pricing trends.

The Commission's price suppression finding was flawed because it relied on the unreliable apparent U.S. consumption calculations advanced by Petitioners at the last minute.  Had the Commission used its original calculations from the Prehearing Staff Report, it would have seen that weak apparent U.S. consumption, not subject imports, prevented U.S. producers from raising prices during the interim period.

For these reasons, the Commission failed to provide reasoned explanations for its findings regarding underselling and price suppression, in violation of the "substantial evidence" standard.  Therefore, the Commission's overarching finding of adverse price effects was unsupported by substantial evidence and unlawful.

### i.   The Commission's Underselling Analysis Was Unsupported By Substantial Evidence and Inconsistent with Prior Determinations

The Commission's underselling analysis was contrary to the record evidence and, inexplicably, departed from the Commission's analysis in analogous cases.  As discussed in

Section II above, the final pricing data collected by the Commission showed that subject imports had oversold the domestic like product in nearly 60 percent of instances (88 out of 148 quarterly comparisons), and over [    ] percent of the volume considered in the Commission's pricing analysis was shipped in periods of overselling.  *See* Final Staff Report, at V-33-V-35, C.R. 206, P.R. 145.  In addition, the overselling margins were far more significant than the underselling margins.  The average overselling margin of [        ] percent was [                        ] larger than the average underselling margin of [        ] percent.  *See* Final Staff Report, at V-33-V-35, C.R. 206, P.R. 145.  The maximum overselling margin of [        ] percent was also [

    ] as large as the maximum underselling margin of [        ] percent.  *See* Final Staff Report, at V-33-V-35, C.R. 206, P.R. 145.  Finally, the record showed majority overselling (both in terms of quarters and volume) for the three pricing products (Products [            ]) that collectively accounted for over [        ] percent of the volumes considered in the Commission's pricing analysis.  *See* Final Staff Report, at V-33-V-35, C.R. 206, P.R. 145.

    In prior determinations, the Commission has found that similar frequencies and magnitudes of overselling amounted to "predominant overselling" and "weigh{ed} heavily against a finding of significant underselling of the domestic product by subject imports." *Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125, at 15-16 (Sept. 2020) ("PET Resin Remand").  For example, in the PET Resin Remand, the Commission found "predominant overselling", and no significant underselling, where overselling occurred in 68 percent of quarterly comparisons and for 69 percent of volumes considered, and where the average overselling margin was higher than the average underselling margin, even by just a few percentage points.  *See* PET Resin Remand, at 15-16.  More recently, in its investigation of

31

aluminum extrusions from fourteen countries, the Commission found predominant overselling, and no significant underselling, where overselling occurred in 60.9 percent of quarterly comparisons and for 63.3 percent of volumes considered, and where the average and maximum overselling margins were larger than the average and maximum underselling margins.  *See Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560, at 61-65 (Nov. 2024) ("Aluminum Extrusions Determination").

In its Russia Views, the Commission did not distinguish its PET Resin Remand or Aluminum Extrusions Determination, even though the Commission made similar findings of a general nature regarding overselling trends in those decisions.  *See* Commission Russia Views, at 41-45, C.R. 210.  Indeed, the Commission did not even mention those recent decisions.  *See* Commission Russia Views, at 41-45, C.R. 210.  By failing to distinguish or otherwise explain why it was departing from those recent decisions, the Commission failed to provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Chemours*, 443 F. Supp. 3d at 1321 (internal citations omitted).  For this reason, the Commission's underselling analysis was unsupported by substantial evidence and not in accordance with the law.

     **ii.  The Commission Failed to Provide a Reasoned Explanation For Rejecting Joint Respondents' Arguments Regarding the 2023 Pricing Trends**

The Commission's underselling findings were also unlawful because the Commission failed to provide adequate reasons for rejecting Joint Respondents' arguments regarding pricing trends in 2023.  As noted in Section II, Joint Respondents explained why underselling in 2023

resulted not from subject import competition, but from market dynamics that gave the U.S.

producers negotiating power to keep prices high.  *See* Joint Respondents' Post-Hearing Brief, at

10, APP-34-APP-37, C.R. 182, P.R. 128.  Specifically, the U.S. producers were able to secure

high contract prices for 2023 during the 2022 negotiating ("mating") season, due to: (1) robust

outlooks for 2023 demand; and (2) "domestic producer supply constraints in late 2022 that fueled

perceptions of a domestic shortage."  Commission Russia Views, at 45 fn. 205, C.R. 210; *see*

*also* Joint Respondents' Post-Hearing Brief, at 10, APP-34-APP-35, C.R. 182, P.R. 128.

