# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| TNC KAZCHROME JSC,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>        and<br><br>CC METALS AND ALLOYS, LLC and<br>FERROGLOBE USA, INC.,<br><br>        Defendant-Intervenors. | **Court No. 25-00129**<br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Removed from Pages ii, 3-4, 8-9, 13, 15-20, 24-32, 35-36, and 39-44** |

## DEFENDANT-INTERVENORS' RESPONSE BRIEF

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

Date:  July 14, 2026

*Counsel to Defendant-Intervenors
CC Metals and Alloys, LLC And
Ferroglobe, USA, Inc.*

**PUBLIC VERSION**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... iii

I.     RULE 56.2 STATEMENT ........................................................................................... 1

       A.   The Administrative Determination Under Review ............................................ 1

       B.   Issues Presented And Summary of Argument .................................................. 2

            1.   Whether the Commission's methodology for calculating U.S. apparent consumption
                 was reasonable and supported by substantial evidence? ................................................. 2

            2.   Whether the Commission's volume determination was reasonable and supported by
                 substantial evidence? ........................................................................................................ 4

            3.   Whether the Commission's price effects determination was reasonable and supported
                 by substantial evidence? ................................................................................................... 6

            4.   Whether the Commission's impact determination was reasonable and supported by
                 substantial evidence? ........................................................................................................ 8

II.    STANDARD OF REVIEW ....................................................................................... 10

III.   STATEMENT OF FACTS ........................................................................................ 11

IV.    ARGUMENT ............................................................................................................. 21

       A.   The Commission's Volume Analysis Should Be Upheld ................................ 21

       1.   The Commission's calculation methodology regarding U.S. apparent consumption was
            reasonable and supported by substantial evidence ........................................................... 21

       2.   The Commission's volume determination was reasonable and supported by substantial
            evidence ............................................................................................................................. 31

       B.   The Commission's Price Effects Determination Should Be Upheld ............... 35

       1.   The Commission's price effects analysis was supported by substantial evidence or
            otherwise in accordance with law ..................................................................................... 35

       2.   Plaintiff's arguments regarding 2023 pricing trends were reasonably rejected by the
            Commission ....................................................................................................................... 37

       3.   Plaintiff's claims regarding price suppression should be rejected .................................... 40

       C.   The Commission's Impact Determination Should Be Upheld .......................... 41

i

**PUBLIC VERSION**

1. The Commission reasonably found that [                    ] were not an alternate cause of injury ............................................................................................ 41

2. The Commission's impact analysis correctly disregarded methodologically unsound calculations that ignored inventories ........................................................... 44

V. CONCLUSION .................................................................................................... 45

PUBLIC VERSION

## TABLE OF AUTHORITIES

**CASES**

*Adisseo Espana S.A., v. United States*,
No. 1:21-cv-00562-MMB, Slip. Op., *available at* 2023 WL 8866562 ..................................... 33

*Atl. Sugar Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)................................................................................................ 11

*Cleo In. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)...................................................................................... 11, 33, 36

*Consolidated Edison v. NLRB*,
305 U.S. 197 (1938)................................................................................................................. 10

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)................................................................................................................. 11

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................................... 11

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n*,
253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019).......... 33

*JMC Steel Grp. v. United States*,
38 CIT 1560, 24 F. Supp. 3d 1290 (2014) ............................................................................... 22

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984).................................................................................................. 10

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)................................................................................................ 11

*Nucor Corp. v. United States*,
28 CIT 188 F. Supp. 2d 1207 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2010) ......................... 37

*OCTAL, Inc. v. United States*,
539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ........................................................................... 33

*PAM, S.p.A v. United States*,
582 F.3d 1336 (Fed. Cir. 2009)........................................................................................... 10, 11

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) .................................................................................. 11

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009)................................................................................................................. 10

**PUBLIC VERSION**

*Whirlpool Corp. v. United States*,
   37 CIT 1775 (2013) ................................................................................................ 22

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................ 10

19 U.S.C. § 1677(7)(C)(i) ........................................................................................... 31, 34

19 U.S.C. § 1677(7)(C)(iii)................................................................................................ 32

19 U.S.C. § 1677(7)(G)(iii)................................................................................................ 12

28 U.S.C. § 2639(a)(1)....................................................................................................... 10

**FEDERAL NOTICES**

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*,
   90 Fed. Reg. 21,078 (Int'l Trade Comm'n May 16, 2025)........................................... 1

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia; Determinations*,
   89 Fed. Reg. 43,435 (Int'l Trade Comm'n, May 17, 2024)........................................ 12

*Ferrosilicon from Russia*,
   89 Fed. Reg. 88,814 (Int'l Trade Comm'n, Nov. 8, 2024) ........................................... 2

**USITC PUBLICATIONS**

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*,
   Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 (Nov. 2024) ..................................................................................................... 36

*Certain Preserved Mushrooms from France*,
   Inv. No. 731-TA-1587 (Final), USITC Pub. 5393 (Jan. 2023)................................... 33

*Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*,
   Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125 (Sep. 2020) ..................... 36

## I.    RULE 56.2 STATEMENT

Defendant-Intervenors CC Metals and Alloys, LLC ("CC Metals") and Ferroglobe, USA, Inc. ("Ferroglobe") (together, "Petitioners"), petitioners in the underlying investigation, respectfully submit this response in opposition to the Rule 56.2 motion for judgment on the agency record filed in this case by TNC Kazchrome JSC ("Kazchrome" or "Plaintiff").  TNC Kazchrome JSC's Rule 56.2 Motion For Judgment On The Agency Record, Ct. No. 25-00129 (CIT Feb. 19, 2025) (ECF No. 35) ("Pl. Br.").

### A.    The Administrative Determination Under Review

The administrative determination under review is the United States International Trade Commission's (the "Commission's") final affirmative determinations in the antidumping ("AD") and countervailing duty ("CVD") investigations of ferrosilicon from Brazil, Kazakhstan, and Malaysia.  *See* Pl. Br. at 1.  The Federal Register notice was published at 90 Fed. Reg. 21,078 (Int'l Trade Comm'n May 16, 2025), P.R. 180, and the public version of the Commission's Views and Staff Report for these investigations are contained in *Ferrosilicon from Brazil, Kazakhstan, and Malaysia*, Inv. Nos. 701-TA-712-714 and 731-TA-1679-1681 (Final), USITC Pub. 5620 (May 2025) ("Trailing Views"), P.R. 178.[1]

The AD and CVD petitions regarding ferrosilicon from Brazil, Kazakhstan, and Malaysia were filed on the same day as a petition regarding ferrosilicon from Russia.  However, the final phases of these investigations were split after the Department of Commerce ("Commerce") postponed the final determinations for ferrosilicon from Brazil, Kazakhstan, and Malaysia, but

---

[1] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of the brief, in accordance with Rule 5(g) of the Court's Rules.

PUBLIC VERSION

did not postpone its AD and CVD investigations regarding Russia. Trailing Views at 3-4. As a result, earlier, affirmative, final determinations in the AD and CVD investigations concerning Russia were made. 89 Fed. Reg. 88,814 (Int'l Trade Comm'n, Nov. 8, 2024), P.R. 156; *Ferrosilicon from Russia*, Inv. Nos. 701-TA-715 and 731-TA-1682 (Final), USITC Pub. 5556 (Nov. 2024) ("Leading Views"), P.R. 155.[2] Although the final determinations regarding Russia occurred earlier, the Commission analyzed subject imports from Brazil, Kazakhstan, Malaysia, and Russia on a cumulated basis during this earlier phase, and the Trailing Views adopted the Commission's prior analyses and findings in its ultimate determinations on subject imports from Brazil, Kazakhstan, and Malaysia. Trailing Views at 7.

### B.    Issues Presented And Summary of Argument

**1.    Whether the Commission's methodology for calculating U.S. apparent consumption was reasonable and supported by substantial evidence?**

**Yes**. In response to issues regarding a significant inventory overhang and low questionnaire data coverage, the Commission revised its U.S. apparent consumption calculation to use U.S. shipment data for Russian subject merchandise, and official import data for all other imports. Plaintiff objects to the Commission's final methodology in an attempt to force an alternative methodology that does not actually measure consumption.

First, Plaintiff attempts to portray any action by the Petitioners and the Commission as procedurally late in the investigation. Yet, during the proceedings, Plaintiff made an argument on market share in its Prehearing Brief that ignored inventory levels. That argument was challenged by Petitioners at the hearing, which is also when Commissioner Kearns called for all

---

[2] Citations to the Commission's confidential Views in the leading investigation ("Commission Views") are to C.R. 210. Citations to the confidential Final Staff Report in the leading investigations ("Final Staff Report") are to C.R. 206.

parties to comment on how to best address this issue, which the parties did in their posthearing briefs. After the publication of the Final Staff Report, all parties then commented on the new methodology in their Final Comments. As such, Plaintiff's attempts to imply procedural irregularities should be seen for what they are, a red herring.

Next Plaintiff argues that the Commission ignored alternative calculations presented by the parties, including the two alternatives put forth by Plaintiff. However, the Commission clearly set out its reasoning for changing its methodology to use the most reliable data to calculate U.S. apparent consumption and to reject the other options, while specifically stating that it considered Plaintiff's arguments, but rejected them.

Furthermore, Plaintiff's proposed alternatives either ignore the inventory overhang issue or offer a poorly constructed calculation based on unreliable data in an attempt to minimize the reported level of consumption of Russian ferrosilicon in the United States. While Plaintiff's calculation may have achieved that goal, it also resulted in [

] despite post-COVID demand increases and higher prices at that time.

