**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| TNC KAZCHROME JSC,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>UNITED STATES,<br><br>　　　　　　Defendant,<br><br>　　and<br><br>CC METALS AND ALLOYS, LLC AND<br>FERROGLOBE USA, INC.<br><br>　　　Defendant-Intervenors. | Court No. 25-00129<br><br>**PUBLIC VERSION**<br><br><br>**Business Proprietary Information Redacted in Brackets ("[ ]") on pages 2, 5-7, and 13** |

**PUBLIC REPLY BRIEF IN SUPPORT OF PLAINTIFF'S RULE 56.2**
<u>**MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Christine M. Streatfeild
Nathaniel J. Halvorson

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

Date: August 13, 2026

*Counsel to Plaintiff TNC Kazchrome JSC*

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................1

II.   ARGUMENT .....................................................................................................................2

    A.    Defendants Mischaracterize Kazchrome's Challenge to the
        Use of Shipment Data as a Mere Preference for Different Data........................................2

    B.    The Commission Failed to Address Contrary Evidence
        Undermining the Russian-Inventory Premise...................................................................7

    C.    Defendants Do Not – and Cannot – Reconcile the Revised
        Consumption Calculation with the Record as a Whole ....................................................9

    D.    The Commission's Volume and Price Determinations Were
        All Tainted By Its Failure to Consider the Data in the Context
        of the Entire Record and Industry Conditions ................................................................11

    E.    The Same Unexplained Methodology Undermines the
        Commission's Impact and Causation Findings ...............................................................13

III.  CONCLUSION.................................................................................................................14

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
  167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) .................................................. 4, 5, 6, 8

*Chemours Co. FC, LLC v. United States*,
  443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) ........................................................ 4, 6

*Hynix Semiconductor, Inc. v. United States*,
  431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade 2006) ........................................................... 13

*OCP S.A. v. United States*,
  Consol. Ct. No. 21-00219, Slip Op. No. 23-136 (Sept. 19, 2023) ........................................ 8

*United Steel, Paper and Forestry, Rubber Mfg. v. United States*,
  348 F. Supp. 3d 1328, 1333 (CIT 2018) ............................................................................. 8

**Statutes**

19 U.S.C. § 1677(7)(B) .......................................................................................................... 7

19 U.S.C. § 1677(7)(C)(iii) .................................................................................................... 7

**Administrative Materials**

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy,
  Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates,
  and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final),
  USITC Pub. 5560 (Nov. 2024) ......................................................................................... 12

*Ferrosilicon from Brazil, Kazakhstan, and Malaysia*
  Inv. Nos. 701–TA–712–714 and 731–TA–1679–1681 (Final) ............................................. 1

*Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*,
  Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125, at 15-16 (Sept. 2020)............. 12

**PUBLIC VERSION**

## I.    INTRODUCTION

Plaintiff TNC Kazchrome JSC ("Kazchrome") respectfully submits this reply to the response briefs filed in this case by defendant the United States ("Government") and defendant-intervenors CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively, "Defendant-Intervenors") regarding the affirmative injury finding by the U.S. International Trade Commission ("Commission") in antidumping and countervailing duty ("AD/CVD") investigations of *Ferrosilicon from Brazil, Kazakhstan, and Malaysia* (Inv. Nos. 701–TA–712–714 and 731–TA–1679–1681 (Final)).

The Government and Defendant-Intervenors attempt to recast this case as a routine dispute over the Commission's discretion to select among competing methodologies. *See* Gov. Br. at 2-4, 17-24; Def.-Ints. Br. at 2-4, 21-31. That is not Kazchrome's challenge. As an initial matter, the Commission's Final Staff Report suffered from fundamental flaws in its determinations regarding the significance of subject import volumes, alleged underselling (when in fact subject imports **oversold** and by significant margins), unsubstantiated price suppression, market share losses (when in fact there were gains by domestic producers), and significance of price effects. A central concern is the Commission's final acceptance of revised data following the hearing and then circular application of this data to essentially override all key data factors in a manner that resulted in an injury finding. Contrary to the Government and Defendant-Intervenors' claims, Kazchrome does not dispute that the Commission may use shipment data, inventory data, or other reasonable measures of apparent U.S. consumption where the record supports doing so and where accompanied by a fulsome analysis of the evidence that fairly undermines that data. But here, the Commission abandoned its prehearing apparent-consumption methodology, adopted one newly proposed post-hearing methodology, disregarded competing alternatives presented on the record, and never adequately explained why its