   The Commission found these explanations for high domestic prices in 2023 unpersuasive

For multiple reasons.  However, all of the Commission's rationales fall apart upon examination.

<u>First</u>, the Commission cited aggregated data from the U.S. Purchaser questionnaire responses

presented in the Final Staff Report—presumably, the fact that "{s}ixteen purchasers indicated

that they had not experienced any problems obtaining ferrosilicon" during the POI—as refuting

the claim of a "widespread perception of incipient shortages in 2023."  Commission Russia

Views, at 45 fn. 205, C.R. 210; *see also* Final Staff Report, at II-9, C.R. 206, P.R. 145.

However, this data only shows that sixteen purchasers (reportedly) did not *actually* experience a

domestic supply shortage in 2023 or earlier.  This data was provided in response to a

retrospective question about the purchasing challenges that market participants may have in fact

experienced during the specified historical periods.  This data does not show that purchasers did

not *believe* such a shortage was imminent in late 2022, *i.e.*, at the time they were negotiating to

secure supply for the 2023 period.

   <u>Second</u>, the Commission stated that Joint Respondents' argument regarding purchasers'

perception of an impending domestic supply shortage for 2023 was "inconsistent with {their}

assertions that increases in consumption and prices in 2022 would inevitably decline in 2023."

Commission Russia Views, at 45 fn. 205, C.R. 210.  For this point, the Commission cites sections of Joint Respondents' Prehearing Brief that discussed trends in apparent U.S. consumption in 2022 and 2023.  *See* Commission Russia Views, at 45 fn. 205, C.R. 210 (*citing* Joint Respondents' Prehearing Brief, at 15, 41, C.R. 175, P.R. 117).  These sections of Joint Respondents' Prehearing Brief discuss the trends in apparent U.S. consumption actually seen in 2023 and as understood in retrospect—not the trends for 2023 that were anticipated in 2022.  Neither the fact that consumption in fact declined in 2023 relative to 2022, nor the fact that market observers might characterize that decline as "inevitable" in retrospect, speaks to whether U.S. purchasers anticipated that decline in late 2022.  Rather, all of the following facts could be simultaneously true: (1) in late 2022, U.S. purchasers could not have realized that 2022 would be an anomalous year, and therefore could have expected an increase in consumption for 2023; (2) however, consumption for 2023 ultimately turned out to be lower than 2022 consumption; and (3) looking back on 2022, market observers would now characterize 2022 as anomalous.  In short, Joint Respondents' comments about consumption in 2022 and 2023 are entirely compatible with their arguments regarding U.S. purchasers' perceptions of the market in late 2022.  The Commission's attempts to claim otherwise are illogical.

    Third, the Commission cites the fact that the domestic industry was operating at **[       ]** percent capacity utilization in 2022 as apparent evidence that purchasers did not anticipate a domestic supply shortage for 2023.  Of course, this operational metric says nothing about U.S. purchasers' *perceptions*: U.S. purchasers may not have known these details of the domestic industry's capacity utilization, and may very well still have anticipated a domestic supply shortage.  Moreover, in Petitioners' Post-Hearing Brief, **[**

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

].  *See* Petitioners' Post-Hearing Brief, at Exhibit 7, C.R. 184, P.R. 126.  Therefore, figures for the domestic industry's capacity utilization in 2022 did not reflect the industry's actual ability to supply customers, let alone demonstrate that customers perceived the industry as having ample ability to supply.