Finally, Plaintiff argues that the selected methodology did not accurately reflect market conditions. In doing so, Plaintiff relies on evidence, such as an affidavit from a trader, to push a narrative that U.S. purchasers were not buying Russian merchandise and, therefore, Russian imports had no market effect in the late period of investigation ("POI").

Reliance on these prognostications is misplaced and contrary to record evidence. When the Commission used U.S. shipment data of Russian imports, it was relying on actual, certified shipment data ([

]. In addition, the record shows that [

3

]. Given the volume shipped and the purchasers of those volumes, Plaintiff's assertion that shipments of Russian product from inventory did not impact the U.S. ferrosilicon market in the latter segments of the POI is patently false and should be rejected.

Plaintiff also claims that the Commission's methodology is flawed because it showed an increase in consumption from interim 2023 to interim 2024; however, the Commission explained that Plaintiff's argument was not persuasive given that the record evidence concerning demand during the period was mixed. Moreover, the data relied upon by the Commission is actual data provided and certified from [                    ] Russian imports in the U.S. market, not the speculation of a third party who has no insight in the actual sales made by that company.

The Commission also pointed out an apparent conflation of demand and apparent consumption in Joint Respondent's arguments. As these are two, distinct economic terms, even lower demand in interim 2024 would not foreclose the possibility of higher apparent domestic consumption relative to interim 2023. Therefore, Plaintiff's conjecture regarding demand does not undermine the hard data relied upon by the Commission to measure consumption of subject imports from Russia.

The Court should, therefore, reject Plaintiff's arguments and find that the Commission's chosen methodology was reasonable, supported by substantial evidence, and in accordance with law.

> **2.      Whether the Commission's volume determination was reasonable and supported by substantial evidence?**

**Yes.** The Commission's determination that that the volume of cumulated subject imports is significant, in absolute terms and relative to both consumption and production in the United States, was supported by substantial evidence and in accordance with law. Subject imports were

**PUBLIC VERSION**

large on an absolute basis, and the Commission recognized that subject imports were the largest supply source to the U.S. market in 2021 and 2022, the second largest source in 2023, and then returned to being the largest supply source in interim 2024. In addition, the ratio of subject imports to domestic production was also significant. Plaintiff does not challenge the Commission's findings regarding absolute volume or volume relative to production.

Plaintiff's arguments do not undermine these findings. First, Plaintiff merely reiterates its arguments with regard to the calculation of U.S. apparent consumption. These should be rejected for the reasons stated above. Second, Plaintiff argues that the Commission is prohibited from finding material injury when the record shows the domestic industry gaining U.S. market share and cumulated subject imports have lost U.S. market share over the full years of a POI. Yet, Plaintiff can point to no statutory or other requirement for the Commission to base its volume finding on only the full years of the POI. Applying such a cookie cutter requirement would be contrary to the statutory instruction that the Commission consider this factor within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

In addition, Plaintiff's claim of a standard set by prior Commission practice is incorrect. Plaintiff ignores that each Commission investigation is *sui generis* and must respond to the unique set of facts that surrounds each industry. Moreover, the Commission has previously made case-specific, affirmative determinations when subject import market share decreased over the full years of the POI.

Fourth, we agree with Defendant that Plaintiff's argument is inappropriately framed as it is, ultimately, a causation argument. As volume effects are not part of the Commission's statutory volume analysis, then volume effects are not a basis for the court to reject a reasonable,

**PUBLIC VERSION**

supported volume determination.  To the extent that Plaintiff's claims are part of its impact arguments, those should also be rejected as set out in the impact section of this brief.

In short, Plaintiff's arguments are an invitation for the Court to reweigh the evidence on volume.  The Court should reject such an impermissible request.

Finally, Petitioners note that, even if, *arguendo*, Plaintiff's claims regarding volume effects and market share did result in this Court rejecting the Commission's finding that subject import volume was significant relative to consumption, since Plaintiffs do not challenge the Commission's findings regarding volume in absolute terms and relative to production, those volume findings, and thus the Commission's overall volume determination, would still stand.

### 3. Whether the Commission's price effects determination was reasonable and supported by substantial evidence?

**Yes.**  Plaintiff argues that the Commission's underselling analysis was contrary to record evidence and inconsistent with prior investigations, specifically, that the Commission must look at the price data only through the lens of frequency, volume, and degree of underselling on a cumulated basis over the entire POI.  *Id*.  Plaintiff further argues that because subject imports oversold the domestic like product at times over the POI, the Commission erred in finding that subject imports undersold U.S.-produced ferrosilicon to a significant degree.  Plaintiff's claims are misplaced and should be rejected, as they asks the Court to reweigh the record evidence in this case to only find probative value in one aspect of the price data—the overall POI-wide comparisons—and to ignore the other record evidence discussed in the Commission's Views, including the pattern of increasing underselling over the POI, as well as the high degree of substitutability of this product, the importance of price in purchasing decisions, and lost sales and lost revenues evidence.

Moreover, Plaintiff's argument has no statutory or legal basis, and is an attempt to impose an artificial constraint on the Commission's analysis. The prior investigations relied upon by Plaintiff present opposite fact patterns that do not support such a circumscription. The differences between the investigations highlight why the Commission's approach to each investigation is *sui generis* in order to respond to the unique set of facts that surrounds each industry. Ultimately, Plaintiff's arguments seek to isolate one data point and impose a threshold not found in the statute, all in order to avoid the record that as a whole demonstrates significant underselling at the end of the POI and a determination of significant price effects.

Plaintiff also argues that the Commission failed to provide an adequate explanation when rejecting Plaintiff's claim that U.S. producer bargaining power in the 2022 mating season was the cause of 2023 underselling by subject imports.[3] This is another invitation by Plaintiff to reweigh the evidence and should be rejected.

Plaintiff argues that purchasers in 2022 thought that demand was increasing while supply was decreasing, but that these market dynamics only applied to U.S. producers, and, therefore, these purchasers paid U.S. producers a premium. However, when demand is high and supply is restricted, prices increase for all market participants, not just domestic producers. If Plaintiff's view of the market were correct, then subject imports would also be able to benefit from higher prices in the marketplace. However, those prices declined, leading to a significant decline in the domestic industry's financial performance driven by an increase in the industry's COGS to sales

---

[3] The so-called "mating season" is a period in autumn in which annual supply agreements for the following calendar year are negotiated. For example, annual contracts between suppliers and purchasers for ferrosilicon covering all of calendar year 2023 would have been negotiated in the autumn mating season of 2022.

ratio, even when shipments increased.  Furthermore, subject importers increased underselling to near-universal levels in interim 2024, a fact not challenged by Plaintiff.

In its Views, the Commission thoroughly explained its multiple reasons for rejecting Plaintiff's theory, yet Plaintiff's response to the record evidence is that this is all about perception, not what actually happened in 2023.  However, the record showed that what occurred in 2023 was foreseen by the industry in late 2022, as prices were already decreasing.  Plaintiff's claims regarding U.S. supply also fail, as imports were necessary in the U.S. market, thus any demand increase coupled with a supply shortfall would increase prices for all, but particularly imports as they would be the only other option for supply.

Finally, Plaintiff argues that the Commission's price suppression analysis was faulty because it was based on an incorrect calculation of U.S. apparent consumption.  As discussed above, this argument should be rejected because the Commission's use of the U.S. apparent consumption calculation that accounted for the inventory overhang during the POI was reasonable, and the increase in consumption in interim 2024 set out in that calculation should have led to an increase in prices.  Plaintiff's argument also ignores other record evidence supporting the Commission's price suppression determination, including findings on the domestic industry's COGS-to-sales ratio.

>    **4.     Whether the Commission's impact determination was reasonable and supported by substantial evidence?**

**Yes.**  The Commission determined that significant volumes of subject imports increased underselling to near-universal levels at the end of the POI, capturing market share from domestic producers and suppressing prices, which led to decreases in the financial performance of the domestic industry in 2023 and interim 2024.  Yet Plaintiff argues that the domestic industry's financial performance in 2023 was entirely due to [                              ] detached from subject

imports.  First, this argument regarding [          ] is limited to 2023, and thus completely

ignores interim 2024, when the financial performance of [

] during a time of near-universal underselling and increasing demand.  Plaintiff does

not argue that [                                        ] the domestic industry's financial

performance during the interim period, nor could it, as [

].

Second, Plaintiff's arguments are based on the assumption that all members of the

domestic industry must be identical and have identical experiences, yet they rarely are, nor are

they required to be.  Each member of the domestic industry has different structures and

commercial realities, and as such, the companies' individual financial results will differ.  Such

differences do not break the causal link between subject imports and impact.  Plaintiff ignores

that, regardless of such differences, the performance trends of [                    ] were

similar, including substantial declines in financial performance from 2022 to 2023 and into

interim 2024.  Moreover, the Commission considered Plaintiff's argument but found that the

lower level of profitability reported by [          ] throughout the POI could not explain the

substantial declines in the financial performance of the domestic industry at the end of the POI,

as cumulated subject imports intensified their underselling and pulled down prices.  The

Commission also explained how record evidence supported the finding that [

], did not cause any declines, as the purchases affected by [

] were relatively small and would not explain its financial

decline.