pivot on the data was reliable notwithstanding substantial contrary evidence. *Compare* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110, *with* Final Staff Report at Table C-1, C.R. 206, P.R. 145; *see also* Commission Russia Views at 39-40 n.189, C.R. 210. And all of this occurred after all traditional factors plainly confirmed no volume or price effects. This is not a challenge to the Commission's authority to use shipment data in any context. It is a specific challenge to the Commission's failure to explain why it changed its apparent-consumption methodology late in the proceeding based on information that long existed on the record [                                                    ], and then used that change to support consequent findings on volume, price, impact, and causation without addressing contrary evidence. *See* Gov. Br. at 2-4, 20-23; Def.-Ints. Br. at 2-4, 17, 21-24; Commission Russia Views at 39-40 n.189, 45, 47-48, 53-54, C.R. 210.

The unexplained methodological choice materially altered the Commission's findings on volume, market-share, price-suppression, impact, and causation, and as such, the affirmative injury determination cannot be sustained.

## II.    ARGUMENT

### A.    Defendants Mischaracterize Kazchrome's Challenge to the Use of Shipment Data as a Mere Preference for Different Data

In their response briefs, the Government and Defendant-Intervenors repeatedly attempt to support the Commission's findings by citing discretion to select reasonable methodologies and argue that Kazchrome merely prefers a different measure of apparent U.S. consumption. *See* Gov. Br. at 17-18, 22-24; Def.-Ints. Br. at 21-23. That framing not only misses the point but it actually captures precisely Defendant-Intervenors' strategy before the Commission in cherry-picking data to reverse obvious trends that were unfavorable for them going into the hearing. Further, Kazchrome's challenge is <u>not</u> that the Commission lacked authority to consider shipment data or to account for inventory movements. The challenge is first that the Commission's data did not support an injury

finding – under any reading but particularly as presented in the Staff Report in advance of the hearing. *See, e.g.,* Plaintiff's Opening Br. at 12-13 (demonstrating evidence and testimony presented at the Commission's hearing prior to data pivot by Defendant-Intervenors). The Government and Defendant-Intervenors ask the Court to look past this significant evidence of what the record data actually showed, but the Court cannot as it goes to the heart of Kazchrome's challenge to the Commission's findings. Moreover, the Commission adopted a new methodology after the hearing, rejected or ignored competing methodologies on the record, and failed to explain why its chosen approach was reliable despite contrary evidence undermining the Russian-inventory premise on which that approach depended. *See* Commission Russia Views at 39-40 n.189, C.R. 210; *see also* Gov. Br. at 20-23; Def.-Ints. Br. at 24-27. Surprisingly, the Government contends for the first time in its brief that the Commission revised the apparent consumption calculations to address the response received by one U.S. importer. That response was received on time and well in advance of the Staff Prehearing Report and hearing. It cannot be the cause of the post-hearing change. Each of these independently presents grounds for vacatur and remand.

The record did not present the Commission with a binary choice between official import statistics and shipment data. Rather, the Commission had before it several distinct approaches to apparent U.S. consumption. Staff's prehearing approach used U.S. producer shipment data and official import statistics for imports. *See* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110. Defendant-Intervenors then proposed a new post-hearing approach that combined shipment data for Russian-origin imports with official import statistics for other sources. *See* Petitioners' Post-Hearing Br. at 6-7, Ex. 2, C.R. 184, P.R. 126. Defendant-Intervenors also advanced a separate inventory-adjusted methodology. *See id.* at 8-9, Ex. 3. Joint Respondents, in turn, proposed an alternative

approach using importer shipment data adjusted for coverage concerns. *See* Joint Respondents' Post-Hearing Br. at 6-7, Ex. 1 APP-17-APP-20, C.R. 182, P.R. 128.