Fourth, the Commission claimed that Joint Respondents' arguments regarding purchasers' perceptions of a domestic supply shortage for 2023 were rebutted by [

].  Commission Russia Views, at 45 fn. 205, C.R. 210 (*citing* Petitioners' Post-Hearing Brief, at A-2-A-3 and Exhibits 6 through 16, C.R. 184, P.R. 126).  Contrary to the Commission's claims, Petitioners' evidence does not undermine Joint Respondents' arguments.  While these [

].  In addition, in [

].  *See* Petitioners' Post-Hearing Brief, at Exhibit 7, C.R. 184, P.R. 126.  In short, Petitioners' [

] do more to support Joint Respondents' arguments than refute them.

Regardless of the Commission's illogical reasons for rejecting Joint Respondents'

arguments about the U.S. producers' bargaining power during the 2022 mating season, trends on

the record support Joint Respondents' view.  For example, the fact that the U.S. producers

increased their U.S. shipments and gained a notable **[      ]** percentage points of U.S. market

share between 2022 and 2023 shows that the U.S. producers successfully used their bargaining

power in late 2022 to secure robust contractual opportunities for the upcoming year.  *See* Final

Staff Report, at Table C-1, C.R. 206, P.R. 145.

Overall, the Commission rejected the Joint Respondents' arguments regarding

underselling in 2023 without providing a reasoned explanation for doing so, and despite record

evidence that supported the Joint Respondents' position.  This failure corrupted the Commission's

overall pricing analysis, making its determination that subject imports undersold the domestic

like product to a significant degree unsupported by substantial evidence.

### iii.  The Commission's Determination That Subject Imports Suppressed Prices for U.S.-Produced Ferrosilicon Was Unsupported By Substantial Evidence

In its Russia Views, the Commission presented a muddled price suppression analysis that

seemed to rest fully on the interim period.  While the Commission's phrasing was less than clear,

the Commission appears to have found price suppression based on the conclusion that the

domestic producers' prices did not increase between the interim periods despite an increase in

apparent U.S. consumption.  *See* Commission Russia Views, at 47-48, C.R. 210.  As explained in

Section IV.A above, the finding that apparent U.S. consumption increased between the interim

periods was based entirely on the faulty, eleventh-hour calculations advanced by Petitioners in

their post-hearing brief.  The appropriate calculations from the Prehearing Staff Report showed

that apparent U.S. consumption declined by **[      ]** percent between interim 2023 and interim

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

2024.  *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.  That decline fully explained the [      ] percent decline in the AUVs of the U.S. producers' U.S. shipments between the interim periods.  *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110. Because the Commission's price suppression finding was wholly grounded in a faulty estimate of apparent U.S. consumption in interim 2024, this finding was unsupported by substantial evidence and not in accordance with law.

*       *       *

In sum, the Commission's determinations that subject imports undersold the domestic like product and suppressed prices for the domestic like product to a significant degree during the POI were both unlawful and unsupported by substantial evidence.  As a result, the Commission lacked any adequate legal basis on which to find that subject imports had significant effects on prices of the domestic like product.  Therefore, the Commission's overall price effects determination was unlawful and unsupported by substantial evidence.

### C.  The Commission's Impact Analysis Was Unsupported By Substantial Evidence

In assessing the impact of subject imports, the Commission failed to meaningfully consider alternative factors—namely, trends in apparent U.S. consumption, non-subject imports, and specific business decisions by the domestic producers—that were truly responsible for the industry's condition in the latter portion of the POI.  By failing to meaningfully engage with Joint Respondents' arguments about these factors, the Commission failed to "analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing . . . injury."  *Accord Hynix Semiconductor, Inc.*, 431 F. Supp. 2d at 1317.

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

> ### i. The Commission Failed to Address Compelling Arguments That Factors Other Than Subject Imports Explain the U.S. Industry's Performance in 2023

In general, downturns in the domestic industry's performance were limited to 2023 and interim 2024. Between 2021 and 2022, the domestic industry saw improvements in its practical capacity; production volumes; capacity utilization; volume, value, and AUVs of U.S. shipments; employment metrics; net sales quantities, values, and AUVs; and profitability metrics. Moreover, for most of the aforementioned metrics, the domestic industry's performance in 2023 was better than it had been in 2021. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110; *see also* Final Staff Report, at Table C-1, C.R. 206, P.R. 145. And regardless of the apparent U.S. consumption calculation used (*i.e.*, either the calculation from the Prehearing Staff Report or the Final Staff Report), the domestic industry gained U.S. market share between 2022 and 2023, and had higher market share in 2023 than it had in 2021. *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110; *see also* Final Staff Report, at Table C-1, C.R. 206, P.R. 145.