Finally, similar to its arguments regarding volume and price effects, Plaintiff claims that

the Commission erred in changing its methodology for the calculation of U.S. apparent

consumption, which, therefore, meant that the Commission ignored consumption trends and non-subject imports that were the primary causes of the domestic industry's declining performance in interim 2024. First, as previously discussed above, the Commission properly revised its methodology for calculating U.S. apparent consumption to account for the inventory overhang present during the POI and provided an accurate measure of consumption. Second, as Plaintiff's arguments regarding demand and nonsubject imports are entirely based on consumption and market share calculations that fail to reflect actual consumption or the real size of market share, they should also be rejected. Third, the Commission also rejected Plaintiff's arguments regarding nonsubject imports based on an analysis of AUVs, finding that low volumes of high priced nonsubject imports did not explain the domestic industry's performance – a finding not challenged in this appeal.

## II.    STANDARD OF REVIEW

In reviewing the Commission's determinations, the Court of International Trade must sustain the Commission's determinations, findings or conclusions unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" 19 U.S.C. § 1516a(b)(1)(B)(i). Determinations made by the Commission are presumed to be correct, with the burden on the challenging party to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). "The specific factual findings" on which the Commission relies "in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of an agency in choosing between two fairly conflicting interpretations of the facts on the record. *See Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Further, the Court of Appeals for the Federal Circuit ("Federal Circuit") has held that "substantial evidence on the record means 'more than a mere scintilla' and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if some evidence on the record detracts from the agency's ultimate determination. *Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citing *Universal Camera Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A.*, 582 F.3d at 1339. As the Federal Circuit has held, the substantial evidence standard is a "high barrier" for a challenging party to overcome. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

## III.    STATEMENT OF FACTS

On March 8, 2024, CC Metals and Ferroglobe, American producers of ferrosilicon, filed antidumping and countervailing duty ("AD/CVD") petitions regarding imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia.

11

In May 2024, the Commission made affirmative preliminary material injury determinations for all four subject countries. *Ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia; Determinations*, 89 Fed. Reg. 43,435 (Int'l Trade Comm'n, May 17, 2024), P.R. 75.

Commerce published its preliminary affirmative determinations for the CVD and AD investigations regarding Russia on June 28, 2024. Final Staff Report at I-1. Because Commerce postponed its preliminary affirmative determinations for the AD and CVD investigations on imports from Brazil, Kazakhstan, and Malaysia, the investigation schedules became staggered. Commission Views at 4. While staggered, the Commission, pursuant to 19 U.S.C. § 1677(7)(G)(iii), collected record evidence for all four subject countries in the leading investigations so that the records of both the leading and the trailing investigations would be the same, except for events that had not yet occurred, *i.e.*, the final Commerce determinations for Brazil, Kazakhstan, and Malaysia, Commerce's final critical circumstances determinations on imports from Brazil and Malaysia, and the parties' final comments regarding those yet to be made determinations. *Id.* In other words, collection of questionnaire data, briefing, the hearing, and other gathering of record evidence for all subject countries occurred during the leading investigations.

In the leading investigations, the Commission released its Prehearing Staff Report to the parties on August 28, 2024. INV-WW-102: Final Prehearing Report ("Prehearing Staff Report"), C.R. 173, P.R. 110. In the Prehearing Staff Report, the Commission calculated U.S. apparent consumption using official U.S. import statistics from the Census Bureau. *Id.* at IV-32. These data showed that the volume of subject imports, and the increase in that volume, were significant on an absolute basis, as cumulated subject imports increased from 98,536 short tons constrained silicon ("STCS") in 2021 to 119,121 STCS in 2023, an increase of over 20,500 ST,

or 20.9 percent.  *Id*. at C-3.  While the volume of subject imports in the official statistics decreased from the first half of 2023 to the first half of 2024, on an annualized basis the quantity of subject imports in 2024 – 103,118 STCS – would have exceeded the quantity of subject imports at the beginning of the period of investigation by over 4,500 STCS.  *Id*.

In addition, the data provided in questionnaire responses regarding Russia demonstrated that the true volume of Russian imports shipped to the United States was far greater than the massive volumes reported in the official import statistics, as questionnaire data accounted for a [     ] percent share of the Russian imports reported in the official data concerning imports for consumption (as opposed to general imports).  *Id*. at IV-1. Petitioners' Prehearing Br. at 21, C.R. 174, P.R. 111.   Finally, the Prehearing Staff Report sets out that inventories of Russian ferrosilicon rose [         ] over the period, increasing by [       ] percent from 2021 to 2023, and remaining elevated in the first half of 2024, where the inventory level of Russian ferrosilicon – [       ] STCS – is [                    ] the inventory level in 2021, [         ] STCS.  Prehearing Staff Report at C-3, C.R. 173, P.R. 110; Petitioners' Prehearing Br. at 14, C.R. 174, P.R. 111.

In their Prehearing Brief, Plaintiff, along with ferrosilicon producers in Brazil and Malaysia (together, "Joint Respondents"), argued that the domestic industry did not suffer adverse volume effects by reason of subject imports, pointing to the market share calculation using the U.S. apparent consumption data based solely on official import statistics found in the Prehearing Report, amongst other arguments.  Joint Respondents' Prehearing Br. at 19-26, C.R. 175, P.R. 117.  Joint Respondents' Prehearing Brief ignored inventory levels and U.S. shipments from inventories in its arguments on market share and volume.  *Id*.

At the Commission's hearing on September 12, 2024, the issue of how to calculate U.S. apparent consumption based on the data on the record was a prominent issue.  Petitioners pointed

13

to this issue in their opening remarks, arguing that the Commission's volume analysis should use U.S. shipments "given observed inventory levels and demonstrates that subject imports took significant share from the domestic industry in the first half of 2024."  Hearing Transcript (Tr.) at 8 (Mr. Gordon), P.R. 129.  Petitioners also responded to questions regarding this issue from the Commissioners, setting out the inventory overhang problem and a general solution, but without crossing the line into specifics that would publicly reveal business proprietary information ("BPI").  *See, e.g.*, *id*. at 30-34 & 70 (Mr. Bay).  Joint Respondents were also asked about the inventory overhang issue, as Commissioner Kearns, after reviewing the relevant data in the Prehearing Staff Report, highlighted its importance, and called for all parties to address this issue, at the beginning of the panel for respondents.  Specifically, he stated

> the inventories we're seeing from one source in particular here are pretty dramatic, and it's hard to imagine just ignoring that altogether.  So, you know, how should we take that into account? For example, you know, one possibility would be that we could adjust imports to address the -- essentially, take shipments of imports for, you know, where that's a real issue, inventory is a real issue, and then leaving the rest of the data intact.
>
> You know, is that something that you think would be a fair way of addressing this inventory overhang issue?  And if not that, then how do we?  Because *this is one of the most extreme cases I think I've seen of an inventory overhang* basically.  So how would you respond to that?  And others, of course, the other counsel as well.

*Id*. at 140 (Commissioner Kearns) (emphasis added).

Joint Respondents responded that "a more fulsome answer in terms of the… reasonableness of the type of thing that you just proposed would have to wait until post-hearing." *Id*. at 141 (Mr. Duggan).  Moreover, Joint Respondents acknowledged that they were restricted in how they could discuss inventories because of BPI.  *Id*. ("looking at the subject import inventories, this is Table Roman VII-14, you know, I don't want to comment too much on it involving proprietary information").  After the hearing, Petitioners and Joint Respondents

14

**PUBLIC VERSION**

submitted their posthearing briefs, where both sides proposed alternatives for the Commission to consider on the inventory overhang issue.

Petitioners' Posthearing Brief proposed two alternatives to account for the inventory overhang and its effect on U.S. apparent consumption and market share.  Petitioners' Posthearing Br. at 5-9, C.R. 184, P.R. 126.  The first followed the suggestion by Commissioner Kearns at the hearing, using shipment data for Russian imports to replace official import statistics, but leaving the rest of the data as is.  *Id*. at 6-7.  The second followed prior Commission practice in cases involving significant volumes of shipments from inventories, using net U.S. shipments of imports by adjusting the official import statistics with the change in inventories and re-exports from the questionnaire responses for all imports.  *Id*. at 8-9 (citing, *e.g.*, *Glycine from China, India, and Japan*, Inv. Nos. 701-TA-603-604 and 731-TA-1413-1414 (Final), USITC Pub. 4900 (June 2019) at II-7).  Both proposed calculations result in an increase in U.S. apparent consumption, as well as a market share shift from the domestic industry to subject imports, between the interim periods.  However, the first method's results are more conservative, with apparent consumption increasing by [     ] percent and domestic producers losing [    ] percentage points of market share to subject imports, compared to an apparent consumption increase of [    ] percent and a direct market shift of [     ] percentage points found with the second calculation.  *Compare id*. at 6-7 with *id*. at 8-9.

Joint Respondents made two proposals; first, to ignore the role of shipments and inventories of Russian merchandise (and the behavior of the [

]) altogether; and second, to use an alternative calculation they invented, making arbitrary adjustments by using POI-wide data for each subject country, which resulted in a

[                                                        ].  Joint Respondents' Posthearing Br. at APP-

15

15-24, C.R. 182, P.R. 128.  In other words, Joint Respondents' second alternative calculation results in [                                                    ] when the entire industry, including the Joint Respondents, recognized post-COVID supply chain issues led to increases in demand and higher shipments that led to historically higher prices.  *See, e.g.*, Tr. at 136 (Mr. Duggan), P.R. 129 ("during the full calendar years of 2021 to 2023, when demand was increasing.  This also includes 2022, a year in which the unusual market conditions discussed earlier resulted in historic windfall profits for the industry.").  In addition, Joint Respondents' alternative calculation [                                                              ] from interim 2023 to interim 2024.  Joint Respondents' Posthearing Br. at APP-19 (showing a [                                                                                  ] in the "Change, PY, 2023-24" column); Petitioners' Final Comments at 5-6, n. 19, C.R. 208, P.R. 147.