Those alternatives mattered because they generated materially different views of the U.S. market. Under the Commission's original calculations, apparent U.S. consumption declined in the latter portion of the period of investigation, subject imports lost market share, and the domestic industry gained share. *See* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110; Tr. at 105: 5-7 (Chair) ("{i}nventories for subject imports from Russia appeared to decline in the post-petition period, as illustrated in Table IV-7 of the pre-hearing Staff Report"). Under the newly adopted methodology, however, those trends changed in ways that became central to the Commission's findings on volume, price suppression, impact, and causation. *Compare id. with* Final Staff Report at Table C-1, C.R. 206, P.R. 145; *see also* Commission Russia Views at 39-40 n.189, 45, 47-48, 53-54, C.R. 210. When a methodological choice changes the factual predicate for the injury analysis so significantly – and particularly post-hearing where it appears as a self-serving change to the data trends – the Commission must do more than announce that one data set is more reliable. *See Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (agency must articulate a satisfactory explanation including a rational connection between the facts found and the choice made); *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) (agency must address significant arguments and evidence that seriously undermine its reasoning).

Yet Defendants identify no passage in the determination where the Commission compared these competing methodologies, explained why Defendant-Intervenors' selected approach was superior to its other proposal or Kazchrome/Joint Respondents' alternative, or addressed why the original methodology no longer provided a reliable measure of apparent U.S. consumption. *See* Commission Russia Views at 39-40 n.189, C.R. 210; *see also* Gov. Br. at 22-24; Def.-Ints. Br. at 24-

4

**PUBLIC VERSION**

27. Defendants' reliance on methodological discretion therefore does not address the core of Kazchrome's argument. Discretion permits the Commission to choose among reasonable alternatives; it does not permit the Commission to make a dispositive methodological choice without a reasoned explanation. *See Chemours*, 443 F. Supp. 3d at 1321.

That omission is especially significant because the methodology the Commission adopted depended on a specific factual premise: that shipments from inventories of Russian-origin ferrosilicon better reflected actual U.S. consumption than official import statistics. *See* Commission Russia Views at 39-40 n.189, C.R. 210; Gov. Br. at 18-20; Def.-Ints. Br. at 27-31. Defendants therefore cannot defend the Commission's approach simply by invoking methodological discretion in the abstract. They also cannot claim that the Commission met its legal obligation (because it did not) – namely, that the Commission reasonably explained why the Russian-inventory premise justified replacing its original calculations and why contrary evidence regarding the limited market effect of those inventories did not undermine the reliability of the selected approach. *See Altx*, 167 F. Supp. 2d at 1374. Absent this, the Commission's determination cannot lie.

Defendants' reliance on [                                            ] also does not answer the timing problem. *See* Gov. Br. at 2-4, 20-23; Def.-Ints. Br. at 2-4, 17, 21-24. The record does not show that the Commission discovered a new factual problem after issuance of the prehearing report that justified a wholesale revision to apparent U.S. consumption. [                                ] had already been submitted before the prehearing report; the prehearing report already discussed [                                            ]; Petitioners cited the inventory buildup in their prehearing brief; and the hearing discussion occurred against that existing record. *See* Gov. Br. at 10-11, 20-22; Def.-Ints. Br. at 13-15, 23-24; Prehearing Staff Report at IV-1 n.4 (explaining that "The coverage figure for imports from Russia is [

PUBLIC VERSION

]."), Table C-1, C.R. 173, P.R. 110; Petitioners' Prehearing Br. at 21 & n.84, C.R. 174, P.R. 111; Tr. at 139-41, P.R. 129. Thus, the relevant inventory phenomenon was not newly discovered after the prehearing report. The Commission was therefore required to explain why the prehearing methodology remained acceptable when that information was already before Staff, but became unacceptable in the final staff report. Defendants identify no such explanation.