In its Russia Views, the Commission found a causal connection between subject imports and the declining performance of the domestic industry at the end of the POI. In doing so, the Commission ignored or discounted the significant alternative factors highlighted by the Joint Respondents.

With respect to downturns in the domestic industry's performance in 2023, the Commission discounted the massive impact that [

]. As Joint Respondents highlighted during the proceedings, [

]. *See* Joint

38

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

Respondents' Prehearing Brief, at 44-45, C.R. 175, P.R. 117; *see also* Final Staff Report, at VI-6-VI-7, C.R. 206, P.R. 145.  In 2023, [

]. *See* Final Staff Report, at VI-6-VI-7, C.R. 206, P.R. 145.  While the domestic industry [                                              ] "being profitable or increasing its profitability does not preclude an affirmative determination . . . it strains credulity that [                                              ]" over the full years of the POI, or in 2023 specifically, in light of these trends.  *See* Joint Respondents' Prehearing Brief, at 44-45, C.R. 175, P.R. 117.

On the other hand, [            ] experienced [

]. *See* Final Staff Report, at VI-6-VI-7, C.R. 206, P.R. 145.  Considering [            ] strong performance, it was primarily these downturns in [

]. *See* Joint Respondents' Prehearing Brief, at 45, C.R. 175, P.R. 117.

But [                                    ] had nothing to do with subject imports.  Rather, these issues stemmed from: [

]. *See* Joint Respondents' Prehearing Brief, at 45-52, C.R. 175, P.R. 117.

In rejecting Joint Respondents' points about [                              ], the Commission focused exclusively on the impact of [

]. *See* Commission Russia Views, at 57-58, C.R. 210.  In particular, the Commission assessed whether [

] during the POI.  *See* Commission Russia

39

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

Views, at 57-58, C.R. 210.  While [

                ] certainly warranted the Commission's attention, the Commission entirely ignored

the [

                                        ].  *See* Joint Respondents' Prehearing Brief, at 45-52, C.R. 175,

P.R. 117.  As Joint Respondents highlighted during the proceedings, these [

                ] were major contributors to [                                        ],

and therefore, were significant factors affecting the financial state [

                        ].  *See* Joint Respondents' Prehearing Brief, at 45-52, C.R. 175, P.R. 117.  By

failing to address these issues—and Joint Respondents' arguments about them—the Commission

failed to "address significant arguments and evidence which seriously undermine{d} its

reasoning and conclusions" regarding the impact of subject imports on the domestic industry

between 2021 and 2023.  *Accord Altx, Inc.*, 167 F. Supp. 2d at 1374.  The Commission also

failed to "analyze compelling arguments that purport to demonstrate the comparatively marginal

role of subject imports in causing . . . injury."  *Accord Hynix Semiconductor, Inc.*, 431 F. Supp.

2d at 1317.  As a result, to the extent the Commission's impact analysis relied on findings of

adverse impact and causation during the full years of the POI, such analysis was unsupported by

substantial evidence and unlawful.

### ii.  The Commission's Impact Analysis for the Interim Period Relied on Inappropriate Calculations and Was Therefore Unlawful

Beyond its limited findings related to 2023, the Commission's findings of adverse impact

hinge on the interim period.  In particular, the Commission found that: (1) the domestic

industry's U.S. shipments and net sales quantities, values, and AUVs declined between the

interim periods despite an increase in apparent U.S. consumption (and therefore such declines

must be attributable to subject imports); and (2) a loss of market share to subject imports during

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

NON-CONFIDENTIAL VERSION

interim 2024 "led to further deterioration in the domestic industry's financial performance."