The Commission released its Final Staff Report on October 2, 2024.  In that report, the Commission calculated U.S. apparent consumption "based on data submitted in response to Commission questionnaires (U.S. producers' U.S. shipments and U.S. shipments of imports from Russia) and official import statistics (U.S. imports from Brazil, Kazakhstan, Malaysia, and all other sources)."  Final Staff Report at I-4 n.8 & IV-35 n.17.  Joint Respondents filed final comments in the leading investigation that objected to this methodological change.  Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148.

On October 17, 2024, the Commission voted in the affirmative that subject imports from Russia caused material injury to the domestic industry.  Commission Views at I-2.  The Commission made its determination with regard to Russia on a cumulated basis with all other subject imports, and no respondent party contested cumulation for the Commission's present material injury analysis.  *Id*. at 18 & 21.  In its Views, the Commission explained its

16

**PUBLIC VERSION**

methodology for calculating U.S. apparent consumption and market share in the Final Staff Report, stating that "U.S. shipments of subject imports from Russia reported in U.S. importers' questionnaire responses were the most reliable data to include" in order to ensure apparent U.S. consumption figures reflected subject import volumes sold from inventories but did not include subject import volumes held in inventories. *Id*. at 39-40, n.189.  Specifically, because [


],

official import statistics for Russia were not the best measure of consumption, especially when the U.S. shipment data from questionnaire responses covered the full volume of Russian imports. *Id.* at 39 n.189.  In other words, given that [

], the

official import statistics were not tied to consumption of those products.  The Commission, however, did not use shipment data to measure consumption of other imports, as incomplete questionnaire coverage, as well as that inventories of such imports were smaller and did not present such a dramatic shift than the inventories of subject imports from Russia. *Id.*

The Commission Views rejected Joint Respondents' argument that they were deprived of the opportunity to comment on the Commission's use of U.S. shipment data instead of import data for Russia, as they addressed the issue in their posthearing brief and final comments after being invited to comment on the U.S. apparent consumption calculation methodology by Commissioner Kearns at the hearing, as set out above. *Id.*  The Commission also rejected Joint Respondents' argument that the results of this methodology were inconsistent with evidence that demand declined in interim 2024 compared to interim 2023. *Id*. at 40 n.198.  The Commission

explained that questionnaire responses on demand trends were mixed, and that conflating demand with consumption was inappropriate. *Id*.

Ultimately, using this methodology, the Commission found that U.S. apparent consumption of ferrosilicon "fluctuated, increasing from [     ] STCS in 2021 to [     ] STCS in 2022, and then decreasing to [     ] STCS in 2023, a level essentially equal to 2021; it was [   ] percent higher in interim 2024, at [     ] STCS, than in interim 2023, at [     ] STCS." *Id*. at 27. With respect to market share, the Commission found that the domestic industry's "share of apparent U.S. consumption was lower in interim 2024, at [   ] percent, than in interim 2023, at [   ] percent," meaning that the domestic industry went from being the largest supply source in 2023 to being the second largest supply source by the end of the POI. *Id*. at 27-28. The ratio of cumulated subject imports to domestic production was also "lower in interim 2024, at [   ] percent, than in interim 2023, at [   ] percent." *Id*. at 40. Altogether, the Commission found that the "volume of cumulated subject imports is significant, in absolute terms and relative to both consumption and production in the United States." *Id*.

Relative volume, however, was not the whole story. Pricing data showed predominant overselling by subject imports at the beginning of the POI, yet there was "a notable shift in the pricing behavior toward the end of 2022 {that} led to extensive underselling by subject imports in 2023, and near-universal underselling by volume in interim 2024." *Id.* at 42. U.S. Purchaser responses also indicated both lost sales and lost revenues due to subject imports. *Id*. at 43-44. Given the "high degree of substitutability between domestically produced ferrosilicon and subject imports, the importance of price in purchasing decisions, the extensive underselling in 2023 and the near-universal underselling by volume in interim 2024 by subject imports, and the evidence of lost sales and revenues," the Commission found that underselling by subject imports

18

was significant. *Id*. at 44-45. This significant underselling "led to a shift in market share of [      ] percentage points from the domestic industry to subject imports which began in the second half of 2023 and was greatly accelerated in interim 2024." *Id.* at 45. The Commission further found that subject imports suppressed domestic prices in interim 2024, as the domestic industry should have been able to realize at least modest price increases in interim 2024 given increased demand and the need to cover relatively high costs, but were prevented from doing so by declining subject import prices and near universal underselling. *Id.* at 47-48.

The price effects of subject imports at the end of the POI caused declines in the domestic industry's financial performance. The Commission found that the "domestic industry's trade and financial indicators generally improved from 2021 to 2022, after which the domestic industry's financial performance began deteriorating," and "continued to deteriorate in interim 2024, while the domestic industry's market share dropped precipitously." *Id.* at 50. This was triggered when a "significant volume of subject imports undersold the domestic like product to a significant degree in 2023, which brought about a sharp deterioration of the domestic industry's financial performance." *Id*. at 53. As subject import prices declined and underselling increased to near-universal levels in 2024, subject imports suppressed domestic prices and took [      ] percentage points of market share from the domestic industry, further harming the domestic industry's financial performance. *Id*. at 53-54. The Commission found that, while the domestic industry should have expected to increase its U.S. shipments and net sales in line with the increase in apparent U.S. consumption in interim 2024, subject import underselling instead caused declines in its output, market share, and net sales AUV. *Id.* at 54. Ultimately, the Commission determined that the domestic industry "would have realized a greater volume of sales and increased revenue in the absence of dumped and subsidized subject imports," and, therefore,

19

"low-priced subject imports resulted in overall declines to the domestic industry's production, employment, U.S. shipments, net sales, and financial performance." *Id.* at 54.

The Commission also considered whether other factors had an impact on the domestic industry, and explained that those other factors, "including nonsubject imports and decreasing apparent U.S. consumption, that may have had an impact on the domestic industry to ensure that we are not attributing injury from such other factors to subject merchandise." *Id.* at 54-56.

The Commission rejected multiple arguments made by the Joint Respondents regarding impact. First, the Commission rejected the argument that subject import underselling could not have affected the mating season in 2022 or the pricing of shipments in 2023. *Id*. at 56-57. Second, the Commission rejected Plaintiff's argument that the domestic industry's declining performance was "entirely attributable to [                                    ] rather than subject imports." *Id*. at 57-58. While the Commission found that [

                                    ], both companies saw similar trends in their performance throughout the POI, including substantial declines in their financial performance from 2022 to 2023, which continued declining into interim 2024." *Id*. at 57-58. There was also "little evidence that [                                    ] had a meaningful impact on [

    ] sales of ferrosilicon" as only two purchasers reporting issues specific to that company, with one purchaser attributing the issues to [                            ] and the other purchasing [                        ]. *Id*. at 58. Finally, the Commission rejected the argument that domestic producers were incapable of increasing their U.S. shipments or market share beyond the levels achieved during the POI. *Id*. at 58-59.

Based on the record, the Commission found that cumulated subject imports caused present material injury to the domestic industry, and made an affirmative determination with

20

regard to Russia. *Id.* at 65. Later, the Trailing Views adopted the Commission's prior analyses and findings in its affirmative determinations on subject imports from Brazil, Kazakhstan, and Malaysia. Trailing Views at 3 & 7, P.R. 178, C.R. 214.

## IV.    ARGUMENT

### A.    The Commission's Volume Analysis Should Be Upheld

Plaintiff argues that the Commission unlawfully adopted the Petitioner's "flawed, eleventh-hour methodology to calculate apparent U.S. consumption that the Joint Respondents demonstrated was both unwarranted and unreliable," allegedly without providing Plaintiff with sufficient time to comment on the methodology during the investigations. Pl. Br. at 27. Plaintiff also argues that, based on this revised methodology, the Commission's volume findings were not supported by substantial evidence. *Id.* at 28. Plaintiff's arguments, however, ignore the record evidence necessitating the Commission's chosen methodology and the totality of the Commission's volume findings, as well as misrepresent the prior determinations of the Commission and the administrative record of the case, all in an attempt to reach a predetermined conclusion, rather than provide the best measurement for U.S. apparent consumption based on the record. For the reasons set out below, Plaintiff's arguments should be rejected, and the Commission's determination should be affirmed.

#### 1.    The Commission's calculation methodology regarding U.S. apparent consumption was reasonable and supported by substantial evidence

As set out by Commissioner Kearns and the Petitioners at the hearing, the U.S. apparent consumption calculation in the Prehearing Staff Report failed to account for an inventory overhang that was "a real issue." Tr. at 140 (Commissioner Kearns), P.R. 129. Moreover, questionnaire data coverage for imports other than Russian imports were low. Commission Views at 6 n.13, 39 n.189. Plaintiff confirms, citing the Joint Respondents' Posthearing Brief,

that the questionnaire data coverage for imports other than Russian were low, and their use would skew the U.S. apparent consumption calculation results. Pl. Br. at 22-23 ("It is true that the U.S. importer questionnaire data offered incomplete coverage for non-Russian imports, and that the reliance on that raw data would not have provided an accurate view of the U.S. ferrosilicon market"). In response to these issues, the Commission "based apparent U.S. consumption on U.S. shipments where questionnaire data coverage permit, as is the case for the domestic industry and for subject imports from Russia," but used official U.S import statistics "where questionnaire data are less complete, as is the cases for other import sources," in the Final Staff Report. Commission Views at 6 n.13.