The Commission's explanation therefore fails at the point that matters. Defendants principally argue that the final methodology was reasonable because U.S. shipments [

] better captured current market supply than official import statistics. *See* Gov. Br. at 18-20, 26-27; Def.-Ints. Br. at 27-31. But that defense does not identify any Commission explanation for the methodological change itself. The Commission did not explain why the prehearing methodology became unreliable when the same information [                    ] was already before Staff, why that information supported one apparent-consumption methodology in the prehearing report but a different methodology in the final report, or why [

] justified using shipment data only for Russia while continuing to rely on official import statistics for all other sources. *See* Commission Russia Views at 39-40 n.189, C.R. 210. At most, the Commission reconsidered how it wanted to treat evidence it already possessed; but without a reasoned explanation for that departure, the resulting apparent-consumption calculation cannot supply substantial evidence for the Commission's injury determination. *See Chemours*, 443 F. Supp. 3d at 1321; *Altx*, 167 F. Supp. 2d at 1374.

6

**B.      The Commission Failed to Address Contrary Evidence Undermining the Russian-Inventory Premise**

The Government's primary contention is that the post-hearing revised data related to the inclusion of an additional questionnaire response from a U.S. importer [            ]. *See, e.g.,* Gov. Br. at 2-4, 18-20. The Government characterizes this as an important change in data from the preliminary phase of the investigation until the final phase. *Id.*; *see also* Def.-Ints. Br. at 3-4, 27-31. Defendants' defense of the revised apparent-consumption methodology rests heavily on the assertion that inventories of Russian-origin ferrosilicon distorted official import statistics and that shipments from those inventories therefore better measured actual U.S. consumption. *See* Commission Russia Views at 39-40 n.189, C.R. 210. But that response merely repeats the Commission's premise; it does not cure the Commission's failure to address the record evidence undermining that premise. Plus, the Commission failed to consider contrary evidence that specifically addressed the Russian inventory shipments – and specifically the testimony regarding the unique situation surrounding the selling of this product in the United States given the geopolitical circumstances that intervened during the relevant periods. *See, e.g.*, Plaintiff's Op. Br. at 23-24 (citing specific declaration evidence); Joint Respondents' Post-Hearing Br. at 4-5, Ex. 1 APP-5-APP-10, C.R. 182, P.R. 128.

Kazchrome did not argue that no Russian-origin material was ever shipped from inventory. Defendant-Intervenors' contrary framing—that [

]—misses the point. *See* Def.-Ints. Br. at 27-28. The point is narrower and more important: the Commission assumed that movements from Russian inventory reflected ordinary market consumption and justified replacing its prior calculations, while failing to engage with evidence that purchasers were <u>reluctant to buy</u> Russian-origin material, that the inventory was <u>not</u> moving through the market in a manner comparable to other imports, and that the asserted <u>inventory effect</u> did not explain broader market conditions. *See* Joint Respondents' Post-Hearing Br. at 4-5,

Exs. 2-3, C.R. 182, P.R. 128; Final Staff Report at Table C-1, C.R. 206, P.R. 145. Acknowledging some inventory shipments does not answer whether those shipments supplied a reliable basis for rewriting apparent U.S. consumption. Indeed, it did not.