Commission Russia Views, at 53-55, C.R. 210.  But the Commission's conclusions regarding

apparent U.S. consumption and subject import market share in interim 2024 were based on

unreliable and unlawful calculations, as discussed in Section IV.A above.  Because these

conclusions relied on unlawful calculations, these conclusions were unlawful and unsupported by

substantial evidence, as well.

Had the Commission retained its reliable calculations from the Prehearing Staff Report, it

would have seen that apparent U.S. consumption declined by **[**          **]** percent between the interim

periods.  *See* Prehearing Staff Report, at Table C-1, C.R. 173, P.R. 110.  That substantial decline

in apparent U.S. consumption—<u>not</u> subject imports—explained declines in the U.S. producers'

U.S. shipments, net sales, and profitability.  Indeed, in such weak market conditions, these

declines in the U.S. producers' metrics are to be <u>expected</u>.  Using its calculations from the

Prehearing Staff Report, the Commission would have also seen that: (1) subject imports declined

by 32.5 percent between the interim periods; (2) non-subject imports increased by 27.4 percent

between the interim periods; and (3) subject imports lost considerably more U.S. market share

than the domestic industry in interim 2024 (nearly **[**                    **]**), with all market share

gained accruing to <u>non</u>-subject imports.  *See* Prehearing Staff Report, at Table C-1, C.R. 173,

P.R. 110.  In sum, using the proper calculations, the Commission would have seen that trends in

apparent U.S. consumption and non-subject imports were the primary causes of the domestic

industry's declining performance in interim 2024.  On such a record, the Commission could not

have found that the domestic industry experienced material injury "by reason of" the subject

imports between the interim periods.

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED

Instead of using the proper calculations for apparent U.S. consumption and subject import market share from the Prehearing Staff Report, the Commission used unreliable and unlawful calculations that were newly introduced at the eleventh hour.  The Commission also sidestepped record evidence that those new calculations were inappropriate, as discussed in Section IV.A above.  As a result, the Commission's impact and causation analysis for the interim periods—which relied on these unlawful calculations—were themselves unlawful and unsupported by substantial evidence.

*       *       *

In sum, the Commission's impact and causation analysis is legally flawed—both with respect to the full years of the POI and with respect to the interim period.  For the full years of the POI, the Commission failed to consider various [                                    ]—and Joint Respondents' arguments about said issues—that explain [

].  For the interim period, the Commission based its entire impact and causation analysis on last-minute calculations of apparent U.S. consumption and subject import market share that were unreliable, inappropriate, and undermined by considerable evidence elsewhere on the record.  As a result of these errors, the Commission's impact and causation analysis is unsupported by substantial evidence and unlawful.

## V.    CONCLUSION

For the reasons explained above, Plaintiff respectfully requests that this Court hold that the Commission's Final Injury Determination was unsupported by substantial evidence on the record and not in accordance with law.  Plaintiff therefore respectfully requests that this Court enter judgment on the agency record in its favor.

Dated: February 19, 2026                    Respectfully submitted,

                                            */s/ Christine M. Streatfeild*
                                            Christine M. Streatfeild
                                            Lauren Shapiro
                                            Baker & McKenzie LLP
                                            815 Connecticut Avenue, N.W.
                                            Washington, DC 20006-4078
                                            Tel.: (202) 835-6111
                                            christine.streatfeild@bakermckenzie.com

                                            *Counsel to Plaintiff TNC Kazchrome JSC*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Memorandum of Law in Support of Plaintiff TNC Kazchrome JSC's Rule 56.2 Motion for Judgment on the Agency Record, filed February 19, 2026, contains 12,415 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation for Memoranda of Law in Support of Rule 56.2 Motions for Judgment on the Agency Record, as set forth in the United States Court of International Trade's Chambers Procedures.

Dated: February 19, 2026                    Respectfully submitted,

                                            */s/ Christine M. Streatfeild*
                                            Christine M. Streatfeild
                                            Lauren Shapiro
                                            Baker & McKenzie LLP
                                            815 Connecticut Avenue, N.W.
                                            Washington, DC 20006-4078
                                            Tel.: (202) 835-6111
                                            christine.streatfeild@bakermckenzie.com

                                            *Counsel to Plaintiff TNC Kazchrome JSC*