"The ITC has 'broad discretion' in choosing methodology for measuring volume." *Whirlpool Corp. v. United States*, 37 CIT 1775, 1786 (2013) (citing *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT 1370, 1384 (2012)). Accordingly, "{w}hen presented with a challenge to the Commission's methodology, the court examines 'not what methodology {plaintiff} would prefer, but ... whether the methodology actually used by the Commission was reasonable.'" *JMC Steel Grp. v. United States*, 38 CIT 1560, 1468, 24 F. Supp. 3d 1290, 1300 (2014) (quoting *Shandong*, 35 CIT at 559, 774 F. Supp. 2d at 1329); *see also Whirlpool Corp.*, 37 CIT at 1786. In this case, Plaintiff's unsupported arguments have not shown the Commission's methodology for calculating apparent U.S. consumption to be anything other than reasonable, and those arguments should be rejected.

Plaintiff, however, claims that the Commission's methodology in the Final Staff Report inexplicably rejected other alternatives and was "nonsensical," in addition to implying that it was also procedurally improper. Pl. Br. at 21-27. Plaintiff's claims ignore the record in an attempt

22

for force a methodology on the Commission for measuring consumption that does not actually measure consumption.

First, Plaintiff attempts to portray any action by the Petitioners and the Commission as "last minute," "late in the proceedings," and "eleventh-hour." Pl. Br. at 21 & 27. These word choices seem to echo the Joint Respondent argument raised during the investigation that "they were deprived of an opportunity to meaningfully comment on the Commission's decision to use questionnaire data for Russian imports to calculate apparent U.S. consumption, as the Commission only adopted this approach in the posthearing staff report." Commission Views at 39 n.189 (citing Joint Respondents' Final Comments at 2, C.R. 209, P.R. 148). Petitioners note that Plaintiff has not brought forth such an argument on appeal, instead using this colorful language in an attempt to distract from the record of the investigations.

Yet these word choices ignore the straightforward nature of those proceedings, as set out in the Statement of Facts above. Specifically, the Joint Respondents made an argument regarding U.S. apparent consumption in their Prehearing Brief, this position was discussed extensively at the hearing – although circumscribed by BPI limitations acknowledged by both Petitioners and Joint Respondents – where it was opposed by Petitioners, who pointed out how Joint Respondents' argument does not address the issue of the inventory overhang present in the market. Commissioner Kearns then specifically called for all parties to comment on how to best address the inventory overhang issue, and both Petitioners and Joint Respondents made arguments and proposals to the Commission in their posthearing briefs. After publication of the Final Staff Report, both Petitioners and Joint Respondents had another chance to comment on the Commission's methodology and each others' proposals, which they did. The Commission then made its determination, utilizing its chosen methodology, as the best available to provide the best

measure of U.S. apparent consumption after considering the record evidence and parties'

arguments. Nothing in this timeline could be seen as Plaintiff being blindsided by the inventory

overhang, particularly as Plaintiff had the same access to the information provided in

[          ] questionnaire response that Petitioners used to highlight [

] in their Prehearing Brief. Petitioners' Prehearing Br. at 21 & n.84. As such, Plaintiff's

attempts to imply procedural irregularities should be seen for what they are, a red herring.

Second, Plaintiff argues that "the original calculations from the Prehearing Staff Report

were inexplicably erased, Petitioners' second proposed method was inexplicably ignored," and

another alternative proposed by Joint Respondents "was also inexplicably ignored." Pl. Br. at

22. But, as acknowledged by Plaintiff, the Commission set out its reasoning for changing its

methodology in its Views, including why it used U.S. shipment data for Russian imports and

official Commerce statistics for all other imports, as these "were the most reliable data to include

for purposes of calculating apparent U.S. consumption." Commission Views at 39-40 n.189; Pl.

Br. at 22. Furthermore, Plaintiff would have known exactly why the calculation changed at the

time of the release of the Final Staff Report, based on the clear identification of the problematic

issues set out at the hearing and addressed in the parties' briefs.

Third, Plaintiff claims that the Commission ignored its alternative method for calculating

U.S. apparent consumption. Pl. Br. at 23.[4] This is patently false. In its Views, the Commission

stated that it "considered Joint Respondents' comments, but for the reasons discussed above {in

the footnote} found that U.S. shipments of subject imports from Russia reported in U.S.

---

[4] Petitioners note that the alternative method discussed by Plaintiff was not the Joint Respondents' primary argument. The principal method they suggested was to ignore the overhang issue altogether and continue to use only official U.S. import statistics for all imports in the U.S. apparent consumption calculation. Joint Respondents' Posthearing Br. at 1-7, C.R. 182, P.R. 128

**PUBLIC VERSION**

importers' questionnaire responses were the most reliable data to include for purposes of calculating apparent U.S. consumption." Commission Views at 49 n.189.

The Commission was presented with four alternative methodologies to calculate U.S. apparent consumption. Petitioners proposed two alternatives to properly account for the inventory overhang and its effect on U.S. apparent consumption and market share. Petitioners' Posthearing Br. at 5-9, C.R. 184, P.R. 126. The first followed the suggestion by Commissioner Kearns at the hearing, using shipment data for Russian imports to replace official import statistics, but leaving the rest of the data as is. *Id*. at 6-7. The second followed prior Commission practice in cases involving significant volumes of shipments from inventories, using net U.S. shipments of imports by adjusting the official import statistics with the change in inventories and re-exports from the questionnaire responses for all imports. *Id*. at 8-9 (citing, *e.g.*, *Glycine from China, India, and Japan*, Inv. Nos. 701-TA-603-604 and 731-TA-1413-1414 (Final), USITC Pub. 4900 (June 2019) at II-7). Both proposed calculations show in an increase in U.S. apparent consumption, as well as a market share shift from the domestic industry to subject imports, between the interim periods. However, the first method's results are more conservative, with apparent consumption increasing by [    ] percent and domestic producers losing [   ] percentage points of market share to subject imports, compared to an apparent consumption increase of [   ] percent and a direct market shift of [    ] percentage points found with the second calculation. *Compare id*. at 6-7 with *id*. at 8-9.

Joint Respondents made two proposals: first, to ignore the role of shipments and inventories of Russian merchandise altogether and simply use official U.S. import statistics; and second, to use an alternative calculation they invented, making arbitrary adjustments by using POI-wide data for each subject country, which resulted in a [

25

].  Joint Respondents' Posthearing Br. at APP-15-24, C.R. 182, P.R. 128; *see also* Petitioners' Final Comments at 5-6, C.R. 208, P.R. 147.  Notably, Joint Respondents' alternative calculation, despite cherry picking data in an attempt to create the most favorable calculation possible, [

] from interim 2023 to interim 2024.  Joint Respondents' Posthearing Br. at APP-19 (showing a [

] in the "Change, PY, 2023-24" column); *see also*, Petitioners' Final Comments at 5-6 n.19, C.R. 208, P.R. 147.

The Commission elected to use the approach described by Commissioner Kearns and proposed by Petitioners, where apparent U.S. consumption was calculated using import data from official Commerce statistics for subject imports from Brazil, Kazakhstan, Malaysia, and nonsubject sources and questionnaire data for U.S. shipments of subject imports from Russia.  Commission Views at 39 n.189.  This methodology reflects measuring subject imports from Brazil, Kazakhstan, and Malaysia using the primary method advocated by Joint Respondents.  In other words, Plaintiff does not disagree with the method used to quantify Brazilian, Kazakhstani, and Malaysian imports, but objects to the trends shown once the behavior of Russian imports in the U.S. market, specifically the volume of inventories [                                    ], is factored into the calculation.  As such, Joint Respondents' first alternative completely ignored the inventory overhang issue identified by the Commission at the hearing, and the second offered a poorly MacGyvered methodology, based on adjusting already low-coverage questionnaire data, in order to minimize the reported level of consumption of Russian ferrosilicon in the United States.  However, Joint Respondents' second alternative calculation results in [

] even though the entire industry, including the Joint

26

Respondents, recognized post-COVID demand increases and higher prices at that time. *See, e.g.*, Tr. at 136 (Mr. Duggan), P.R. 129 ("during the full calendar years of 2021 to 2023, when demand was increasing. This also includes 2022, a year in which the unusual market conditions discussed earlier resulted in historic windfall profits for the industry."). In short, Plaintiff is asking this Court to require the Commission to rely on consumption data that do not actually account for consumption of subject merchandise from Russia in order to limit the record and reach the result that it wants. This court should reject Plaintiff's argument.