When the Commission analyzes the three statutory factors of volume, price, and impact pursuant to 19 U.S.C. § 1677(7)(B), it does not do so in a vacuum. It is required under 19 U.S.C. § 1677(7)(C)(iii) to "evaluate all relevant economic factors described in this clause within the context of the business cycles and conditions of competition that are distinctive to the affected industry." *Id.* It is undisputed that the "Commission's findings regarding competition and market conditions must be supported by substantial evidence in the record." *United Steel, Paper and Forestry, Rubber Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union v. United States*, 348 F. Supp. 3d 1328, 1333 (CIT 2018). As this Court found in *OCP S.A. v. United States*, Consol. Ct. No. 21-00219, Slip Op. No. 23-136, at 28 (Sept. 19, 2023), "{i}ndustry conditions must dwell in the realm of reality and not merely in the realm of possible. Industry conditions that are hypothetical, theoretical, or speculative are not part of the conditions of competition distinctive to the affected industry; and Commission findings that have been premised on such conjectures are legally deficient." *Id.*, citing 19 U.S.C. § 1677(7)(C)(iii) and *Altx, Inc. v. United States*, 26 CIT 709, 719 (2002). The Commission also must address significant evidence that seriously undermines its reasoning. *See Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

The Commission engaged in pure conjecture with respect to inventory, and that failure matters because the Commission's selected methodology depended on treating Russian inventory shipments differently from other imports and contrary to record evidence about how these Russian volumes impacted U.S. market trends. As Kazchrome set forth in its Opening Brief at 24-25, substantial qualitative and quantitative evidence on the record demonstrated that Russian inventories

of subject merchandise did not have a material impact on the U.S. ferrosilicon market in 2023 and 2024; yet, the Commission ignored this evidence in the Russia Views. *See* Joint Respondents' Post-Hearing Br. at 4-5, Exs. 2-3, C.R. 182, P.R. 128; Final Staff Report at Table C-1, C.R. 206, P.R. 145; Commission Russia Views at 39-40 n.189, C.R. 210. If the Commission intended to give those shipments dispositive weight, it was required to explain why the contrary evidence did not undermine the reliability of that approach. *See Altx*, 167 F. Supp. 2d at 1374. Instead, the Commission invoked inventory movement as a justification for the new methodology without confronting the evidence showing that the inventory issue was not a sufficient proxy for actual U.S. consumption. As demonstrated in Kazchrome's Opening Brief at 24-25, this change also distorted the apparent U.S. consumption calculation and failed to align with both industry stakeholder testimony and underlying data showing actual demand trends. In the face of significant contrary evidence that undermined a finding of an increase in apparent U.S. consumption between the interim periods, the Commission's findings could not stand. *See* Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148; *see also* Tr. at 28:6-7, 28:18-21, P.R. 129; Plaintiff's Op. Br at 25-26 (collecting sources of "demand weaknesses" in the United States, including from Defendant-Intervenor, Ferroglobe itself).

### C.     Defendants Do Not – and Cannot – Reconcile the Revised Consumption Calculation with the Record as a Whole

Defendants also contend that Kazchrome improperly conflates demand and apparent consumption. *See* Gov. Br. at 24-27; Def.-Ints. Br. at 29-31. This is simply not true, as a careful reading of Kazchrome's arguments both here and in the proceeding below make clear. Rather, that is a mere repetition of the Commission's faulty and illogical comment from the investigation (*see* Commission Russia Views at 40, fn. 189, C.R. 210). To be clear, the Commission concluded that "even if demand was lower in interim 2024, that would not foreclose the possibility of higher

9

apparent domestic consumption relative to interim 2023." *Id.* But this defies logic and conflicts with other important evidence. Crucially, using U.S. shipments data of past Russian imports in interim 2024 could not overstate purchasers' demand for Russian imports in that period. (Theoretically, relying on U.S. shipment data to calculate apparent U.S. consumption could understate total demand if purchasers satisfied their needs from previously built-up inventory but the Commission ignored this too.) As discussed, Kazchrome also presented extensive evidence that demand in fact declined (or at most, remained flat) in interim 2024, which is consistent with the apparent consumption trends and figures pre-hearing. *See* Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148; Tr. at 28:6-7, 28:18-21, P.R. 129; Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110. The legal error is that the Commission adopted a new apparent consumption calculation that generated a materially different picture of the U.S. market while failing to reconcile that result with substantial record evidence describing flat or declining market conditions. *Compare* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110, *with* Final Staff Report at Table C-1, C.R. 206, P.R. 145. Moreover, this calculation became the backbone of each material finding to prop up volume, price, and impact conclusions to support injury. *See* Commission Russia Views at 39-40 n.189, 45, 47-48, 53-54, C.R. 210. This interim period calculation is therefore fundamental and the legal and factual flaws surrounding it were amplified to reach the result here.