Finally, Plaintiff argues that the selected methodology is unlawful because it "did not accurately reflect market conditions." Pl. Br. at 23. Essentially, Plaintiff relies on evidence submitted by Joint Respondents that "shipments of Russian product from inventory did not, in actuality, materially impact the U.S. ferrosilicon market in the latter segments of the POI." *Id*. at 24 (citing Joint Respondents' Posthearing Br. at 4, C.R. 182, P.R. 128). For example, Plaintiff relies on evidence such as "an affidavit from a representative of a major ferrosilicon trader—showing that U.S. customers were 'increasingly refus{ing} to purchase product imported from Russia,' even if that product was already in the United States and sitting in importers' inventories" to support its contention. Pl. Br. at 24 (citing Final Staff Report at Table C-1 & Joint Respondents' Posthearing Br. at 5 & Exhibit 3, C.R. 182, P.R. 128). Plaintiff claims that this evidence "illustrates how U.S. customers were unwilling to purchase Russian-origin volumes, even if they were already sitting in inventory in the United States." *Id*. at 24-25.

Plaintiff's reliance on this evidence is misplaced and contrary to record evidence. When the Commission used U.S. shipment data of Russian imports, it was relying on actual, certified shipment data [

27

].  Final Staff Report at IV-3 n.6 & V-44 to V-45 (setting out that [

]).  Thus, the

Commission knew exactly when and what volumes were actually sold to end use consumers –

*i.e.*, the exact thing that U.S. apparent consumption is attempting to measure.  As a result, the

Commission knows that U.S. purchasers, whom Plaintiff claims were refusing to purchase

Russian material at the end of the POI, purchased [            ] in interim 2024, accounting for

[            ] of all consumption of ferrosilicon in the United States.  Final Staff Report at IV-36

(Table IV-17).

Furthermore, the Commission knows who purchased Russian subject merchandise during

the POI.  For example, [

].  Response to U.S.

Purchasers' Questionnaire by [            ] at 6, 9 & 15, C.R. 84;  *See also* Petitioners' Prehearing

Br. at 17 n.67 (citing Prehearing Staff Report at V-41, C.R. 173, P.R. 110) ([

]).  This undercuts the validity of the

market speculators that Plaintiff cites to, as those prognostications missed [

].  Given the volume shipped and the purchasers of

those volumes, Plaintiff's assertion that shipments of Russian product from inventory did not

impact the U.S. ferrosilicon market in the latter segments of the POI is demonstrably incorrect,

and should be rejected.

Plaintiff also claims that the methodology is flawed because it showed an increase in

consumption from interim 2023 to interim 2024, and, if annualized, would result in U.S.

apparent consumption [                                                    ] the unprecedented levels of consumption in 2022." Pl. Br. at 25 (citing Joint Respondents' Final Comments at 3, C.R. 209, P.R. 148). However, the Commission's Views set out how it considered the arguments and record evidence highlighted by Plaintiff with regard to this claim, but found it outweighed by other evidence. Commission Views at 39-40 n.189 (citing Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148). Specifically, the Commission explained that Plaintiff's argument was not persuasive given that the record evidence concerning demand during the period was mixed. Commission Views at 39-40 n.189 (citing Section VII.B.1 of that document, which set out varied responses by market participants of demand patterns over the POI, and that consumption did not track production of downstream products). Furthermore, annualizing the interim 2023 consumption data would result in U.S. apparent consumption that would be [

] the amount of consumption that actually occurred over that full year, highlighting that annualization of a number can be indicative, but not necessarily when other record evidence points to [                                                               ].

Moreover, as set out above, the Commission relied on actual data provided and certified by [                      ] Russian imports in the U.S. market, not the speculation of a third party who has no insight in the actual sales made by that company. Yet, in this case, Plaintiff would have the Commission discard actual data collected in a questionnaire, which no party has questioned the accuracy or validity of, not only for the predictions of others, but only on the predictions of others who support their position when the record is mixed (and those predictions are made by those who were wholly incorrect in their view of the volume of sales of Russian merchandise in this market).

29

**PUBLIC VERSION**

The Commission also pointed out an apparent conflation of demand and apparent consumption concepts in Joint Respondent's arguments, highlighting that "{d}emand refers to consumers' willingness to purchase a product at various price levels, while consumption reflects what was actually purchased and sold in the market." Commission Views at 40 n.189. As these are two, distinct economic terms, "even if demand was lower in interim 2024, that would not foreclose the possibility of higher apparent domestic consumption relative to interim 2023." *Id*. Therefore, the evidence highlighted by Plaintiff does not disqualify data, again, based on actual shipments, showing that apparent U.S. consumption was higher in interim 2024 compared to interim 2023.

Yet Plaintiff still pursues this point, arguing that "apparent U.S. consumption based on shipment data might understate total demand if purchasers were satisfying their needs from their own previously-built inventories" but "could not overstate purchasers' demand for Russian imports in that period." Pl. Br. at 26-27 (emphasis removed). But this position once again inappropriately conflates demand with apparent consumption in an attempt to restrict hard data. [

]. Commission Views at 35 (citing [

]. [

] of imports of Russian material in 2023. Final Staff Report at IV-2 (Table IV-1). U.S. shipments of subject imports from Russia then increased by [      ] percent between the interim periods as [                                                 ], even as subject imports from Russia decreased by [      ] percent in the official import statistics when [

]. *Id*. at IV-3 n.5, IV-4 (Table IV-2) & C-1. Plaintiff claims that this is not possible because of its view of demand, but the data are what the data are. The Commission collected [          ] data on its imports, its inventory levels, and its U.S. shipments. No one besides those inside [          ] and under APO in these investigations have these data, no matter how "in the know" they might be. Any third party's opinion of market demand for Russian product is deficient in comparison and do not trump the actual data on consumption. In other words, Plaintiff's conjecture regarding demand does not limit the hard data relied upon by the Commission to measure consumption of subject imports from Russia.

The Court should, therefore, reject Plaintiff's arguments and find that the Commission's chosen methodology was reasonable, supported by substantial evidence, and in accordance with law.

2. The Commission's volume determination was reasonable and supported by substantial evidence

In making its volume determination, the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). In this case, the Commission did exactly that. As set out in its determination, the volume of subject imports increased from 98,536 STCS to 120,762 STCS from 2021 in 2022, then decreased to 119,121 STCS in 2023. Commission Views at 38. Subject import volume decreased from interim 2023 (76,454 STCS) to interim 2024 (51,569 STCS). *Id*. While subject imports' share of apparent U.S. consumption decreased from 2021 to 2023, from [     ] percent to [     ] percent, subject share then increased from interim 2023, at [     ] percent, to interim 2024, at [     ] percent. *Id*. at 39. "Subject imports were the largest supply source to the U.S. market in 2021 and 2022, and was the second largest source in 2023 (when the domestic industry

31

temporarily exceeded subject imports' U.S. market share)," but then recaptured the top spot in interim 2024. *Id*. at 28-29. In addition, the ratio of subject imports to domestic production "decreased from [     ] percent in 2021 to [     ] percent in 2022, and then increased to [     ] percent in 2023; it was lower in interim 2024, at [     ] percent, than in interim 2023, at [     ] percent." *Id*. at 40. Supported by this record, the Commission found "that the volume of cumulated subject imports is significant, in absolute terms and relative to both consumption and production in the United States." *Id*.

Plaintiff's arguments do not undermine these findings. First, Plaintiff merely reiterates their arguments regarding calculation of U.S. apparent consumption, which should be rejected for the reasons stated above. Second, Plaintiff's arguments would impermissibly restrict the Commission's volume analysis. Plaintiff claims that in cases where "where the domestic industry has gained U.S. market share and cumulated subject imports have lost U.S. market share over the full years of a POI, the Commission has not found present material injury." Pl. Br. at 28 (citing *Glass Wine Bottles from China*, Inv. No. 701-TA-703 (Final), USITC Pub. 5550 (Oct. 2024), at 1, IV-32; *Fabricated Structural Steel from Canada, China, and Mexico*, Inv. Nos. 701-TA-616-617 and 731-TA-1432-1434 (Final), USITC Pub. 5031 (Mar, 2020), at 1, IV-27). There is no statutory requirement that the Commission base its volume finding on only the full years of the POI, and to apply such a cookie cutter requirement would be contrary to the statutory instruction for the Commission to consider this factor "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

It also ignores that not every investigation is solely about volume. When U.S. producers are faced with competition from low-priced, unfairly traded imports, they have two choices: 1)

match or beat those prices to maintain sales volume, or 2) lose the sale. Plaintiff's strict rule would require domestic producers to lose sales volume in order to obtain relief from unfair imports, regardless of the dynamics of the industry or the factual scenario they face.

Third, Plaintiff's claim of a set prior practice by the Commission is incorrect. Plaintiff ignores that each Commission investigation in *sui generis* and must respond to the unique set of facts that surrounds each industry. *See Cleo Inc.,* 501 F.3d at 1299 (because each injury investigation by the Commission is *sui generis*, "prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries"). Moreover, the Commission has previously made case-specific, affirmative determinations when subject import market share decreased over the full years of the POI. For example, in *Certain Preserved Mushrooms from France*, "subject imports as a share of apparent U.S. consumption decreased… from 2019 to 2021," yet the Commission still reached affirmative determinations. Inv. No. 731-TA-1587 (Final), USITC Pub. 5393 (Jan. 2023) at 3 & 25. Moreover, unlike the factual scenario here, subject import market share in that investigation also declined between the interim periods, which did not preclude a finding that volume was significant in absolute terms and relative to both production and consumption, nor an affirmative determination of material injury. *Id*. at 3 & 25-26.