Contrary to the Government's claim, Kazchrome has not taken the position that the Commission was required to find that every demand indicator moved in lockstep with apparent consumption. *See* Gov. Br. at 24-27. But when producers, importers, purchasers, downstream indicators, and market participants all pointed to weak or flat market conditions and the Commission accepted an unwarranted revision of data after such a record is developed, the Commission was required to explain the discrepancy and set forth a defensible rationale for how it accounted for this

evidence. *See* Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148; Joint Respondents' Prehearing Br. at 42, C.R. 175, P.R. 117; Tr. at 28:6-7, 28:18-21, P.R. 129. Simply stating that demand and consumption are different concepts does not constitute reasoned analysis. *See Chemours*, 443 F. Supp. 3d at 1321; *Altx*, 167 F. Supp. 2d at 1374.

Defendants' response therefore confirms the analytical gap rather than closing it. They defend the Commission's methodology in isolation, but they do not identify any explanation by the Commission reconciling the revised consumption figures with the contrary market evidence. *See* Gov. Br. at 24-27; Def.-Ints. Br. at 29-31; Commission Russia Views at 39-40 n.189, C.R. 210. That omission is particularly problematic because the revised calculation supplied the foundation for the Commission's findings on volume, price effects, and impact. *See* Commission Russia Views at 39-40 n.189, 45, 47-48, 53-54, C.R. 210; Final Staff Report at Table C-1, C.R. 206, P.R. 145.

    **D.**    **The Commission's Volume and Price Determinations Were All Tainted By Its Failure to Consider the Data in the Context of the Entire Record and Industry Conditions**

Defendants suggest that any dispute over apparent U.S. consumption is immaterial because the Commission retained discretion to find subject import volume significant, including in absolute terms and relative to production. *See* Gov. Br. at 27-31; Def.-Ints. Br. at 31-35. But the legally insufficient approach did not merely affect a subsidiary calculation. It transformed the market-share narrative on which the Commission relied. *See* Commission Russia Views at 39-40, 53-54, C.R. 210.

Under the original calculations, subject imports lost share and the domestic industry gained share. *See* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110. Under the revised methodology, the Commission found market-share trends that supported its affirmative injury determination, including an asserted interim-period market-share shift from the domestic industry to subject

imports. *See* Final Staff Report at Table C-1, C.R. 206, P.R. 145; Commission Russia Views at 39, 53-54, C.R. 210.

The same problem affects price suppression. The Commission's suppression analysis depended on the premise that apparent U.S. consumption increased while domestic prices failed to rise commensurately. *See* Commission Russia Views at 47-48, C.R. 210. That premise exists only because the Commission adopted the revised methodology. *Compare* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110, *with* Final Staff Report at Table C-1, C.R. 206, P.R. 145. If the methodology was not adequately explained, then the price-suppression finding built on that methodology cannot stand. *See Chemours*, 443 F. Supp. 3d at 1321.

Nor do Defendants cure the Commission's separate failure to explain its underselling analysis. Defendants emphasize selected end-of-period comparisons, but they do not explain why the Commission could discount predominant overselling, the volume associated with overselling, and larger overselling margins without addressing the inconsistency between that treatment and prior Commission analyses. *See* Gov. Br. at 31-40; Def.-Ints. Br. at 35-41; Final Staff Report at V-33-V-35, C.R. 206, P.R. 145. In prior determinations, the Commission treated comparable predominant overselling evidence as weighing against significant underselling. *See Polyethylene Terephthalate Resin from Brazil, Indonesia, Korea, Pakistan, and Taiwan*, Inv. Nos. 731-TA-1387-1391 (Final) (Remand), USITC Pub. 5125, at 15-16 (Sept. 2020); *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560, at 61-65 (Nov. 2024). The Commission's methodological and pricing analyses therefore suffer from the same defect: significant contrary evidence was barely acknowledged, if at all, but not meaningfully addressed. *See Altx*, 167 F. Supp. 2d at 1374.