Fourth, we agree with Defendant that "Plaintiff's argument is inappropriately framed as a challenge to the Commission's volume analysis," when it is, in fact, a causation argument. Def. Br. at 29-30. Volume effects are not part of the Commission's statutory volume analysis. *See ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019); *OCTAL, Inc. v. United States*, 539 F. Supp. 3d 1291, 1299-1300 (Ct. Int'l Trade 2021); *Adisseo Espana S.A., v. United States*, No. 1:21-cv-00562-

MMB, Slip. Op. at 15-16, *available at* 2023 WL 8866562, at *6 (Ct. Int'l Trade Dec. 18, 2023). As such, volume effects are not a basis for the court to reject a reasonable, supported volume determination.

Moreover, to the extent that Plaintiff's causation argument is part of its claims regarding impact, those claims should be rejected, as set out in Section IV.C below. The Commission considered the market share trends over the entire POI and properly found that the increase in subject import market share at the expense of the domestic industry in interim 2024, driven by increasing underselling to near-universal levels at the end of the POI, directly impacted the domestic industry's trade and financial indicators and that no other factors account for this injury. Commission Views at 49-59.

Ultimately, Plaintiff's arguments regarding volume come from a dislike of how the Commission called balls and strikes based on the record before it, and they are asking the Court to impose its judgement of the facts onto the Commission. The Court should reject such an impermissible request.

Finally, even if, *arguendo*, Plaintiff's claims regarding volume effects and market share did result in this Court rejecting the Commission's finding that subject import volume was significant relative to consumption, we note that Plaintiffs do not challenge the Commission's findings regarding volume in absolute terms and relative to production. While the statute requires the Commission to make a volume determination, it does not require that all of the enumerated scenarios be present in order for the Commission to find that volume is significant. 19 U.S.C. § 1677(7)(C)(i) ("whether the volume of imports of the merchandise, *or* any increase in that volume, *either* in absolute terms or relative to production or consumption in the United States, is significant.") (emphasis added). Therefore, even if this Court were to reject part of the

34

Commission's volume findings, the overall determination that subject import volume was significant stands.

### B.    The Commission's Price Effects Determination Should Be Upheld

#### 1.    The Commission's price effects analysis was supported by substantial evidence or otherwise in accordance with law

Plaintiff argues that the Commission's underselling analysis was contrary to record evidence and inconsistent with prior investigations. Pl. Br. at 30-32. Specifically, Plaintiff claims that the Commission's analysis is circumscribed, and that it must look at the price data only through the lens of frequency, volume, and degree of underselling on a cumulated basis over the entire POI. *Id*. Plaintiff further argues because subject imports oversold the domestic like product "in nearly 60 percent of instances" and "over [    ] percent of the volume"—including "majority overselling (both in terms of quarters and volume) for the three pricing products… that collectively accounted for over [    ] percent of the volumes"—over the POI, and that "the overselling margins were far more significant than the underselling margins," that the Commission erred in finding that "subject imports undersold U.S.-produced ferrosilicon to a significant degree." *Id*.

Plaintiff's claims are misplaced and should be rejected, as they ask the Court to reweigh the record evidence in this case to only find probative value in one aspect of the price data—the overall POI-wide comparisons—and to ignore the other record evidence discussed in the Commission's Views, including the pattern of increasing underselling over the POI, as well as "the high degree of substitutability between domestically produced ferrosilicon and subject imports, the importance of price in purchasing decisions,… and the evidence of lost sales and revenues." Commission Views at 4-45. Plaintiff's argument, however, has no statutory or legal basis, and is an attempt to impose an artificial constraint on the Commission's analysis.

35

Plaintiff also argued that these frequency and volume thresholds, on their own, are dispositive thresholds that require the Commission to make certain determinations based on other cases.  Pl. Br. at 31-32.  Yet the cases cited by Plaintiff present substantially different fact patterns, particularly as both cases saw increases in the degree of overselling by subject imports over the POI.  *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125 (Sep. 2020) at 16-17; *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 (Nov. 2024) at 61-65.  This is opposite to the record here, where overselling by subject imports in the first two years of the POI transitioned to "extensive underselling in 2023 and the near-universal underselling by volume in interim 2024 by subject imports."  Commission Views at 44-45.

In addition, Plaintiff claims that the Commission must not find significant underselling "when the average overselling margin was higher than the average underselling margin, even by just a few percentage points.  Pl. Br. at 31.  Plaintiff again ignores the trends over the POI specific to this case regarding increased underselling, while declines in prices of subject merchandise [            ] than the declines of the domestic like product during a period where underselling margins were significant [                              ], all while undersold volume increased.  Commission Views at 43-45; Final Staff Report at V-35.  These differences highlight why the Commission's approach to each investigation is *sui generis,* in order to respond to the unique facts of each industry.  *See Cleo Inc.,* 501 F.3d at 1299 (because each injury investigation by the Commission is *sui generis*, "prior determinations by the

PUBLIC VERSION

Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries").

Ultimately, Plaintiff's arguments are an attempt to isolate one data point and apply a threshold not found in the statute, all in order to avoid the record that as a whole demonstrates significant underselling at the end of the POI and significant price effects. This argument attempts to decouple the Commission's analysis from the conditions in the marketplace (such as the post-COVID period at the beginning of the POI) and from subject importer behavior, and would add an extra-statutory requirement that underselling must occur in every year of the POI. This argument is thus contrary to this court's holding that it is permissible for the Commission to focus on the more recent part of the POI to "'evaluating the *causal effects* of the subject imports.'" *See Nucor Corp. v. United States*, 28 CIT 188, 204-205, 318 F. Supp. 2d 1207, 1223-24 (2004), *aff'd*, 414 F.3d 1331 (Fed. Cir. 2010) (quoting *Taiwan Semiconductor v. United States*, 93 F. Supp. 2d 1283, 1294 n.13 (Ct. Int'l Trade 2000), *aff'd*, 266 F.3d 1339 (Fed. Cir. 2001)). The Court should reject Plaintiff's invitation to apply such a threshold here and decline to reweigh the record evidence.

> 2.    Plaintiff's arguments regarding 2023 pricing trends were reasonably rejected by the Commission

Plaintiff argues that the Commission failed to provide an "adequate" explanation when rejecting Plaintiff's claim that U.S. producer bargaining power in the 2022 mating season was the cause of 2023 underselling by subject imports. Pl. Br. at 32-36. This is yet another invitation by Plaintiff to reweigh the evidence that should be rejected.

Plaintiff claims that domestic producers were able to secure higher prices in the 2022 mating season than importers were because of "robust outlooks for 2023 demand" and "perceptions of a domestic shortage." Pl. Br. at 33. In other words, Plaintiff argues that

37

**PUBLIC VERSION**

purchasers in 2022 thought that demand was increasing while supply was decreasing, but that these market dynamics only applied to U.S. producers, and, therefore, these purchasers paid U.S. producers a premium. This is nonsensical. When demand is high and supply is restricted, prices increase for all market participants, not just domestic producers. This is particularly true in a market for a highly substitutable product such as ferrosilicon. If Plaintiff's view of the market were correct, then subject imports would also be able to benefit from higher prices in the marketplace; however, those prices declined. Commission Views at 46 ("prices of subject imports followed trends similar to, but more dramatic than, those for the domestically produced products, with significant increases from 2021 to the second quarter of 2022 followed by significant decreases through the first/second quarter of 2024").

Plaintiff points to increasing domestic producer shipments from 2022 to 2023 to support its theory. Pl. Br. at 36. That claim, however, ignores that prices for the six pricing products for which domestic producers reported shipments throughout the POI decreased from the third quarter of 2022 through the end of the POI. Commission Views at 45. In other words, not only did domestic prices begin declining during the 2022 mating season—when Plaintiff claims demand and supply pressures were giving U.S. Producers bargaining power—those prices kept decreasing throughout 2023, when those 2022 mating season contracts were applied. Yet, despite the supposed bargaining power held by the domestic industry, even though domestic producers were increasing shipment volume, there was a "sharp deterioration of the domestic industry's financial performance" in 2023, driven by an increase in the industry's COGS to sales ratio. *Id*. at 53; Final Staff Report at C-4. Simply put, domestic producers cut prices to increase shipments, contrary to the market description put forth by Plaintiff that is untethered from basic economics.

Moreover, Plaintiff ignores what happened next in time. In interim 2024, subject importers increased underselling to near-universal levels to capture market share. Commission Views at 44-45. Plaintiff does not challenge the Commission's findings on near-universal underselling during the interim periods, which furthered the financial harm on the domestic industry.

In its Views, the Commission thoroughly explained its multiple reasons for rejecting Plaintiff's theory. First, the Commission found that there was no perceived domestic shortage based on the lack of supply constraints reported in the questionnaire responses of producers and purchasers and price declines in 2023 [                                        ] that were contrary to supply shortages. *Id*. at 27 & 45, n. 205. Second, the Commission relied upon Plaintiff's own assertions that demand and price increases tied to post-COVID market conditions would inevitably decrease in 2023. *Id*. Third, the Commission relied upon the [      ] amounts of excess capacity available at domestic facilities in both 2022 and 2023, which corroborated purchasers reporting of a lack of supply constraints for the domestic industry. *Id*.

Plaintiff's response to the record evidence is that this is all about perception, not what actually happened in 2023. Pl. Br. at 34. Yet, as set out above, record evidence, particularly [                                        ], showed that what occurred in 2023 was foreseen by the industry in late 2022, as prices were already decreasing. Plaintiff goes on to argue that [

] somehow confirms that there was a domestic supply shortage. Pl. Br. at 35. At no point did any party claim that U.S. producers could satisfy the entirety of domestic demand, as acknowledged by the Commission. Commission Views at 28 (citing Petitioners' Prehearing Br. at 19, C.R. 174, P.R.