E.      **The Same Unexplained Methodology Undermines the Commission's Impact and Causation Findings**

The Commission's impact and causation findings likewise depend on the revised apparent-consumption and market-share calculations. *See* Commission Russia Views at 53-56, C.R. 210. Defendants argue that the Commission reasonably found injury because both domestic producers experienced adverse trends and because subject imports allegedly captured market share through underselling and price suppression. *See* Gov. Br. at 41-47; Def.-Ints. Br. at 41-45. But that response does not address Kazchrome's core point: the Commission was required to distinguish injury caused by subject imports from injury attributable to other record factors, including weak demand, non-subject imports, and [                                                                                                ]. *See Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1317 (Ct. Int'l Trade 2006) (Commission must analyze compelling arguments demonstrating the comparatively marginal role of subject imports); *Altx*, 167 F. Supp. 2d at 1374.

Once the Commission's revised consumption methodology is removed or adequately questioned, the causal narrative becomes materially different. The record no longer supports a straightforward account in which subject imports gained share in a strengthening market and suppressed domestic prices. *Compare* Prehearing Staff Report at Table C-1, C.R. 173, P.R. 110, *with* Final Staff Report at Table C-1, C.R. 206, P.R. 145. Instead, the evidence indicates declining or weak demand, subject-import trends that were at minimum disputed, and other factors contributing to the domestic industry's results. *See* Joint Respondents' Final Comments at 3-6, C.R. 209, P.R. 148; Joint Respondents' Prehearing Br. at 40-56, C.R. 175, P.R. 117; Tr. at 28:6-7, 28:18-21, P.R. 129. The Commission did not adequately grapple with those alternative explanations.

Defendants cannot cure that defect by urging the Court to defer to the Commission's weighing of the evidence. Deference applies to reasoned weighing of evidence; it does not permit the

**PUBLIC VERSION**

agency to rely on a dispositive methodology while failing to explain why contrary evidence and alternative causal factors do not undermine the determination. *See Chemours*, 443 F. Supp. 3d at 1321; *Altx*, 167 F. Supp. 2d at 1374; *Hynix*, 431 F. Supp. 2d at 1317. Because the Commission's impact and causation findings rest on the same inadequately explained methodological foundation, they too require remand.

### III.    CONCLUSION

For the reasons explained above and in Kazchrome's opening brief, the Court should reject Defendants' effort to characterize this case as a routine dispute over methodological discretion. The Commission's affirmative injury determination rests on an unexplained methodological change that materially altered the agency's analysis of apparent U.S. consumption, market share, volume, price suppression, impact, and causation. Because the Commission failed to provide a reasoned explanation for that choice and failed to address substantial contrary evidence, Kazchrome respectfully requests that the Court enter judgment on the agency record in its favor and remand the determination to the Commission for further consideration.

Dated: August 13, 2026                                    Respectfully submitted,

                                                          */s/ Christine M. Streatfeild*
                                                          Christine M. Streatfeild
                                                          Nathaniel J. Halvorson
                                                          **Baker & McKenzie LLP**
                                                          815 Connecticut Avenue, N.W.
                                                          Washington, DC 20006-4078
                                                          Tel.: (202) 835-6111
                                                          christine.streatfeild@bakermckenzie.com

                                                          *Counsel to Plaintiff TNC Kazchrome JSC*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Reply Brief in Support of Plaintiff TNC Kazchrome JSC's Rule 56.2 Motion for Judgment on the Agency Record, filed August 13, 2026, contains 4,211 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures.

Dated: August 13, 2026

Respectfully submitted,

*/s/ Christine M. Streatfeild*
Christine M. Streatfeild
Nathaniel J. Halvorson
**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

*Counsel to Plaintiff TNC Kazchrome JSC*