111).  As set out above, since imports were necessary in the U.S. market, any demand increase coupled with a supply shortfall would increase prices for all, but particularly imports as they would be the only other option for supply.  As with Plaintiff's other arguments, this relies on an assumption that each participant in the U.S. ferrosilicon market lives in its own vacuum and has no concept of market developments, market dynamics, or price factors, despite the existence of price indices and [                                        ].  Commission Views at 34 & 45 n.205.  Plaintiff's argument fails.

As with its arguments related to volume, Plaintiff once again wants this Court to reweigh the evidence regarding 2023 prices, not only to get around the Commission's reasonable findings based on record evidence, but also to undercut the Commission's finding with regards to underselling during the interim period, which led to increases in subject import market share at the expense of the domestic industry.  This Court should reject Plaintiff's invitation to reweigh evidence.

3.    Plaintiff's claims regarding price suppression should be rejected

Plaintiff argues that the Commission's price suppression analysis was faulty as it was based on an incorrect calculation of U.S. apparent consumption.  Pl. Br. at 36-37.  This argument should be rejected because, as set out above, the Commission's use of the U.S. apparent consumption calculation that accounted for the inventory overhang during the POI was reasonable, and the increase in consumption in interim 2024 set out in that calculation should have led to an increase in prices.  Commission Views at 48.  Plaintiff also ignores other record evidence supporting the Commission's price suppression determination, including that the Commission found that the domestic industry's costs increased over the POI, which remained higher at the end of the POI than during the beginning, and that "both U.S. producers' COGS-to-net-sales ratios were higher in interim 2024 than in interim 2023."  *Id*. at 48 n.213.  Despite the

fact that the Commission expected that the domestic industry to "realize at least modest price increases, reflective of increased demand and necessary to cover relatively high costs," subject import prices continued to decrease and reached nearly universal underselling by volume in 2024," which then harmed the industry's financial performance. *Id*. at 48. As such, the Commission's determined that subject imports suppressed prices, as the domestic industry would have raised prices but for the pricing pressure of subject imports, is reasonable and supported by substantial evidence. *Id*.

### C.   The Commission's Impact Determination Should Be Upheld

1.   The Commission reasonably found that [                                    ] were not an alternate cause of injury

Plaintiff argues that [                              ] by the two domestic producers breaks the causal link between injury and subject imports. Pl. Br. at 37-40. This argument is unsupported by the record and should be rejected.

First, Plaintiff's argument regarding [              ] is limited to 2023, completely ignoring interim 2024, when the financial performance of [

] during a time of near-universal underselling and increasing demand, a key aspect of the Commission's impact findings.[5] Commission Views at 53 ("As the prices for the significant volume of subject imports continued their decline into 2024 and increasingly undersold the domestic like product, the volume of subject imports underselling the domestic like product became near-universal, resulting in suppressed domestic producer prices and lost market share, which led to further deterioration in the domestic industry's financial

---

[5] While Plaintiff attempts to [                        ] for the domestic industry's declining performance in 2023, no respondent party contested the definition of the domestic industry as including all U.S. producers of ferrosilicon. Commission Views at 12.

performance"). In fact, Plaintiff does not argue that [                                    ] the

domestic industry's financial performance during the interim period at all, nor could they, as

[

                              ]. Final Staff Report at VI-6. Thus, regardless of Plaintiff's belief that

[                                    ] in 2023 should be treated as dispositive is misplaced, as it

asks the Court to ignore the state of the domestic industry at the end of the POI even if,

*arguendo*, [                     ] not related to subject imports were the cause of poor domestic

industry performance in 2023.

Second, Plaintiff's arguments are based on an assumption that all members of the

domestic industry must be identical and have identical experiences. Yet they rarely are, nor are

they required to be. For example, CC Metals is unionized, while Ferroglobe is not. Petitioners'

Posthearing Br. at A-16, C.R. 126, P.R. 184. Moreover, Ferroglobe is an integrated producer

with both quartz and coal mining operations in the United States. Commission Views at 36. As

such, the companies' individual financial results will differ, but such differences do not break the

causal link between subject imports and impact. In fact, while Plaintiff claims that [

                              ] were significant factors affecting the financial state of the [

                                              ], and not of

any metrics to support [

                     ]. Pl. Br. at 40 (citing Joint Respondents' Prehearing Br. at 42-52, C.R. 175, P.R. 117).

Despite these differences, the performance trends of [                     ] were similar,

42

including the substantial declines in financial performance from 2022 to 2023 and into interim 2024. *Id*. at 57-58.

Moreover, while Plaintiff contends that the Commission ignored [

], Plaintiff fails to recognize the Commission discussed Joint Respondents' argument that the "domestic industry's increasing COGS-to-net-sales ratio from 2021 to 2023 was

[          ] attributable to [          ], since [          ] COGS-to-net-sales ratio [          ]

during the period."  Commission Views at 48 n.213.  For the Commission, Joint Respondents'

argument failed as "both U.S. producers' COGS-to-net-sales ratios were higher in interim 2024

than in interim 2023, with [          ] COGS-to-net-sales ratio being [          ] higher in

interim 2024, at [     ] percent, than in interim 2023, at [     ] percent." *Id*.  Therefore, the

Commission considered Plaintiff's argument but found that the lower level of profitability

reported by [          ] throughout the POI could not explain the substantial declines in the

financial performance of the domestic industry at the end of the POI, as cumulated subject

imports intensified their underselling and pulled down prices.

Finally, as acknowledged by Plaintiff, the Commission addressed how record evidence

supported the finding that [                                        ] did not

cause any financial declines, as the purchases due affected by [

], were relatively small and would not

explain its financial decline.  Pl. Br. at 39-40; Commission Views at 58.

In sum, the record supports the Commission's rejection of Plaintiff's attribution

argument.

2.      The Commission's impact analysis correctly disregarded methodologically unsound calculations that ignored inventories

Similar to its arguments regarding volume and price effects, Plaintiff claims that the Commission erred in changing its methodology for the calculation of U.S. apparent consumption, which, therefore, meant that the Commission ignored "trends in apparent U.S. consumption and non-subject imports were the primary causes of the domestic industry's declining performance in interim 2024." Pl. Br. at 41.

First, as set out above, the Commission properly revised its methodology for calculating U.S. apparent consumption to account for the inventory overhang present during the POI and provide an accurate measure of consumption. As such, the Court should reject Plaintiff's continued invitations to put its hand on the scale with regard to this issue.

Second, as Plaintiff's arguments regarding demand and nonsubject imports are entirely based on consumption and market share calculations that fail to reflect actual consumption, they should also be rejected. Instead, the record evidence demonstrates that the Commission's finding that the significant volume of low-priced subject imports captured [      ] percentage points of market share from the domestic industry through underselling and price suppression in interim 2024 at a time when a [      ] percent increase in apparent U.S. consumption should have led to increased prices, sales, and financial performance. Commission Views at 53-55. Moreover, with regard to nonsubject imports, which were the smallest source of supply in the U.S. market, the Commission found that the domestic industry's loss of [      ] percentage points of market share to nonsubject imports in interim 2024 was disproportionate compared to the [      ] percentage point loss to subject imports. Commission Views at 56.

Third, while it was reasonable that the Commission rejected Plaintiff's arguments regarding nonsubject import market share, it is important to note that the Commission also

44

PUBLIC VERSION

rejected Plaintiff's arguments regarding nonsubject imports based on an analysis of AUVs finding that low volumes of high priced nonsubject imports did not explain the domestic industry's performance. *Id*. at 56. Plaintiff does not challenge the Commission's findings with regard to nonsubject import pricing here.

For the above reasons, the Court should find that the Commission reasonably determined that cumulated subject imports had a significant impact on the domestic industry, and that the Commission correctly and rationally disregarded the unsupported arguments of Plaintiff.

## V.   CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that this Court deny Plaintiff's motion for judgment on the agency record and sustain the Commission's affirmative final determination as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

Date: July 14, 2026

*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

*Counsel to Defendant-Intervenors CC Metals and Alloys, LLC And Ferroglobe, USA, Inc*

45

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 13,414 words and therefore complies with word count limitation in the Standard Chambers Procedures.

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to Defendant-Intervenors CC Metals and Alloys, LLC And Ferroglobe, USA, Inc*

<u>**CERTIFICATE OF SERVICE**</u>

***TNC KAZCHROME JSC v. UNITED STATES***

**Court No. 25-00129**

Pursuant to Rule 56.2 of the Rules of the Court of International Trade ("CIT"), and in accordance with the CIT's Administrative Order 25-1 of October 16, 2025, I, Adam H. Gordon, certify that I had copies of the Opposition to the Rule 56.2 Motions filed by Defendant-Intervenors CC Metals and Alloys, LLC and Ferroglobe USA, Inc., in the above titled matter served on the following parties via secure electronic delivery, on July 14, 2026:

**On Behalf of the United States:**
Garrett Peterson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E. Street, SW
Washington, DC  20436
 (202) 205-3241
garrett.peterson@usitc.gov

**On Behalf of Plaintiff TNC Kazchrome JSC**
Christine M. Streatfeild
Baker McKenzie, LLP
815 Connecticut Avenue, NW
Suite 900
Washington, DC 20006-4078
(202) 835-6111
christine.streatfeild@bakermckenzie.com

_____
Adam H. Gordon

Dated:  July 14, 2026